ACCEPTED
15-25-00116-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
6/30/2025 12:00 AM
CHRISTOPHER A. PRINE
CLERK

No. \_\_\_\_\_

Iɴ ᴛʜᴇ Fɪғᴛᴇᴇɴᴛʜ Cᴏᴜʀᴛ ᴏғ Aᴘᴘᴇᴀʟꜱ

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS

6/30/2025 9:04:00 AM
CHRISTOPHER A. PRINE
Clerk

KEN PAXTON, ᴇᴛ ᴀʟ.,
*Appellants,*

v.

DELIA GARZA, ᴇᴛ ᴀʟ.,
*Appellees.*

On Direct Appeal from the
419th Judicial District Court, Travis County, Texas
No. D-1-GN-25-003445, Consolidated With
No. D-1-GN-25-003531 & No. D-1-GN-25-003581

## APPELLEES' EMERGENCY MOTION FOR TEMPORARY RELIEF

TO THE HONORABLE FIFTEENTH COURT OF APPEALS:

Appellees file this emergency motion under Texas Rule of Appellate Procedure 29.3, and request this Court to stay enforcement of a new rule adopted by the Attorney General. *See* 1 Tᴇx. Aᴅᴍɪɴ. Cᴏᴅᴇ ch. 56 ("Challenged Rules").

The trial court temporarily enjoined these legally invalid Challenged Rules, which impose an unauthorized and onerous regulatory scheme on certain district and county attorneys and require regular reporting to the Attorney General, starting June 30. The Attorney General waited until **after 4 p.m. on Friday**—the last workday before the Rules' first reporting deadline—to appeal the order, which automatically supersedes the temporary injunction. Given that deadline, Appellees request relief *as soon as possible, and no later than June 30, 2025.*

## INTRODUCTION

State officials may not adopt rules without express authority granted by the Constitution or the Legislature. Yet that is what the Attorney General did here.

The Challenged Rules establish an unprecedented executive-branch regulatory regime over select large-county prosecutors. District and county attorneys are officers of the judicial branch, not the executive branch. The Challenged Rules mandate quarterly submission—beginning June 30, 2025—of voluminous, sensitive protected information (including healthcare information, grand jury records, and crime-victim statements) and criminal-prosecution information (such as disclosure of certain complete case files, all related correspondence, internal resignation communications, and detailed financial records). They further call for an "initial report" by July 1, 2025, mandating this same information going back **over four years.** There is still no available mechanism for submitting these reports as the Challenged Rules provide, but the rules also create an oversight committee with executive-branch staff, construing any violation as "official misconduct" serving as a basis for removal from office.

These sweeping rules were adopted without statutory or constitutional authority and so intrude into core prosecutorial functions and confidential matters protected by law. Appellees filed this suit for a declaration that the Challenged Rules are invalid, *see* TEX. GOV'T CODE § 2001.038, and to enjoin enforcement.

The sole statute that the Attorney General cites as the rulemaking authority,

Section 41.006 of the Texas Government Code, does not give the Attorney General *any* rulemaking authority. It does not state that the Attorney General "shall adopt" or even "may adopt" any rules. It only contemplates ad-hoc information gathering:

> At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state.

TEX. GOV'T CODE § 41.006.

The Challenged Rules would necessitate significant resources to implement, even requiring some Appellees to hire new staff or create a new department. And would deeply invade confidential and privileged materials, including prosecutorial work product, attorney–client communications, and sensitive information about minors, victims, and witnesses. Simply put, Appellees cannot comply with the rules' deadlines without diverting critical resources from their constitutional prosecutorial duties. These rules put much of Appellees' judicial-branch offices under control of the Attorney General, unconstitutionally interfering with their authority. Damages are no cure; the only remedy is to prevent such interference.

The Attorney General, by contrast, has never before requested such reporting and would suffer no prejudice from a stay—even if he ultimately prevails. Indeed, if the Attorney General wins the appeal, he would be entitled to obtain each of the reports required to be produced under the Challenged Rules.

To protect the parties' rights, the balance of equities favors temporary relief.

## BACKGROUND

The Challenged Rules (attached hereto as Appendix Tab C.1) provide for sweeping and regular reporting requirements upon district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more persons. In adopting the rule, the Office of the Attorney General ("OAG") claimed that the new regulation "is necessary to implement §41.006" of the Government Code. (App'x Tab C.1 at 50 Tex. Reg. 2173). But Section 41.006 does not authorize the OAG to make any rule. And the Challenged Rules require Appellees[1] to spend millions of dollars and divert staff from their core prosecutorial functions in order to comply with the Challenged Rules by identifying, reviewing, and maintaining massive amounts of data. (*See* App'x Tabs C.2–.19 (detailing the cost and difficulty faced by various Appellees in complying with the rules)).

Specifically, the Challenged Rules require covered district and county attorneys to submit highly burdensome initial, quarterly, and annual "reports." 1 TEX. ADMIN. CODE § 56.1. The first quarterly "report" is **due by June 30, 2025**.

---

[1] Appellees are the various plaintiffs in the underlying matter. Specifically, Appellees are Delia Garza, in her official capacity as Travis County Attorney; José P. Garza, in his official capacity as Travis County District Attorney; Travis County; James Montoya, in his official capacity as El Paso County District Attorney; Christina Sanchez, in her official capacity as El Paso County Attorney; El Paso County; John Creuzot, in his official capacity as Dallas County Criminal District Attorney; Dallas County; Joe Gonzales, in his official capacity as Bexar County Criminal District Attorney; Bexar County; Sean Teare, in his official capacity as Harris County District Attorney; Harris County; Brian M. Middleton, in his official capacity as District Attorney for the 268th Judicial District (Fort Bend County); and Shawn W. Dick, in his official capacity as District Attorney for the 26th Judicial District (Williamson County).

4

*Id.* § 56.5(a)(1) ("The quarterly report … is due within 30 days of the beginning of each new reporting quarter for reporting events that occurred in the prior reporting quarter."); *id.* § 56.5(a)(2)(C) (identifying "March through May" as a reporting quarter). Meanwhile, the large "initial report" is set to be due **the next business day**. *See id.* § 56.5(a)(4) ("The initial report under this section is due within 90 days of the effective date of this rule.").[2]

The Challenged Rules require Appellees to provide numerous categories of information and documents to the OAG including "case file[s]" for particular categories of cases, "all correspondence" on particular topics or with particular entities regarding decisions whether to indict an individual or category of offenses, and the number of times certain prosecution events occurred. *Id.* § 56.3; *see also id.* §§ 56.4, 56.9(c). The Challenged Rules contain no exception for statutorily protected information and explicitly include privileged work product and protected communications.

On March 8, 2024, the OAG proposed an initial rule, similar to the one at issue here. The initial proposed rule received numerous public comments about the rule—mostly in opposition. The OAG withdrew the initial proposed rule on

---

[2]  The parties agreed that July 1, 2025 was the due date before the trial court's injunction was entered. (App'x Tab C). However, Appellees do not concede that this is still necessarily the case, given the temporary injunction (even if superseded). The injunction—which was in force for over a week before the Attorney General's notice of appeal—complicates how to determine "within 90 days of the effective date."

September 13, 2024, the same day it proposed a new rule. The new proposed rule also received numerous written comments in opposition. Many of those comments came from Appellees, detailing the extraordinary burden and cost associated with complying with the new proposed rule and raising concerns regarding conflicting statutory and ethical obligations requiring the safeguarding of sensitive and confidential information. (*See* App'x Tabs C.2–.10.)

In adopting the Challenged Rules, the OAG dismissed the public comments by moving forward without substantive modifications and without engaging with commenters' concerns about the rule's legality, cost, or feasibility. (*See* App'x Tab C.1 at 50 Tex. Reg. 2175–80).

Faced with this new burden after the Challenged Rules went into effect, Appellees—a bipartisan coalition of district and county attorneys from seven counties—soon after filed a suit seeking injunctive relief and declaratory relief that the Challenged Rules are invalid and/or *ultra vires* under several legal theories, including Texas Government Code Section 2001.038 and the Texas Constitution's separation-of-powers provision. The trial court consolidated the separate lawsuits and set a hearing on Appellees' applications for a temporary injunction on June 16, 2025.

After an evidentiary hearing, the district court orally granted the temporary injunction. On June 20, 2025, the trial court entered a written injunction order. (App'x Tab A). The trial court found that Appellees state a valid cause of action

6

against Appellants, that they have a probable right to the declaratory and permanent injunctive relief, and that they will suffer probable, imminent, and irreparable injury absent the temporary injunction. (*Id.* at 2). The trial court also found that Appellees are likely to prevail on their claims that (1) "Texas Government Code Section 41.006 does not confer any administrative rulemaking authority on the OAG and the Challenged Rules are therefore invalid and Defendants' promulgation and enforcement is an ultra vires act"; (2) "the Challenged Rules impermissibly impose burdens and conditions not authorized by the statute"; (3) "the Challenged Rules are not in substantial compliance with the reasoned justification requirement of Section 2001.033 of the Administrative Procedure Act"; and (4) "the Challenged Rules violate the Separation of Powers Clause of the Constitution because they permit the Executive Branch (the OAG) to interfere with Judicial Branch officers' performance of their prosecutorial duties." (*Id.* at 2–3). The trial court further found imminent and irreparable harm through (a) the significant expenses and resources to provide the first reports, diverting resources from prosecution of crimes, and (b) the Rule's requiring disclosure of confidential information, which causes irreparable harm both on its own by discouraging other people from reporting crimes and participating in prosecution, thereby decreasing Appellees' "ability to perform their constitutionally assigned duties and protect their communities from criminal activity." (*Id.* at 3).

More than ten days after the temporary injunction hearing and oral order,

Attorney General Ken Paxton and the OAG filed this interlocutory notice of appeal—**after 4 p.m. on Friday**, June 27, 2025, the last business day before the Challenged Rules' first reporting deadline. Special statutes and rules provide that the notice of appeal supersedes the temporary injunction by operation of law. *See* TEX. R. APP. P. 29.1(b); TEX. CIV. PRAC. & REM. CODE § 6.001(b). Appellees therefore seek emergency relief by this motion to preserve their rights and the status quo pending appeal.[3]

### ARGUMENT

Texas Rule of Appellate Procedure 29.3 allows an appellate court to "make any temporary orders necessary to preserve the parties' rights until disposition of the appeal." TEX. R. APP. P. 29.3. This rule "gives an appellate court great flexibility in preserving the status quo based on the unique facts and circumstances presented." *In re Geomet Recycling LLC*, 578 S.W.3d 82, 89 (Tex. 2019). In exercising its flexibility, the appellate court should consider an "equitable balancing" of the injury or harms that would befall the parties depending on the court's decision, along with the likelihood of success. *See In re State*, 711 S.W.3d 641, 645 (Tex. 2024).

The balance of equities especially favors the status quo in a lawsuit between

---

[3]   It is black-letter law that the notice of appeal automatically supersedes the judgment as to the County Appellees. However, Appellees are unaware of a case that has addressed this issue between two state officers.

8

two governmental entities regarding their proper authorities when one unlawfully interferes with the exercise of another's exclusive constitutional authority. A temporary order enjoining an arguably invalid or illegal state action against another governmental entity is therefore appropriate, where, as here, the new state action or actor's interference would change another governmental unit's "manner of governance" from its "last, actual, peaceable non-contested status" before the lawsuit. *In re Tex. Educ. Agency*, 619 S.W.3d 679, 683–84 (Tex. 2021); *see also In re Abbott*, No. 21-0720 (Tex. Aug. 26, 2021) (order) (granting temporary relief to preserve the status quo in a case between government entities that asked the Court "to determine which government officials have the legal authority to decide what the government's position on [important] questions will be"); *In re State*, No. 20–0715 (Tex. Sept. 15, 2020) (order) (granting temporary relief to prevent sending mail-in ballot applications prior to the court of appeals even acting); *Transport Co. of Tex. v. Robertson Transports, Inc.*, 261 S.W.2d 549, 553-54 (Tex. 1953) (reinstating trial court's temporary injunction because the "status quo in this case was the status of the controversy as it existed prior to the entry of the Commission's order" being challenged as invalid).

Additionally, although there generally must be *some* likelihood of success on the merits for a movant to obtain temporary relief, success need not be certain. Indeed, harm combined with a mere likelihood of success justifies temporary relief regardless of the ultimate correctness of the movant's claims. *Cf. In re Tex. Educ.*

9

*Agency*, 619 S.W.3d at 683–84 (justifying temporary relief despite the government's automatic supersedeas and despite subsequent merits decisions)[4]; *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990) ("An injunction plaintiff need not establish the correctness of his claim to obtain temporary relief, but must show only a likelihood of success on the merits."). That said, if a party is "*very* likely to succeed on the merits," it would patently "be unjust to require" that movant "to wait for the lengthy appellate process to play out before exercising his legal rights." *In re State*, 711 S.W.3d at 645.

Here, Appellees face imminent and irreparable injuries and harm if required to comply with the Challenged Rules. At the same time, the OAG faces virtually no harm by waiting for an appellate decision. The harm balancing is further weighted by the fact that the Challenged Rules are invalid for numerous reasons, too. Thus, a stay of enforcement of the Challenged Rules is the only means to preserve the parties' rights and the status quo.

## I. The balance of harms means that a stay of enforcement of the Challenged Rules is the only way to preserve the parties' rights.

Compliance with the Challenged Rules costs significant money and diverts staff away from their prosecutorial responsibilities, and it also infringes upon the county and district attorneys' constitutional rights and responsibilities. These

---

[4] Of course, the *Texas Education Agency* cases did not even consider a claim that one party was violating the other party's separation-of-powers right, which is a more weighty and constitutional harm justifying temporary relief.

harms are irreparable, and so this Court's temporary relief is required for Appellees' rights to be preserved.

The offices of district attorney and county attorney are constitutionally created entities that exist as part of the judicial branch. *See* TEX. CONST. art. V, § 21. Their primary function is "to prosecute the pleas of the state in criminal cases." *State v. Stephens*, 663 S.W.3d 45, 50 (Tex. Crim. App. 2021) (quoting *Meshell v. State*, 739 S.W.2d 246, 254 (Tex. Crim. App. 1987)). And as part of the judicial branch, they thus have the exclusive constitutional right that "no person, or collection of persons" from another branch of the state—including the Attorney General—"shall exercise any power" that violates the separation of powers between one branch and another. TEX. CONST. art. II, § 1. This is not a mere technicality, either; the Challenged Rules divert Appellees' resources from their decisions whether to prosecute various crimes and their ability to do so. (*See, e.g.*, App'x Tabs C.11 at ¶ 13; C.17 at 2) (explaining how prosecutor-attorney time is required for compliance). The Rules also deprive Appellees of the ability to protect confidential information in their judicial roles while requiring that the confidential information be given to an executive entity without the protections afforded under existing statutes, especially for individuals reporting crimes and participating in prosecutions. (*See, e.g.*, App'x Tabs C.2 at 4–7; C.11 at ¶ 19; C.19 at ¶ 8). In these ways, the Challenged Rules change the judicial-branch prosecutors' "manner of governance," such that a stay from this Court is necessary to protect the

constitutional rights of the parties to the separation of powers and the status quo—the "last, actual, peaceable non-contested status" before the lawsuit. *In re Tex. Educ. Agency*, 619 S.W.3d at 683–84 (Tex. 2021).

To comply with the Challenged Rules, Appellees would incur significant economic costs and divert staff away from their core, constitutional prosecutorial duties. For example, Joshua Reiss—the General Counsel of the Harris County District Attorney's Office—attested that ten full time employees in roles that do not currently exist would be required to comply with the Challenged Rules. (App'x Tab C.17 at 2). And compliance by the current June 30 and July 1 deadlines would be "impossible," because the District Attorney's office currently lacks possession and control of some of the data required to be reported by the Rules and because the numerous hours of attorney review of the office's data that will be necessary to meet the rule's specifications cannot happen before those deadlines. (*Id.* at 3–8). Over a 5-year period, the Harris County District Attorney's Office would be required to spend millions of dollars on a new unit to comply with the Challenged Rules. (*See generally id.*). Appellees herein further assert that in attempting to comply with the Rules, all Appellees' offices would be unduly burdened in a manner similar to that described by Harris County, as attempted compliance with the Rules would necessitate the expenditure of substantial additional funds to hire additional employees and/or purchase adequate technology. Similarly, all Appellees would be irreparably harmed by the diversion of resources away from their core

constitutional duty to prosecute criminal matters, with said resources being redirected to attempt compliance with the Rules. These factual assertions are supported by the live testimony from the temporary-injunction hearing as well as by declarations stipulated to as part of the temporary-injunction hearing, which are attached hereto as Appendix Tabs C.2–.19.[5]

On the other hand, Attorney General Paxton and the OAG will suffer no harm by waiting for the appeal to proceed. If the Court holds that Appellees are not entitled to an injunction, then the OAG will be able to proceed with collecting the information sought by the Challenged Rules, pending ultimate resolution of the merits of Appellees' actions. Indeed, if the OAG's interpretation of the governing statute (Texas Government Code Section 41.006) and the relevant constitutional provisions is ultimately determined to be correct, then the Attorney General would be entitled to the reports that they would have received during the pendency of any stay and injunction. There is no reason the Attorney General and OAG cannot wait on the resolution of this appeal.[6]

The balance of harms here is entirely one-sided, weighing very heavily in support of a stay. The rights of Attorney General Ken Paxton and the OAG are in

---

[5] The transcript of the hearing is not yet available but will necessarily be part of the Reporter's Record.

[6] And the statute on which he relies—Texas Government Code Section 41.006—has been around in some form for over a century before any Attorney General sought to proposed any type of administrative rules like these.

no way hampered by a stay of the new Challenged Rules. But the rights of Appellees—from the right to govern themselves, to the right towards a proper stewardship of millions of dollars of taxpayer money, to the right to separation of powers, and to their right and obligation to preserve and protect their communities from crime—are all endangered by the imminent deadlines in this case. Significantly, the rights of the residents who are the victims of crimes would be harmed by the forced disclosure of their most private and legally protected information. To preserve the status quo and protect the parties' rights—where a data-reporting scheme like the one in the Challenged Rules has never existed in the long history of Texas Government Code Section 41.006 or our Constitution—this Court must grant relief.

## II. Appellees are likely to succeed on the merits because the Challenged Rules are invalid and an ultra vires act.

The Texas Supreme Court has recently cautioned that "an appellate court can hardly endeavor to preserve the parties' rights pending appeal without making a preliminary inquiry into what those rights are." *In re State*, 711 S.W.3d at 645. And although the inquiry is only preliminary, the merits here certainly justify a stay. The trial court already concluded that Appellees are likely to succeed on the merits in establishing that the Attorney General and OAG lack a relevant statutory right and the Challenged Rules violate the prosecuting attorney's constitutional rights. (App'x Tab A). At this stage, before full briefing on the merits, Appellees'

likelihood of success is apparent for several overarching reasons:

*No Authority to Promulgate the Challenged Rules.* An agency "can adopt only such rules as are authorized by and consistent with its statutory authority." *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). The Attorney General and OAG have no such authority here. In adopting the rule, they rely exclusively on Section 41.006. But that statute does *not* provide *any* rulemaking authority. It does not state that the attorney general may or shall adopt "rules." Rather, the statute explains when the district and county attorneys have a duty to "report to the attorney general." TEX. GOV'T CODE § 41.006. Certainly, there is no delegation of data-reporting *rulemaking* authority there, as there clearly is in other, unrelated statutes. *See, e.g.*, TEX. GOV'T CODE §§ 402.0212(f) ("The attorney general may adopt rules"); 402.035(f-3) (same); 402.0351(b) ("The attorney general by rule shall prescribe"); 402.036(e) (same). The Legislature knows precisely how to authorize the attorney general to adopt a rule when it intends to confer rule-making authority, but the Legislature did not do so—either when enacting the current version of Section 41.006 or any prior version. *Cf. Camerson v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981) ("[W]e believe every word excluded from a statute must also be presumed to have been excluded for a purpose.").

The legislative history of Section 41.006 further confirms that the attorney general does not have the authority to adopt the Challenged Rules. In a prior form, the statute was paired with a *separate* grant of authority to the Attorney General to

15

request certain specified and much more limited information from county attorneys and district attorneys for the purpose of preparing a report to the Governor. (*See* App'x Tab D (1879 Code of Criminal Procedure) at arts. 29–30, 40.). That separate grant of authority no longer exists, but it still shows the point: the Legislature did not enact Section 41.006 to grant the Attorney General any independent authority. Likewise, the legislative history of the current version of Section 41.006 reflects that the Legislature did not intend to grant any rulemaking authority to any state agency, contrary to Appellants' arguments that Section 41.006 provides implied authority to do so. *See* Senate Comm. on Jurisprudence, Bill Analysis, Tex. S.B. 1228, 69th Leg., R.S. (1985); *accord* House Comm. on Judicial Affairs, Bill Analysis, Tex. H.B. 2676, 78th Leg., R.S. (2003).

*Exceeding the scope of Section 41.006.* Even if Section 41006 is construed to confer rule-making authority (and it should not be), the regulation is still invalid because it "imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Tex. St. Bd. of Examiners of Marriage & Family Therapists v. Tex. Med. Assoc.*, 511 S.W.3d 28, 33 (Tex. 2017). Section 41.006, titled "Report to Attorney General," merely contemplates that county and district attorneys "report … information" the attorney general "desires." TEX. GOV'T CODE § 41.006. By contrast, the Challenged Rules demand case files, correspondence, confidential and privileged material protected by law from disclosure, internal legal analyses and other core attorney work product,

internal employee communications, internal policies, and use of funds. The Challenged Rules impose a population bracket, even though Section 41.006 has no population bracket. They impose document retention obligations. They even create an Oversight Advisory Committee that can demand any case file it wants. (*See* App'x Tab D (1879 Code of Criminal Procedure) at art. 30.). And the Challenged Rules seek to restrict county attorneys and district attorneys in their work, too— by purporting to define "official misconduct" under the Texas Government Code Section 87.011, the removal provision, and authorizing the OAG to file a petition for quo warranto seeking forfeiture of the prosecutor's office—all in a way wholly independent of any legislative mandates about mere reporting. Section 41.006 simply does not authorize the attorney general or the OAG to obtain or do any of these things. The Challenged Rules are thus also invalid because they impose additional burdens, conditions, and restrictions on county attorneys and district attorneys beyond what Section 41.006 permits.

*An unconstitutional violation of the separation of powers.* The Texas Constitution enshrines a clear separation of powers. After expressly dividing the powers into three branches, the Texas Constitution states: "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." TEX. CONST. art. II, § 1. A constitutional violation occurs when one branch attempts to usurp or interfere with the core function of another. *See In re Turner*,

17

627 S.W.3d 654, 660 (Tex. 2021). The separation of powers can be violated in two ways. "'First, it is violated when one branch of government assumes, or is delegated, to whatever degree, a power that is more 'properly attached' to another branch.'" *Martinez v. State*, 503 S.W.3d 728, 733 (Tex. App.—El Paso 2016, pet. ref'd) (quoting *Armadillo Bail Bonds v. State*, 802 S.W.3d 237, 239 (Tex. Crim. App. 1990) (superseded by statute on other grounds)). The second occurs "when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers." *Id.* (quoting *Martinez v. State*, 323 S.W.3d 493, 501 (Tex. Crim. App. 2010)).

The Attorney General and his office are constitutionally part of the executive branch of the government, whereas the district and the county attorneys are part of the judicial branch. *Compare* TEX. CONST., art. V, § 21, *with* TEX. CONST., art. IV, § 22. The Challenged Rules improperly intrude on the judicial branch's prosecutorial duties and, at minimum, unduly interfere with the judicial branch by imposing OAG oversight, review, and potential discipline over district attorneys and county attorneys, who function exclusively within the judicial branch of the Texas Constitution.

And the OAG unlawfully interferes with district attorneys and county attorneys' prosecutorial functions and responsibilities by requiring them to produce burdensome regular reports. *See Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 502, 506 (Tex. 2024) (explaining when one branch attempts to

18

impinge on another's exercise of its core powers, it is less the degree of interference but the fact of threatened interference at all that raises a separation-of-powers problem). "Exceptions to the constitutionally mandated separation of powers are never to be implied in the least; they must be 'expressly permitted' by the Constitution itself." *Fin Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 570 (Tex. 2013) (quoting TEX. CONST., art. II, § 1). But without any express constitutional exception, the Challenged Rules here unconstitutionally intrude on that separation of powers. That, too, makes the Challenged Rules invalid.

*No proper procedure.* "When an agency promulgates a rule without complying with the proper rule-making procedures, the rule is invalid." *El Paso Hosp. Dist. v. Tex. Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008). The rule must show the agency's "reasoned justification" in a "clear and logical fashion" justifying a "legitimate objective." TEX. GOV'T CODE §§ 2001.033, .035. That reasoned justification must also include "a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption" before showing why the agency agrees or disagrees with those comments. TEX. GOV'T CODE § 2001.033. Here, the Challenged Rules violate the "reasoned justification" provision of the Administrative Procedure Act (APA) in multiple ways. (*See* App'x Tab C.1). For example, the Challenged Rules do not show the names of those individuals or groups that offered comments on the

19

Challenged Rules and whether they were for or against the rules. The preamble states that the Challenged Rules are intended to "ensure that county and district attorneys are *consistently* complying with statutory duties." 50 Tex. Reg. 2173 (emphasis added). But by limiting the Challenged Rules to only 13 of the 254 counties in Texas, the Challenged Rules do not and could not show whether there is "consistent" compliance with statutory duties by district and county attorneys. The Challenged Rules do not even provide a reasoned justification for imposing burdensome recordkeeping, document-review, and reporting requirements on these district attorneys and county attorneys, and it did not justify any need for the transfer of highly confidential information protected from disclosure under federal and state law. (*Compare* App'x Tab C.1, *with* App'x Tabs C.2–.10.).

The APA also requires the OAG to conduct a comprehensive cost–benefit analysis, with a detailed statement of the public benefits and economic costs for five years of implementation. *See* TEX. GOV'T CODE § 2001.024. But the OAG did not conduct a meaningful analysis; the preamble merely provides vague, conclusory statements about "minimal" costs and benefits, unsupported by data and devoid of any reasoned evaluation. (*See* App'x Tab C.1). And, remarkably, the preamble ignores altogether the costs of producing the "initial report" that requires production of twelve categories of materials going back to 2021; the preamble states only that there may be "minimal costs" for gathering and submitting "quarterly and annual reports to OAG." 50 Tex. Reg. 2174. The OAG did not even

20

proffer evidence to support these minimal cost conclusions at the temporary injunction hearing. In sum, the OAG's failure to comply with the procedural requirements of the APA also invalidates the Challenged Rules.

<p style="text-align:center">✼ ✼ ✼ ✼</p>

There are multiple reasons why the Challenged Rules are invalid. Appellees need only prevail on one to succeed on the final merits. The trial court properly enjoined application and enforcement of the Challenged Rules pending a trial on the merits. With a balance of harms also weighing heavily in favor of staying enforcement of the Challenged Rules, and with numerous analyses showing that the rules were properly enjoined on the merits by the district court, this Court should protect the rights of the parties and maintain the status quo by issuing a stay.

## III. At minimum, this Court should enter an administrative stay while considering this motion.

While considering this motion for temporary relief for the full pendency of the appeal, this Court should at least grant an administrative stay of the Challenged Rules while considering this motion. Administrative stays appropriately "freeze legal proceedings until the court can rule on a party's request for expedited relief" and "do not typically reflect the court's consideration of the merits of the stay application." *In re State*, 711 S.W.3d at 643 n.2. Such administrative orders are appropriate and have been used by the Supreme Court of Texas. *See, e.g. In re*

*Automotive Promotion Consultants, LLC*, No. 25-0428 (Tex. May 23, 2025) (order) (granting administrative stay pending motion for temporary relief); *In re Terry Lynn Jones*, No. 23-1013 (Tex. Dec. 13, 2023) (same). At minimum, therefore, this Court should do the same.

## PRAYER

Appellees pray that this Court grant its motion and, during the pendency of this appeal, enter an order staying any enforcement of Chapter 56 in Title 1 of the Texas Administrative Code against Appellees. Appellees alternatively request this Court grant an order administratively staying any enforcement of Chapter 56 in Title 1 of the Texas Administrative Code against Appellees while it considers the instant motion. Appellees request some relief from this Court—at least an administrative stay—*as soon as possible and no later than June 30, 2025.* Appellees further request any other relief to which they are entitled.

Respectfully submitted,

[Signatures Beginning on Next Page]

22

/s/ Leslie W. Dippel
Leslie W. Dippel
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
Todd A. Clark
State Bar No. 04298850
Todd.Clark@traviscountytx.gov
Cynthia W. Veidt
State Bar No. 24028092
Cynthia.Veidt@traviscountytx.gov
Travis County Attorneys
**DELIA GARZA**
**TRAVIS COUNTY ATTORNEY**
P.O. Box 1748
Austin, TX 78767
Tel.: (512) 854-9513
Fax: (512) 854-4808

*Counsel for Appellees Delia Garza, in her Official Capacity as Travis County Attorney, José P. Garza, in his Official Capacity as Travis County District Attorney, and Travis County*

/s/ Justin C. Pfeiffer
Justin C. Pfeiffer
State Bar No. 24091473
jpfeiffer@gavrilovlaw.com
Gavrilov & Brooks, PC
P.O. Box 56632
Houston, TX 77256
Tel.: (832) 312-7900

*Attorney for Appellee Brian M. Middleton, in his Official Capacity as Fort Bend County District Attorney (268th Judicial District)*

/s/ Bradley W. Snead
Jonathan G.C. Fombonne
Deputy County Attorney & First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
Tiffany S. Bingham
Managing Counsel
Affirmative & Special Litigation Division
State Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
Christopher Garza
Deputy Division Director
Affirmative & Special Litigation Division
State Bar No. 24078543
Christopher.Garza@harriscountytx.gov
Office of the Harris County Attorney
**CHRISTIAN D. MENEFEE**
**HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, TX 77002
Tel.: (713) 274-5101
Fax: (713) 755-8924

Bradley W. Snead
State Bar No. 24032706
snead@wrightclosebarger.com
Michael Adams-Hurta
State Bar No. 24097860
hurta@wrightclosebarger.com
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Tel.: (713) 572-4321
Fax: (713) 572-4320

*Counsel for Appellees District Attorney Sean Teare and Harris County*

/s/ Bernardo Cruz
Christina Sanchez
El Paso County Attorney
State Bar No. 24062984
Ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz
Assistant County Attorney
State Bar No. 24109774
b.cruz@epcountytx.gov
**CHRISTNA SANCHEZ**
**EL PASO COUNTY ATTORNEY**
320 S. Campbell St., Suite 200
El Paso, TX 79901
Tel.: (915) 273-3247

*Counsel for Appellees El Paso County District Attorney James Montoya, El Paso County Attorney Christina Sanchez, and El Paso County*

/s/Michael Satin
Alexandria Oberman
State Bar No. 24131555
aoberman@milchev.com
Michael J. Statin
(*pro hac vice* application forthcoming)
msatin@milchev.com
Laura G. Ferguson
(*pro hac vice* application forthcoming)
lferguson@milchev.com
**MILLER & CHEVALIER CHARTERED**
900 16th Street, NW
Washington, DC 20006
Tel.: (202) 626-5800
Fax: (202) 626-5801

*Counsel for Appellees Criminal District Attorney John Creuzot, Dallas County; Criminal District Attorney Joe Gonzales; and Bexar County*

/s/Randy T. Leavitt
C. Robert Heath
State Bar No. 09347500
bheath@bickerstaff.com
**BICKERSTAFF HEATH DELGADO ACOSTA**
1601 S. Mopac Expy., Suite 400
Austin, TX 78746
Tel.: (512) 404-7821

Randy T. Leavitt
State Bar No. 12098300
randy@randyleavitt.com
**LAW OFFICE OF RANDY T. LEAVITT**
1301 Rio Grande St.
Austin, TX 78701
Tel.: (512) 476-4475

*Attorneys for Appellee Shawn M. Dick in his Official Capacity as Williamson County District Attorney (26th Judicial District)*

## VERIFICATION

STATE OF TEXAS    §
            §
COUNTY OF TRAVIS   §

I, Leslie W. Dippel, declare as follows:

1. &ldquo;My name is Leslie W. Dippel. I am over eighteen (18) years of age and am fully competent to make this affidavit. The facts stated in this affidavit are true and correct and are based upon my personal knowledge.

2. &ldquo;I am licensed to practice law in the state of Texas and am one of the counsel in this matter for Appellees.

3. &ldquo;The documents attached to this motion are true and correct copies of pleadings and exhibits filed by the parties or presented to the Court at the temporary injunction hearing on June 16, 2025.

4. &ldquo;I have personally reviewed this motion and have concluded that the factual statements contained in the petition are true and correct and are supported by pleadings in this case and/or proceedings and events that I witnessed as an attorney in this case and as someone who was present at the temporary injunction hearing on June 16, 2025.

&ldquo;My name is Leslie W. Dippel, my date of birth is April 30, 1970, and my address is P.O. Box 1748, Austin, TX 78767. I declare under penalty of perjury that the foregoing is true and correct.&rdquo;

Executed in Travis County, Texas, on the 29th day of June, 2025.

*/s/ Leslie W. Dippel*

**CERTIFICATE OF CONFERENCE**

I certify that on June 27, 2025, counsel for Appellees conferred with counsel for Appellants, and counsel for Appellants stated that Appellants are opposed to the relief sought in this motion.

/s/ *Michael Adams-Hurta*
Michael Adams-Hurta

## CERTIFICATE OF SERVICE

I certify that on June 29, 2025, this document was filed electronically via the Court's electronic filing system, causing electronic service upon all counsel of record, including the following:

William H. Farrell
Assistant Attorney General
Biff.farrell@oag.texas.gov
General Litigation Division
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, TX 78711

*Counsel for Appellants*

*/s/ Michael Adams-Hurta*
Michael Adams-Hurta

## APPENDIX

Tab A:    Written Order Granting Plaintiffs' Applications for Temporary Injunction, signed June 20, 2025

Tab B:    Defendants' Notice of Appeal, filed June 27, 2025

Tab C:    Joint Stipulation of Undisputed Facts and Admissibility of Exhibits, filed June 15, 2025 in connection with the Temporary Injunction Hearing

Tab C.1:  The Challenged Rules (1 TEX. ADMIN. CODE ch. 56), adopted March 13, 2025. (Temporary Injunction Hearing Exhibit P-1).

Tab C.2:  Dallas County Criminal District Attorney John Creuzot's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-4).

Tab C.3:  Bexar County Criminal District Attorney Joe Gonzales' Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-5).

Tab C.4:  Dallas County Assistant County Administrator Charles Reed's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-6).

Tab C.5:  Harris County Attorney Christian D. Menefee's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-7).

Tab C.6:  Travis County Attorney Delia Garza's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-8).

Tab C.7:  Travis County District Attorney José Garza's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-9).

Tab C.8:  Travis County's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-10).

Tab C.9:  El Paso County Attorney Christina Sanchez' Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-11).

Tab C.10: Williamson County District Attorney Shawn Dick's Comments on the Revised Proposed Rules. (Temporary Injunction Hearing Exhibit P-12).

Tab C.11: Declaration of Danny W. Smith, Jr., Assistant Director of the Family Violence Division, Office of the Travis County Attorney. (Temporary Injunction Hearing Exhibit P-14).

Tab C.12: Declaration of Holly Taylor, Director of the Public Integrity and Complex Crimes Division of the Travis County District Attorney's Office. (Temporary Injunction Hearing Exhibit P-15).

Tab C.13: Declaration of Alma Trejo, Senior Division Chief of the Criminal Unit, Office of the El Paso County District Attorney. (Temporary Injunction Hearing Exhibit P-16).

Tab C.14: Declaration of Amy Lechuga, Chief of Staff to El Paso County District Attorney James Montoya. (Temporary Injunction Hearing Exhibit P-17).

Tab C.15: Declaration of Marsha Edwards, Director of Special programs, Dallas County Criminal District Attorney's Office. (Temporary Injunction Hearing Exhibit P-18).

Tab C.16: Declaration of Jamissa Jarmon, Chief Administrator for the Bexar County District Attorney's Office. (Temporary Injunction Hearing Exhibit P-19).

Tab C.17: Declaration of Joshua Reiss, General Counsel of the Harris County District Attorney's Office. (Temporary Injunction Hearing Exhibit P-20).

Tab C.18: Declaration of Brain M. Middleton, District Attorney of the 268th Judicial District of Texas (Fort Bend County). (Temporary Injunction Hearing Exhibit P-21).

Tab C.19: Declaration of Shawn Dick, District Attorney of the 26th Judicial District of Texas (Williamson County). (Temporary Injunction Hearing Exhibit P-23).

Tab D: 1879 Code of Criminal Procedure of the State of Texas (Temporary Injunction Hearing Exhibit 5).

# Appendix
# Tab A

CAUSE NO. D-1-GN-25-003445

DELIA GARZA, in her official capacity as §
Travis County Attorney; JOSÉ P. GARZA, §
in his official capacity as Travis County §
District Attorney; TRAVIS COUNTY; §
JAMES MONTOYA, in his official capacity §
as El Paso County District Attorney; §
CHRISTINA SANCHEZ, in her official §
capacity as El Paso County Attorney; and §
EL PASO COUNTY, §
§
and §
§
JOHN CREUZOT, in his official capacity as §      CAUSE NOS. D-1-GN-25-003445
Dallas County Criminal District Attorney; §                    D-1-GN-25-003531
DALLAS COUNTY; JOE GONZALES, in §                    D-1-GN-25-003581
his official capacity as Bexar County §
Criminal District Attorney; BEXAR §      IN THE DISTRICT COURT
COUNTY; SEAN TEARE, in his official §      459ᵗʰJUDICIAL DISTRICT
capacity as Harris County District §      TRAVIS COUNTY, TEXAS
Attorney; and HARRIS COUNTY, §
§
and §
§
BRIAN M. MIDDLETON, in his official §
capacity as District Attorney of Fort Bend §
County, Texas (268th Judicial District) and §
SHAWN W. DICK, in his official capacity §
as District Attorney of Williamson County, §
Texas (26th Judicial District), §
§
    *Plaintiffs*, §
§
v. §
§
KEN PAXTON, in his official capacity as §
Attorney General for the State of Texas, and §
the OFFICE OF THE ATTORNEY §
GENERAL for the State of Texas, §
    *Defendants*. §

1

## ORDER GRANTING PLAINTIFFS' APPLICATIONS
## FOR TEMPORARY INJUNCTION

On June 16, 2025, the Court considered Plaintiffs' applications for a temporary injunction in the above-captioned consolidated cases filed against the Office of the Attorney General of Texas ("OAG") and Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of Texas ("Attorney General Paxton" or "Attorney General") (collectively, "Defendants"). Plaintiffs are district and county attorneys Travis County Attorney Delia Garza, Travis County District Attorney José P. Garza, El Paso County District Attorney James Montoya, El Paso County Attorney Christina Sanchez, Dallas County Criminal District Attorney John Creuzot, Bexar County Criminal District Attorney Joe Gonzales, Harris County District Attorney Sean Teare; 268th Judicial District Attorney Brian M. Middleton, and 26th Judicial District Attorney Shawn W. Dick (collectively, "Prosecutor Plaintiffs"), and Travis County, El Paso County, Dallas County, Bexar County, and Harris County (collectively "County Plaintiffs") (together, "Plaintiffs").

Plaintiffs challenge Defendants' adoption of a new Chapter 56 in Title 1 of the Texas Administrative Code (the "Challenged Rules"). Based on the facts and law set forth in Plaintiffs' applications, the supporting declarations, and briefs submitted by the Parties, as well as the testimony and other evidence and arguments of counsel presented at the June 16, 2025, hearing on Plaintiffs' applications, this Court finds sufficient cause to enter a Temporary Injunction. Plaintiffs state a valid cause of action against each Defendant; they have a probable right to the declaratory and permanent injunctive relief they seek; and they will suffer probable, imminent, and irreparable injury absent a temporary injunction.

Plaintiffs are likely to prevail after a trial on the merits of their claims that: (1) Texas Government Code Section 41.006 does not confer any administrative rulemaking authority on the OAG and the Challenged Rules are therefore invalid and Defendants' promulgation and

enforcement is an ultra vires act; (2) even if the statute confers rulemaking authority, the Challenged Rules impermissibly impose burdens and conditions not authorized by the statute; (3) the Challenged Rules are not in substantial compliance with the reasoned justification requirement of Section 2001.033 of the Administrative Procedure Act; and (4) the Challenged Rules violate the Separation of Powers Clause of the Constitution because they permit the Executive Branch (the OAG) to interfere with Judicial Branch officers' performance of their prosecutorial duties.

The Court further finds that Plaintiffs will suffer imminent and irreparable harm if they are forced to comply with the Challenged Rules because, among other reasons:

1. They will need to expend a significant amount of resources, personnel time, and taxpayer funds to provide the first quarterly report and initial report due on June 30, 2025, and July 1, 2025, respectively, and subsequent quarterly and annual reports. Compliance with the Challenged Rules has already diverted and will continue to divert resources and personnel time from performing necessary tasks related to the investigation and prosecution of criminal activity.

2. The Challenged Rules require disclosure of case files, explicitly including confidential work product and privileged communications, as well as documents containing, without limitation, private personal information about law enforcement officers, crime victims, arrestees, criminal defendants, and witnesses; protected information such as grand jury testimony and materials, medical information, mental health information, and information concerning substance abuse disorders and treatments; sexually explicit images of both adults and children; and law enforcement investigation materials.

3. Plaintiffs will be forced to disclose confidential information about previous and ongoing criminal prosecutions and law enforcement investigations, including records and information that are specifically protected from unauthorized disclosure by Plaintiffs under other state and/or federal laws that contain both civil and criminal penalties.

4. Plaintiffs will be forced to disclose the private and confidential information provided to the district and county attorneys in connection with the performance of their prosecutorial duties and such disclosure of confidential and private information containing highly sensitive and personal matters to Defendants will discourage people from reporting crimes, investigating crimes, and/or participating in the prosecution of crimes, thereby decreasing the Plaintiffs' ability to perform their constitutionally assigned duties and protect their communities from criminal activity.

3

This Court further finds that the Challenged Rules changed the *status quo* by requiring Plaintiffs to prepare and produce reports they have never been required to prepare.

Plaintiffs are not seeking and would not be entitled to receive damages or an adequate remedy at law.

The Temporary Injunction being entered by the Court today maintains the status quo prior to March 28, 2025, the date the Challenges Rules were adopted, and should remain in effect until the conclusion of this litigation, including on appeal.

IT IS THEREFORE ORDERED that, until all issues in this lawsuit are finally and fully determined, Defendants are immediately enjoined and restrained from enforcing the Challenged Rules, adopted on March 28, 2025. This Temporary Injunction restrains the following actions by the Defendants: (1) further implementing the Challenged Rules; (2) enforcing the Challenged Rules; (3) taking any actions for alleged non-compliance with the Challenged Rules; (4) assisting or encouraging other persons to take any action, administrative or otherwise, based upon an alleged non-compliance with the Challenged Rules; (5) investigating for alleged non-compliance with the Challenged Rules; (6) declaring non-compliance with the Challenged Rules and/or taking any actions due to alleged non-compliance, as set forth in Section 56.8 of the Challenged Rules; (7) implementing or enforcing any of the Office of Attorney General's policies and internal operating procedures to the extent that they have been updated in response to the adoption of the Challenged Rules; and (8) imposing reporting requirements in any way related to the Challenged Rules.

It is further ORDERED that Defendants shall publish a copy of this Court's order on the OAG's website before June 30, 2025.

It is further ORDERED that a trial on the merits of this case is to begin on December 8, 2025 at 9:00 am.

It is finally ORDERED that this Temporary Injunction Order is effective under the law, and a cash bond in the amount of $10.00 shall be required of the Plaintiffs.

SIGNED on this __20th__ day of June 2025.

_____
JUDGE PRESIDING

# Appendix
# Tab B

CAUSE NO. D-1-GN-25-003445
(Lead Case)

| DELIA GARZA, in her official | § | IN THE DISTRICT COURT |
| Capacity as Travis County Attorney; et al. | § | |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| KEN PAXTON, in his official capacity as | § | |
| Attorney General for the State of Texas, et al. | § | 459th JUDICIAL DISTRICT |

CONSOLIDATED WITH

CAUSE NO. D-1-GN-25-003531

| JOHN CREUZOT, et al. | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| KEN PAXTON, et al. | § | 353rd JUDICIAL DISTRICT |

AND

CAUSE NO. D-1-GN-25-003581

| BRIAN M. MIDDLETON, et al. | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| KEN PAXTON, et al. | § | 98th JUDICIAL DISTRICT |

**DEFENDANTS' NOTICE OF APPEAL**

Defendants, Ken Paxton, in his official capacity as the Attorney General for the State of Texas, and the Office of the Attorney General for the State of Texas hereby give notice of appeal from the Order issued by Judge Catherine Mauzy on June 20, 2025, which granted Plaintiff's Application for Temporary Injunction. Defendants file this Notice of Appeal pursuant to Texas Rule of Appellate Procedure 25.1(a).

Defendants are entitled to an interlocutory appeal pursuant to Texas Civil Practice and Remedies Code 51.014(a)(4) which allows for an immediate appeal from an order that grants a temporary injunction. Defendants appeal to the Fifteenth Court of Appeals. This is an accelerated appeal as provided by Texas Rule of Appellate Procedure 28.1(a). This is not a parental termination or child protection case or an appeal from an order certifying a child to stand trial as an adult. This appeal involves a matter brought against an office of the state in the executive branch and a state official in the executive branch arising out of that officer's official conduct. This case also involves a challenge to the constitutionality of a state rule, and the Attorney General is a party to the case. Upon filing of this instrument, the order issued on June 20, 2025 is superseded pursuant to Texas Civil Practice and Remedies Code 6.001(b), and Texas Rules of Appellate Procedure 25.1(h) and 29.1(b). *See In re Abbott*, 645 S.W.3d 276, 280 (Tex. 2022). Pursuant to section 6.001, as governmental entities and officers, Defendants are not required to file a supersedeas bond for court costs. Defendants' appeal is therefore perfected upon the filing of the notice of appeal.

Date: June 27, 2025

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Civil Litigation

**KIMBERLY GDULA**
Chief, General Litigation Division

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Texas Bar No. 00796531
Assistant Attorneys General
General Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548
T: (512) 979-5561 | F: (512) 320-0667
biff.farrell@oag.texas.gov

**COUNSEL FOR DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2025, this document was filed electronically via the Court's electronic filing system causing electronic service upon all counsel of record.

/s/ William H. Farrell
**WILLIAM H. FARRELL**
Assistant Attorney General

3

# Appendix
# Tab C

6/16/2025 12:00 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-25-003445
Norma Ybarra

**CAUSE NOS. D-1-GN-25-003445**
**D-1-GN-25-003531**
**D-1-GN-25-003581**

| | | |
|---|---|---|
| DELIA GARZA, in her official capacity as Travis County Attorney; JOSÉ P. GARZA, in his official capacity as Travis County District Attorney; TRAVIS COUNTY; JAMES MONTOYA, in his official capacity as El Paso County District Attorney; CHRISTINA SANCHEZ, in her official capacity as El Paso County Attorney; and EL PASO COUNTY, | § § § § § § § § § § | IN THE DISTRICT COURT |
| and | § § § | |
| JOHN CREUZOT, in his official capacity as Dallas County Criminal District Attorney; DALLAS COUNTY; JOE GONZALES, in his official capacity as Bexar County Criminal District Attorney; BEXAR COUNTY; SEAN TEARE, in his official capacity as Harris County District Attorney; and HARRIS COUNTY, | § § § § § § § § § § | 419<sup>th</sup>JUDICIAL DISTRICT |
| and | § § § | |
| BRIAN M. MIDDLETON, in his official capacity as District Attorney of Fort Bend County, Texas (268th Judicial District) and SHAWN W. DICK, in his official capacity as District Attorney of Williamson County, Texas (26th Judicial District), Plaintiffs, | § § § § § § § § | |
| v. | § § § | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, and the OFFICE OF THE ATTORNEY GENERAL for the State of Texas, Defendants. | § § § § § § | TRAVIS COUNTY, TEXAS |

1

**JOINT STIPULATION OF UNDISPUTED FACTS AND ADMISSIBILITY OF EXHIBITS**

Delia Garza, in her official capacity as Travis County Attorney; José P. Garza, in his official capacity as Travis County District Attorney; Travis County; James Montoya, in his official capacity as El Paso County District Attorney; Christina Sanchez, in her official capacity as El Paso County Attorney; and El Paso County (collectively, the "Garza Plaintiffs"); John Creuzot, in his official capacity as Dallas County Criminal District Attorney; Dallas County; Joe Gonzales, in his official capacity as Bexar County Criminal District Attorney; Bexar County; Sean Teare, in his official capacity as Harris County District Attorney; and Harris County (collectively, the "Creuzot Plaintiffs"); Brian Middleton, in his official capacity as the Fort Bend District Attorney; and Shawn Dick, in his official capacity as the Williamson County District Attorney (collectively, the "Middleton Plaintiffs") (collectively "Plaintiffs"); and the Office of the Attorney General of Texas ("OAG") and Warren Kenneth Paxton, Jr., in his official capacity as the Attorney General of Texas ("Attorney General Paxton" or "Attorney General") (collectively, "Defendants") file this Joint Stipulation of Undisputed Facts and Admissibility of Exhibits in connection with the Court's consideration of Plaintiffs' applications for a temporary injunction. Plaintiffs and Defendants respectfully show the Court the following:

## I.    Stipulated Facts

Plaintiffs and Defendants (collectively, the "Parties") stipulate that the following facts are undisputed and may be accepted as true solely for purposes of the hearing on Plaintiffs' applications for a temporary injunction:

1.    Chapter 56 in Title 1 of the Texas Administrative Code ("Challenged Rules"), adopted by Defendants relating to reporting requirements for district attorneys and county attorneys applies to each of the Plaintiff district and county attorneys in each of the consolidated cases. *See* 50 Tex. Reg. 2173–2182, 2173 (Mar. 28, 2025) (adopting 1 Tex. Admin. Code §§ 56.1-56.10); 1 Tex. Admin. Code §§ 56.1, 56.2(6).

2

2.      The Challenged Rules set the following report deadlines:

   a.      First Quarterly Report: Due June 30, 2025

   b.      Initial Report: Due July 1, 2025

   c.      First Annual Report: Due September 30, 2025

   d.      Second Quarterly Report: Due September 30, 2025

3.      Additional future reports are due as specified in the Challenged Rules.

4.      Defendants intend to enforce the specified reporting deadlines as set forth in the Challenged Rules.

## II.     Stipulated Admissibility of Exhibits

The Parties further stipulate that the following documents are authentic and admissible for purposes of the temporary injunction hearing:

1.      The Challenged Rules, adopted March 13, 2025, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit A and pre-marked as **P-1**.

2.      The Initial Proposed Rules, published March 8, 2024, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit F and pre-marked as **P-2**.

3.      The Revised Proposed Rules, published September 13, 2024, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit G and pre-marked as **P-3**.

4.      Dallas County Criminal District Attorney John Creuzot's Comments on the Revised Proposed Rules, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit H and pre-marked as **P-4**.

5.      Bexar County Criminal District Attorney Joe Gonzales' Comments on the Revised Proposed Rules, attached to Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit I and pre-marked as **P-5**.

6.      Dallas County Assistant County Administrator Charles Reed's Comments on the Revised Proposed Rules, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit J and pre-marked as **P-6**.

7.    Harris County Attorney Christian D. Menefee's Comments on the Revised Proposed Rules and Referenced Comments on the Proposed Rules, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit K and pre-marked as **P-7**.

8.    Travis County Attorney Delia Garza's Comments on the Revised Proposed Rules and Referenced Comments on the Proposed Rules, pre-marked as **P-8**.

9.    Travis County District Attorney José Garza's Comments on the Revised Proposed Rules and Referenced Comments on the Proposed Rules, pre-marked as **P-9**.

10.   Travis County's Comments on the Revised Proposed Rules and Referenced Comments on the Proposed Rules, pre-marked as **P-10**.

11.   El Paso County Attorney Christina Sanchez' Comments on the Revised Proposed Rules and Referenced Comments on the Proposed Rules, pre-marked as **P-11**.

12.   Williamson County District Attorney Shawn Dick's Comments on the Revised Proposed Rule, pre-marked as **P-12**.

13.   The Press Release entitled "Attorney General Ken Paxton Announces New Reporting Requirement to Rein in Rogue District Attorneys and Ensure the Prosecution of Violent Criminals," attached to the Garza Plaintiffs' Original Petition for Declaratory Judgment and Injunctive Relief and Verified Application for Temporary Injunction as Exhibit A and pre-marked as **P-13**.

The Parties further stipulate that the following declarations submitted in connection with the petition are authentic and may be admitted in lieu of or as part of a witness's direct testimony, provided that the declarant is available at the hearing for purposes of cross-examination. This includes, but is not limited to, the declarations pre-marked as P-14 through P-20 as follows:

14.   Declaration of Danny W. Smith, Jr., attached to the Garza Plaintiffs' Supplement and Brief in Support of Application for Temporary and Permanent Injunction as Exhibit 1, and pre-marked as **P-14**.

15.   Declaration of Holly Taylor, attached to the Garza Plaintiffs' Supplement and Brief in Support of Application for Temporary and Permanent Injunction as Exhibit 2, and pre-marked as **P-15**.

16.   Declaration of Alma Trejo, attached to the Garza Plaintiffs' Supplement and Brief in Support of Application for Temporary and Permanent Injunction as Exhibit 3, and pre-marked as **P-16**.

17. Declaration of Amy Lechuga, attached to the Garza Plaintiffs' Supplement and Brief in Support of Application for Temporary and Permanent Injunction as Exhibit 4, and pre-marked as **P-17**.

18. Declaration of Marsha Edwards, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit L and pre-marked as **P-18**.

19. Declaration of Jamissa Jarmon, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit M and pre-marked as **P-19**.

20. Declaration of Joshua Reiss, attached to the Creuzot Plaintiffs' Verified Petition for Declaratory Judgment and Application for a Temporary and Permanent Injunction as Exhibit N and pre-marked as **P-20**.

21. Declaration of Fort Bend County District Attorney Brian Middleton, pre-marked as **P-21**.

22. Verification of Fort Bend County District Attorney Brian Middleton, pre-marked as **P-22**.

23. Declaration of Williamson County District Attorney Shawn Dick as **P-23**.

The Parties reasonably anticipate exchanging information about potential witnesses and disclosing any additional exhibits on Friday, June 13, 2025, and may supplement this stipulation accordingly. The Parties also agree that this stipulation applies to each of the consolidated cases under Cause Nos. D-1-GN-25-003445, D-1-GN-25-003531, and D-1-GN-25-003581.

The Parties respectfully request that the Court approve and enter this stipulation as an order of the Court for the temporary injunction hearing.

June 15, 2025

Respectfully submitted,

  /s/ Bernardo Cruz (by permission)
Christina Sanchez
El Paso County Attorney
ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz
Assistant County Attorney
b.cruz@epcountytx.gov
*Attorneys for El Paso County District Attorney James Montoya, El Paso County Attorney Christina Sanchez, and El Paso County*

/s/ Jonathan Fombonne (by permission)
Jonathan G.C. Fombonne
Deputy County Attorney and First Assistant
Texas Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
Tiffany S. Bingham
Managing Counsel
Affirmative & Special Litigation Division
Texas Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov

Christopher Garza
Deputy Division Director
Affirmative & Special Litigation Division
Texas Bar No. 24078543
Christopher.Garza@harriscountytx.gov

Office of The Harris County Attorney
**CHRISTIAN D. MENEFEE**
**HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, Texas 77002
Telephone: (713) 2745101
Facsimile: (713) 7558924

*Counsel for District Attorney Sean Teare* and *Harris County*

 /s/ Cynthia W. Veidt
Leslie W. Dippel
Leslie.Dippel@traviscountytx.gov
Todd A. Clark
Todd.Clark@traviscountytx.gov
Cynthia W. Veidt
Cynthia.Veidt@traviscountytx.gov Assistant Travis County Attorneys

*Attorneys For Plaintiffs, Delia Garza, in her Official Capacity as Travis County Attorney, José P. Garza, in his Official Capacity as Travis County District Attorney, and Travis County*

/s/ Michael Satin (by permission)
Alexandria Oberman
Texas Bar No. 24131555
Email: aoberman@milchev.com  Telephone: (202) 626-6049
Facsimile: (202) 626-5801

Michael J. Satin
(admitted *pro hac vice*)
Email: msatin@milchev.com
Telephone: (202) 626-6009

Laura G. Ferguson
(admitted *pro hac vice*)
Email: lferguson@milchev.com Telephone: (202) 626-5567

**MILLER & CHEVALIER CHARTERED**
900 16th Street, NW
Washington, DC 20006

*Counsel for Criminal District Attorney John Creuzot; Dallas County; Criminal District Attorney Joe Gonzales; and Bexar County*

/s/ Justin C. Pfeiffer (by permission)
Justin C. Pfeiffer
jpfeiffer@gavrilovlaw.com
*Attorney for Brian M. Middleton, in his Official Capacity as Fort Bend County District Attorney (268th Judicial District)*

/s/ William "Biff" Farrell (by permission)
William "Biff" Howard Farrell
Assistant Attorney General
Office of the Attorney General
P.O. Box 12548
Austin, TX 78711-2548
Tel.: (512) 936-2650
Biff.Farrell@oag.texas.gov
*Counsel for Defendants*

/s/ C. Robert Heath (by permission)
C. Robert Heath
bheath@bickerstaff.com
Randy T. Leavitt
randy@randyleavitt.com
*Attorneys For Shawn M. Dick in his Official Capacity as Williamson County District Attorney (26th Judicial District)*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was forwarded to Defendants via email and all counsel of record by electronic filing in accordance with the Texas Rules of Civil Procedure and Local Rules on June 15, 2025.

/s/ Cynthia W. Veidt

Cynthia W. Veidt

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Amy Pollock on behalf of Cynthia Veidt
Bar No. 24028092
amy.pollock@traviscountytx.gov
Envelope ID: 102025764
Filing Code Description: No Fee Documents
Filing Description: JOINT STIPULATION OF UNDISPUTED FACTS AND ADMISSIBILITY OF EXHIBITS
Status as of 6/16/2025 5:06 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Leslie Dippel | | leslie.dippel@traviscountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Christopher Garza | 24078543 | christopher.garza@harriscountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| William Farrell | 796531 | biff.farrell@oag.texas.gov | 6/15/2025 1:40:40 PM | SENT |
| Randy Leavitt | 12098300 | randy@randyleavitt.com | 6/15/2025 1:40:40 PM | SENT |
| Justin Pfeiffer | 24091473 | jpfeiffer@gavrilovlaw.com | 6/15/2025 1:40:40 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 6/15/2025 1:40:40 PM | SENT |
| Tiffany Bingham | 24012287 | tiffany.bingham@harriscountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| William Farrell | | biff.farrell@oag.texas.gov | 6/15/2025 1:40:40 PM | SENT |
| Bernardo RafaelCruz | | b.cruz@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Christina Sanchez | | Ch.sanchez@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Bernardo Cruz | | b.cruz@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Cynthia  W.Veidt | | cynthia.veidt@traviscountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Christina Sanchez | | Ch.sanchez@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Todd A.Clark | | Todd.Clark@traviscountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Carl Jones | | Carl.Jones@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Alexandria Oberman | | aoberman@milchev.com | 6/15/2025 1:40:40 PM | SENT |
| Michael Satin | | msatin@milchev.com | 6/15/2025 1:40:40 PM | SENT |
| Pamela Lopez | | Pam.Lopez@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| MeLissa Contreras | | M.Contreras@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |
| Isela Baeza | | i.baeza@epcountytx.gov | 6/15/2025 1:40:40 PM | SENT |

# Appendix
# Tab C.1

**Exhibit
P-1**

Adopted rules include new rules, amendments to existing rules, and repeals of existing rules. A rule adopted by a state agency takes effect 20 days after the date on which it is filed with the Secretary of State unless a later date is required by statute or specified in the rule (Government Code, §2001.036). If a rule is adopted without change to the text of the proposed rule, then the *Texas Register* does not republish the rule text here. If a rule is adopted with change to the text of the proposed rule, then the final rule text is included here. The final rule text will appear in the Texas Administrative Code on the effective date.

## TITLE 1. ADMINISTRATION

## PART 3. OFFICE OF THE ATTORNEY GENERAL

## CHAPTER 56. DISTRICT AND COUNTY ATTORNEY REPORTING REQUIREMENTS

### 1 TAC §§56.1 - 56.10

The Office of the Attorney General (OAG) adopts new chapter 56 in Title 1 of the Texas Administrative Code (TAC), relating to reporting requirements for district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more persons. Adopted new chapter 56 consists of §§56.1 - 56.10. New chapter 56 is necessary to implement Government Code §41.006 and is in the public's interest. These new rules are adopted with changes to the proposed text as published in the September 13, 2024, issue of the *Texas Register* (49 TexReg 7139). The new rules will be republished. The changes are in response to public comments.

EXPLANATION OF AND JUSTIFICATION RULES

Texas Government Code §41.006 states that "[a]t the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state." Adopted new chapter 56 helps ensure that county and district attorneys are consistently complying with statutory duties, including seeking justice for citizens who have been harmed by a criminal act, appropriately administering funds, and appropriately prosecuting crimes. Whether a public official and office whose purpose is to fairly prosecute crimes and keep communities safe is enforcing criminal prosecution laws is a criminal matter and within the interest of the state.

Section 41.006 also states that the information must be submitted to the OAG at the times and in the form the OAG directs. New chapter 56 is necessary to implement §41.006. The adopted chapter prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

SECTION-BY-SECTION SUMMARY

Adopted new §56.1 specifies that district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more are required to submit initial, quarterly, and annual reports relating to criminal matters and the interests of the state to the OAG in a manner prescribed by the OAG.

Adopted new §56.2(1) defines the term "case file" as all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electronic, or otherwise, including

drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters. A "case file" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

Adopted new §56.2(2) defines the term "correspondence" as any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity. "Correspondence" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

Adopted new §56.2(3) defines the term "electronic copies" as a digital version of a record that can be stored on a computer device.

Adopted new §56.2(4) defines the term "reporting year" as the period of September 1 through August 31.

Adopted new §56.2(5) defines the term "report" as all information submitted to the OAG by a reporting entity under this chapter.

Adopted new §56.2(6) defines the term "reporting entity" as the office of a District Attorney or County Attorney serving a population of 400,000 or more persons.

Adopted new §56.2(7) defines the term "violent crime" to include capital murder, murder, other felony homicides, aggravated assault, sexual assault of an adult, indecency with a child, sexual assault of a child, family violence assault, aggravated robbery, robbery, burglary, theft, automobile theft, riot, any crime listed in Code of Criminal Procedure §17.50(3), and any attempt to commit such crimes.

Adopted new §56.3(a) specifies the content of the reports that must be electronically submitted to the OAG on a quarterly basis each reporting year.

Adopted new §56.3(b) specifies that reporting entities must submit an initial report containing the contents of the reports described in adopted new §56.3(a) for reporting events that occurred between January 1, 2021, and the effective date of this rule. This section provides exceptions to the initial report requirement.

Adopted new §56.4 specifies the content of the reports that must be electronically submitted to the OAG on an annual basis.

Adopted new §56.5(a) sets forth the deadlines for reporting entities to electronically submit each type of report. Quarterly reports must be submitted within 30 days of the beginning of each new reporting quarter. Annual reports must be submitted at the end of each reporting year and not later than September 30. The initial reports must be submitted within 90 days of the effective date of this rule. Adopted new §56.5(a) also provides that the OAG's

Oversight Committee may grant exceptions to the deadlines on a case-by-case basis if the reporting entity can establish good cause for not meeting the reporting deadlines.

Adopted new §56.5(b) establishes that a reporting entity must submit all reports under this chapter electronically. Information on how to submit reports electronically will be found on the OAG's website.

Adopted new §56.6 establishes that reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

Adopted new §56.7 establishes that if an entity fails to comply with this chapter, the OAG may send notice to the reporting entity identifying the reporting entity of its failure to comply. A reporting entity must remedy the identified reporting failure within 30 days after receipt of notice. Any reporting entity that fails to timely comply with this chapter's reporting requirements may be identified on the OAG's website as being out of compliance with both this chapter as well as Texas Government Code §41.006.

Adopted new §56.8 establishes that if a district attorney or county attorney violates adopted new chapter 56, without limitation, the Attorney General may (1) construe the violation to constitute "official misconduct" under Local Government Code §87.011; (2) file a petition for quo warranto under Civil Practice and Remedies Code 66.002; or (3) file a petition for an injunction in a civil proceeding ordering the District Attorney or County Attorney to comply.

Adopted new §56.9 specifies the makeup and responsibilities of the Oversight Advisory Committee as it relates to adopted new chapter 56. The Oversight Advisory Committee is an internal OAG committee composed of OAG employees who will review, collect, and advise on the reports submitted under new adopted chapter 56. Adopted new §56.9 also states that the Oversight Advisory Committee may request entire case files from reporting entities based on submitted reports or any other information that the Oversight Advisory Committee desires relating to criminal matters and the interests of the state on a case-by-case basis, as consistent with Texas Government Code §41.006.

Adopted new §56.10 specifies that all provisions of new adopted chapter 56 are severable.

FISCAL IMPACT ON STATE AND LOCAL GOVERNMENT

Josh Reno, the Deputy Attorney General for Criminal Justice, has determined that for the first five-year period the adopted rules are in effect, enforcing or administering the rules does not have foreseeable implications relating to cost or revenues of state government.

Mr. Reno has determined that there may be minimal costs to local governments for gathering and submitting quarterly and annual reports to OAG. Because the content of the reports will differ between reporting entities, the OAG cannot predict the cost amounts but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact.

According to Texas SmartBuy, the cooperative purchasing program provided by the Texas Comptroller of Public Accounts, scanners range from $50 to $10,000, and the price will depend on the scanner's quality, speed, and if it is a portable or self-loading model. However, it is likely that reporting entities already maintain a scanner in their respective offices. Because the reporting entities are required to submit the information electronically, there will be no postage or printing cost to do so.

The OAG acknowledges it will take some time for county employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices. The OAG estimates individual employee compensation for an administrative assistant to be $21.29 an hour, and the OAG estimates one to ten hours of work to scan and electronically submit documents to the OAG. This wage is based on the national median hourly wage for each classification as reported in the May 2023 National Industry Specific Occupational Employment and Wage Estimates. Bureau of Labor Statistics, Occupational Employment Statistics, United States Dep't of Labor (August 8, 2024 2:38 p.m.), www.bls.gov/oes/current/oes436014.htm.

PUBLIC BENEFIT AND COST NOTE

Mr. Reno has determined that for the first five-year period the adopted rules are in effect, the public will benefit because the rule will help ensure that county and district attorneys are consistently complying with statutory duties, appropriately administering funds, appropriately prosecuting crimes, and seeking justice for citizens who have been harmed by a criminal act.

Mr. Reno has also determined that for each year of the first five-year period the adopted rules are in effect, there are minimal anticipated costs to the county and district attorneys that are required to comply with the adopted rules. The costs detailed below are the same costs detailed in the Public Benefit and Cost Note section of this adoption order.

Because the content of the reports will differ between reporting entities, the OAG cannot predict the cost amounts but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact.

According to Texas SmartBuy, the cooperative purchasing program provided by the Texas Comptroller of Public Accounts, scanners range from $50 to $10,000, and the price will depend on the scanner's quality, speed, and if it is a portable or self-loading model. However, it is likely that reporting entities already maintain a scanner in their respective offices. Because the reporting entities are required to submit the information electronically, there will be no postage or printing cost to do so.

The OAG acknowledges it will take some time for county employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices. The OAG estimates individual employee compensation for an administrative assistant to be $21.29 an hour, and the OAG estimates one to ten hours of work to scan and electronically submit documents to the OAG. This wage is based on the national median hourly wage for each classification as reported in the May 2023 National Industry Specific Occupational Employment and Wage Estimates. Bureau of Labor Statistics, Occupational Employment Statistics, United States Dep't of Labor (August 8, 2024 2:38 p.m.), www.bls.gov/oes/current/oes436014.htm.

IMPACT ON LOCAL EMPLOYMENT OR ECONOMY

Mr. Reno has determined that the adopted rules do not have an impact on local employment or economies because the adopted rules only impact governmental bodies. Therefore, no local em-

**Exhibit**

**P-1**

ployment or economy impact statement is required under Texas Government Code §2001.022.

ECONOMIC IMPACT STATEMENT AND REGULATORY FLEXIBILITY ANALYSIS FOR SMALL BUSINESSES, MICROBUSINESSES, AND RURAL COMMUNITIES

Mr. Reno has determined that for each year of the first five-year period the adopted rules are in effect, there will be no foreseeable adverse fiscal impact on small business, micro-businesses, or rural communities as a result of the adopted rules.

Since the adopted rules will have no adverse economic effect on small businesses, micro-businesses, or rural communities, preparation of an Economic Impact Statement and a Regulatory Flexibility Analysis, as detailed under Texas Government Code §2006.002, is not required.

TAKINGS IMPACT ASSESSMENT

The OAG has determined that no private real property interests are affected by the adopted rules, and the adopted rules do not restrict, limit, or impose a burden on an owner's rights to the owner's private real property that would otherwise exist in the absence of government action. As a result, the adopted rules do not constitute a taking or require a takings impact assessment under Texas Government Code §2007.043.

GOVERNMENT GROWTH IMPACT STATEMENT

In compliance with Texas Government Code §2001.0221, the agency has prepared a government growth impact statement. During the first five years the adopted rules are in effect, the adopted rules:

- will not create a government program;

- will not require the creation or elimination of employee positions;

- will not require an increase or decrease in future legislative appropriations to the agency;

- will not lead to an increase or decrease in fees paid to a state agency;

- will create a new regulation;

- will not repeal an existing regulation;

- will not result in a decrease in the number of individuals subject to the rule; and

- will not positively or adversely affect the state's economy.

PUBLIC COMMENTS

The OAG held a public hearing on November 18, 2024, and received verbal and written comments on the proposed rule from several county attorneys, district attorneys, organizations and individuals.

**Comments regarding the OAG's authority**

Commenters commented that the OAG lacks authority to adopt this rule. Commenters state that the Texas Legislature did not delegate express or implied authority to the OAG to adopt rules under Government Code §41.006.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG has authority to implement Government Code §41.006.

Commenters also commented that the rule violates the nondelegation doctrine in Article 3, Section 56(2) of the Texas Constitution. Commenters state Government Code §41.006 is so broad and lacking in reasonable standards that it is an impermissible exercise of legislative authority.

**OAG Response**

The OAG considered the comment and declines to make changes to the rule as Article 3, Section 56(2) of the Texas Constitution does not apply to the rulemaking authority of the OAG, but instead it imposes requirements and limitations on the Legislature.

Commenters also commented that Government Code §41.006 does not authorize the OAG to remove duly elected district attorneys and county attorneys from office. Commenters stated Texas law already delineates a specific set of criteria for removing prosecuting attorneys from office under Local Government Code Chapter 87 and the definition of "official misconduct" that can result in removal from office does not include failure to make a report to the Office of the Attorney General.

**OAG Response**

The OAG reviewed the comments and declines to make changes to the rule as the OAG does not purport to have authority to remove district or county attorneys under Local Government Code Chapter 87. Under Local Government Code 87.012, only a district judge may remove a district or county attorney from office. The rule states the OAG may construe the violation to constitute "official misconduct." Section 87.015 sets forth procedures for petitioning a district court for the removal of an attorney. It does not state the OAG may remove a district or county attorney from office.

Commenters also commented that the OAG does not have original jurisdiction to prosecute state criminal offenses and has no legitimate law enforcement purpose in receiving or reviewing this information.

**OAG Response**

The OAG considered the comment and declines to make changes to the rule as the rule does not state the OAG has original jurisdiction to prosecute criminal offenses nor is there a "legitimate law enforcement purpose" requirement for receiving information under Government Code §41.006.

**Comments regarding Separation of Powers**

Commenters commented that the rule violates the separation of powers provision of the Texas Constitution because the respective duties of district and county attorneys shall be regulated by the Texas Legislature.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG determined the requirements in the rule do not violate the separation of powers provision in the Texas Constitution. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters further commented that the rule implies that the OAG has original jurisdiction over the criminal matters in the State of Texas.

**OAG Response:**

Exhibit
P-1

The OAG considered the comments and declines to make changes to the rule because the rule does not imply that the OAG has original jurisdiction over the criminal matters in the State of Texas. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters also commented that the OAG misrepresents the primary duty of prosecuting attorneys under the Texas Constitution.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not make any representation of the primary duty of prosecuting attorneys. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding fiscal impact, cost, and burden**

Commenters commented that the rule is an unfunded mandate that imposes significant financial and operational burdens on reporting entities.

Commenters commented that compliance with the rule would require the diversion of significant resources from the essential functions of reporting entities and divert critical resources from the reporting entity's central purpose.

Commenters also commented that the rule is likely to cost counties and taxpayers millions of dollars in additional staff time and by acquiring new staff to comply with the initial and annual reporting requirements in the rule. Commenters commented that the rule's financial impact analysis underestimates operational, technology, and labor costs and fails to consider and specify cumulative costs.

Commenters further commented that compiling the initial report will require making case-by-case determinations in each case file as to whether the circumstances of a particular case fall within the parameters of the required reports, which would require enormous resources and could effectively bring everyday operations to a halt.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG completed a fiscal impact analysis of the rule and concluded that costs should be minimal as complying with the rule could be absorbed into the reporting entities' ongoing operations. Because the content of the reports will differ between reporting entities, the OAG could not predict the exact cost amounts for each reporting entity but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact. Additionally, the OAG acknowledges it will take some time for employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices.

**Comments regarding the purpose of the rules**

Commenters commented that the purpose of this rule is purely political and designed to allow the OAG to influence arrests, indictments, and prosecutions. Commenters also commented that the purpose of the rule is to target specific groups and organizations that the OAG disagrees with and to protect certain groups and organizations that the OAG agrees with. Commenters stated the purpose of the rule is for the OAG to determine who should or should not be prosecuted.

Commenters also commented that the purpose of the rule is to provide a method to remove elected district and county attorneys over failures to comply with the rule or scrutinize or remove district and county attorneys if the attorney general disagrees with a district or county attorneys' approach on a particular case.

Commenters also commented that the purpose of the rule is to gain information pertaining to elections because the Attorney General has not been successful in prosecuting election related crimes due to lack of information. Commenters stated that review of case files pertaining to elections serves to intimidate election workers around the state.

**OAG Response**

The OAG considered the comments and declines to make changes to the rule as the purpose of the rule is to prescribe the time, form, and content of reports the OAG requires from certain district and county attorneys' offices under Government Code §41.006.

**Comments regarding confidential, sensitive, and privileged information**

Commenters commented that the proposed rules, and broad definition of "case file," would require reporting entities to disclose to the OAG confidential information that they are not legally permitted to disclose. Commenters stated that reporting entities are not permitted to disclose specific information, including, but not limited to: Grand jury information, healthcare records, juvenile justice information, criminal history information, information pertaining to victims and child victims, and DNA information.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG has not identified any instances in which a reporting entity would be prohibited from sharing information with the OAG. Reporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments, to the OAG in various manners and in compliance with other statutes that only generally require disclosure of information to the OAG. The rule implements Government Code §41.006, which specifically states the district and county attorneys shall report to the attorney general the information the attorney general desires. The OAG is required to comply with the same confidentiality statutes for which the reporting entities are required to comply. Any confidential information provided to the OAG pursuant to the rule and §41.006 maintains its confidentiality under the respective confidentiality laws.

Commenters also commented that the rule may require reporting entities to submit information to the OAG that is subject to the work product or attorney-client privileges. Commenters state that once the privileged material has been knowingly and voluntarily disclosed to a third party, even in response to a governmental reporting requirement, the privilege as to that information is waived.

**OAG Response:**

The OAG has reviewed the comments and declines to make changes to the rule as submitting information to the OAG under the rule and Government Code §41.006 will not waive the work product or attorney-client privileges.

Exhibit
P-1

Commenters also commented that there is no provision in the rule to ensure the privacy of sensitive case information, including crime victim and witness information. Because of this, commenters state the rule will have a chilling effect on crime victims and witnesses from coming forward to report crimes, which could result in increased crime. Commenters stated that should these rules go into effect, victims will no longer be assured of how sensitive case information will be accessed, shared, or utilized.

**OAG Response:**

The OAG has reviewed the comments and declines to make changes to the rule as the law requires the OAG to comply with the same confidentiality statutes for which the reporting entities are required to comply.

Commenters commented that the rules violate Article 1. §30 of the Texas Constitution; Rights of Crime Victims.

**OAG Response:**

The OAG reviewed the comments and declines to make changes to the rule because the rule does not violate the Texas Constitution.

**Comments regarding data storage:**

Commenters commented that the rule does not indicate where and how the OAG will store the information received from reporting entities. Commenters commented that the rule does not provide assurances as to the security of the data it receives from reporting entities.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule because the OAG has a legal duty to, and does secure, safeguard, and properly maintain data.

Commenters further commented that it may not be possible for reporting entities to transmit electronically the volume of data required to be reported under the rule.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as reporting entities currently routinely submit electronically their entire case files to the OAG in various manners and in compliance with other statutes.

**Comments regarding the population requirement for compliance with the rule**

Several commenters commented that the fact that the reporting requirements are only for district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more persons is arbitrary and lacks a statutory basis.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule. The population requirement for compliance with the rule allows the OAG to review data from the largest counties in the state which will indicate trends for all counties in the state.

**Comments regarding the rule's definition of "violent crime"**

Commenters commented that the fact that the definition of "violent crime" in §56.2(7) includes crimes the commenters described as nonviolent, such as theft, and any attempt to commit such crimes, is a misleading and overly broad re-categorization of the term violent crime. Commenters state this will generate statistical reports which might incorrectly imply to the public that there has been a significant increase in actual violent crimes. Commenters further state that defining "violent crime" is a legislative issue.

**OAG Response:**

The OAG reviewed the comments and declines to make changes to the rule because the definition of "violent crime" in §56.2(7) is only applicable to the reporting requirements in the rule. The rule does not purport to amend the definition of "violent crime" in any other context. Further, the rule does not speak to generation of statistical reports. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding the Oversight Advisory Committee**

Commenters commented that the work of the Oversight Advisory Committee has no scope at all in the rule.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as 1 TAC §56.9 specifies the makeup and responsibilities of the Oversight Advisory Committee.

**Comments regarding Quarterly Reports**

Commenters asked whether the quarterly reports should repeat information each quarter if the status of the cases has not changed. Commenters also asked whether cases that are declined initially but refiled upon further investigation should be included in the quarterly reports.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not require clarification. The quarterly reports must include a running list of the required reporting information, including cases that were declined initially but refiled upon further investigation.

Commenters commented that the quarterly reports are not "reports" but instead are quarterly demands by the OAG for any case file it wants.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as reporting requirements are only for information that relates to criminal matters and the interests of the state, which is consistent with Texas Government Code §41.006. The term "report" is defined in 1 TAC §56.2(5) as all information submitted to the OAG by a reporting entity under this chapter.

**Comments regarding Annual Reports:**

Commenters commented that §56.4(a)(2) is unclear and ask what state and federal ordinances would be responsive to the section.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule as the rule clearly identifies the information the OAG is requesting. The term ordinance is part of an inclusive list of actions that refers not just to actions of state and federal entities, but also to local and county entities who may pass ordinances.

**Exhibit
P-1**

Commenter commented §56.4(a)(4) and (5) are very unclear and asks if the requirement includes ARPA funds, government grants, or general fund disbursements.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule as §56.4(a)(4) and (5) specify the requested information relates to funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108. Section 41.108 states "the commissioners court of the county or counties composing a district may accept gifts and grants from any foundation or association for the purpose of financing adequate and effective prosecution programs in the county or district."

**Comments regarding 1 TAC §56.3(a)(1)**

Commenters asked whether the reporting requirement for indictment of police officers includes cases in which officers are indicted for personal conduct.

**OAG Response:**

The OAG considered the comment and included clarifying language in §56.3(a)(1) to indicate that the reporting requirement is only for indictment of a peace officer for conduct that occurred while the peace officer was conducting official duties.

Commenters commented that the rule creates a deterrent to the indictment of peace officers which will result in a risk of increased violence to Texans from law enforcement.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not regulate the indictment of peace officers. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding 1 TAC §56.3(a)(2)**

Commenters commented that the reporting requirement in §56.3(a)(2) regarding a decision to indict a poll watcher presents a conflict of interest for the OAG and a safety risk to voters.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the reporting requirement does not present a conflict of interest to the OAG nor a safety risk to individuals. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters also commented that §56.3(a)(2) contains a typographical error as "Teas" is not a word.

**OAG Response:**

The OAG considered the comment and corrected the error to read "Texas" in §56.3.

**Comments Regarding 1 TAC §56.3(a)(3)**

Commenters commented that §56.3(a)(3) is unclear because it does not define how a defendant "raises a justification under Chapter 9 of the Penal Code."

OAG Response:

The OAG considered the comments and revised §56.3(a)(3) to clarify that the request is for the number of prosecutions involving a defendant's discharge of a firearm where any prosecutorial decision was based on Title 9 of the Penal Code.

**Comments regarding 1 TAC §56.3(a)(4)**

Commenters requested clarification as to what party recommends to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error.

**OAG Response:**

The OAG considered the comment and included clarifying language in §56.3(a)(4) that the recommendation to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error is a recommendation made by the reporting entity.

**Comments regarding 1 TAC §56.3(a)(6)**

Commenters commented that the language in §56.3(a)(6) regarding cases where "substantial doubt" for probable cause is extremely broad.

**OAG Response:**

The OAG considered the comment and declines to make changes as substantial doubt is at the discretion of the OAG's Oversight Advisory Committee.

**Comments Regarding 1 TAC §56.3(a)(7)**

Commenters commented that the requirement is unclear as to whether the section only refers to a violent crime or if it includes any case that was resolved by deferred prosecution or any case where all charges were dropped for cases that do not fall under the definition of violent crime.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule. The reporting requirement in 1 TAC §56.3(a)(7) only applies to arrests for violent crime as defined in the rule.

**Comments Regarding 1 TAC §56.3(a)(11)**

Commenters commented that 1 TAC §56.3(a)(11) is broad and unclear. Commenters ask whether the required communication include communications with the Children's Advocacy Center, local crisis shelters, and other community partners.

**OAG Response**

The OAG considered the comment and included clarifying language in 1 TAC §56.3(a)(11) that the reporting requirement is for correspondence with any non-profit organization, not for profit organization, and non-governmental organization regarding a decision to indict an individual. The requirement includes communications with the Children's Advocacy Center, local crisis shelters, and other community partners that are a non-profit organization, not for profit organization, and/or a non-governmental organization.

**Comments regarding 1 TAC §56.3(a)(12)**

Commenters commented that §56.3(a)(12) is unclear and does not define the term "complaint."

Exhibit
P-1

**OAG Response:**

The OAG considered the comments and revised §56.3(a)(12) to clarify that the information the OAG is requesting is all correspondence written at any time by an assistant district attorney or assistant county attorney regarding the attorney's resignation under a formal or informal complaint process. This section does not include communications regarding salary negotiations or retirement policies.

**Comments regarding retention**

Commenters commented that the reporting requirements for the initial report are impractical and legally dubious, as many reporting entities either do not maintain certain categories of information or have already disposed of records in accordance with lawful document retention policies.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as §56.3(b)(1) provides exceptions to the initial reporting requirement in §56.3(a). The exceptions include the option for reporting entities to provide a sworn affidavit that states the information cannot be produced because it was destroyed or otherwise discarded pursuant to a *bona fide* document retention policy that existed prior to the effective date of this rule and that is described in detail and transmitted to the Oversight Advisory Committee.

Commenters also commented that the rules seek information that reporting entities may not possess or have no existing obligation to track. Commenters further commented that the rule creates numerous new data and case information reporting requirements for prosecutor offices and require the collection, storage, documentation, and dissemination of records that are not ordinarily retained as part of a criminal case file.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as §56.6 establishes that reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this Chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

Commenters also commented that §56.6 requires retention of any documents required by this report but provides no exception for expunged matters which could cause a conflict with the penal violations for maintaining records which have been expunged. Additionally, the OAG's office will need to be included in future expunctions for any cases related to these reports.

**OAG Response:**

The OAG has considered the comment and declines to make changes to the rule as laws regarding expunged matters take precedence over administrative rules. Additionally, the OAG will implement a process to be included in future expunctions for any cases related to reports submitted to the OAG under the rule.

**Comments Regarding Procedure**

Commenters commented that providing only a seven-day notice of comment and hearing is insufficient and does not allow for the interests of our communities to be adequately represented.

**OAG Response:**

The OAG considered the comment and declines to make changes as the proposal was published on September 13, 2024, and provided for a 30-day public comment period.

Commenters also comment that the *Texas Register* notice fails to ensure that stakeholders understand the implications of this rule and that stakeholders won't understand that highly personal and confidential information from case files could be transmitted to the attorney general likely without notice or consent given the points in the process when this must occur, under a range of circumstances.

**OAG Response:**

The OAG reviewed the comment and declines to make changes to the rule as the proposal complies with the notice requirements in Government Code Chapter 2001.

**Additional Comments**

Commenters commented that if the OAG makes recommendations on charges in cases obtained under this rule and the county fails to obtain convictions in the resulting proceedings, the government would be exposed to greater financial and legal liabilities.

**OAG Response:**

The OAG has considered the comments and declines to make changes to the rule as the rule does not contemplate OAG recommendations on cases. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters commented that the data collection in the rule focuses on "arrests" and very often an arrest is made that is not adequately supported by probable cause. A number of "arrests" should never be used as a measure of criminality because Americans are not guilty at the point of arrest. Commenters further stated that district attorneys have a responsibility to the Texas taxpayer to pursue only those indictments where probable cause clearly exists.

**OAG Response:**

The OAG has considered the comments and declines to make changes to the rule as the rule does not contemplate the measure of criminality or pursuit of indictments. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters commented that the information required to be reported under the rule is too specific and at the same time so broad such that it will reveal very little about the actual performance of a district attorney's office.

**OAG Response:**

The OAG considered the comment and declines to make changes to rule as the rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices. Government Code §41.006 authorizes the attorney general to direct districts and counties attorneys' offices to report the information that the attorney general desires.

Commenters also commented that the rule interferes with the professional responsibilities and discretion of local prosecutors.

**OAG Response:**

Exhibit
P-1

The OAG considered the comments and declines to make changes to the rule as the rule does not speak to how a local prosecutor executes their duties. The rule implements Government Code § 41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Other changes**

The OAG corrected identified, non-substantive typographical errors.

STATUTORY AUTHORITY

New 1 TAC Chapter 56 is adopted pursuant to Texas Government Code §41.006.

CROSS-REFERENCE TO STATUTE

This regulation clarifies Texas Government Code §41.006. No other rule, regulation, or law is affected by this proposed rule.

*§56.1. General Reporting Requirements.*

District Attorneys and County Attorneys presiding in a district or county with a population of 400,000 or more persons must submit an initial, and quarterly and annual reports relating to criminal matters, and the interest of the state, to the Office of the Attorney (OAG) in a manner prescribed by the OAG and as set forth in this chapter.

*§56.2. Definitions.*

The following words and terms, when used in this subchapter, have the following meanings:

(1) "Case file" means all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electronic, or otherwise, including drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters. A "case file" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

(2) "Correspondence" means any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity. "Correspondence" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

(3) "Electronic copies" means a digital version of a record that can be stored on a computer device.

(4) "Reporting year" means the period of September 1 through August 31.

(5) "Report" means all information submitted to the OAG by a reporting entity under this chapter.

(6) "Reporting entity" means the office of a District Attorney or County Attorney serving a population of 400,000 or more persons.

(7) "Violent crime" includes capital murder, murder, other felony homicides, aggravated assault, sexual assault of an adult, indecency with a child, sexual assault of a child, family violence assault, aggravated robbery, robbery, burglary, theft, automobile theft, riot, any crime listed in Code of Criminal Procedure §17.50(3), and any attempt to commit such crimes.

*§56.3. Quarterly and Initial Reporting Requirements.*

(a) Content of reports. Reporting entities must submit electronic copies of the following information to the OAG quarterly in accordance with this chapter.

(1) The number of instances that the Reporting Entity indicted a peace officer for the peace officer's conduct during official duties;

(2) The number of instances that the reporting entity indicted an individual for a criminal violation under the Texas Election Code.

(3) The number of prosecutions involving a defendant's discharge of a firearm resulting in any prosecutorial decision based on Title 9 of the Penal Code;

(4) The case file for instances a recommendation made by the Reporting Entity is made to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error;

(5) The case file for prosecutions for which the Texas Governor has announced that The Office of the Texas Governor is considering a pardon;

(6) Any case file for prosecutions relating to criminal matters and the interests of the state, as requested by the Attorney General through the Oversight Advisory Committee, including cases where there are substantial doubts by the Oversight Advisory Committee whether probable cause exists to support a prosecution;

(7) The number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped;

(8) All correspondence requested by OAG's Oversight Advisory Committee for a matter listed in response to paragraph (7) of this subsection on a prior quarterly report;

(9) All correspondence and other documentation describing and analyzing a reporting entity's policy not to indict a category or sub-category of criminal offenses;

(10) All correspondence with any employee of a federal agency regarding a decision whether to indict an individual;

(11) All correspondence with any non-profit organization regarding a decision whether to indict an individual; and

(12) All correspondence written at any time by an assistant district attorney or assistant county attorney regarding the attorney's resignation under a formal or informal complaint process. This section does not include communications regarding salary negotiations or retirement policies.

(b) Initial Report. A reporting entity must submit an electronic copy of the information outlined in this section for which a reporting event occurred between January 1, 2021, and the effective date of this rule, unless:

(1) The reporting entity obtains a written exception, in whole or in part, from the OAG;

(2) The reporting entity provides a sworn affidavit that states the information:

(A) was the exclusive product of a previous District or County Attorney; and

(B) is not reflective of the reporting entity's current operations due to a formal change in the office's policies, and the formal

**Exhibit
P-1**

change is described in detail and transmitted to the Oversight Advisory Committee; or

(3) The reporting entity provides a sworn affidavit that states the information cannot be produced because it was destroyed or otherwise discarded pursuant to a *bona fide* document retention policy that existed prior to the effective date of this rule and that is described in detail and transmitted to the Oversight Advisory Committee.

§56.4. *Annual Reports.*

Reporting entities must submit electronic copies of the following information for the prior reporting year in accordance with this chapter.

(1) All policies, rules, and orders, including internal operating procedures and public policy documents, that were modified during the prior 12 months;

(2) A list of all local, county, state, and federal ordinances, statutes, laws, and rules for which the reporting entity files reports, whether that requirement is regular or arises upon the occurrence of an event;

(3) A list of individual expenditures and purchases made based on funds or assets received through civil asset forfeiture;

(4) All information regarding funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108 that were passed on to the reporting entity. The reporting entity must detail how much of the funds were passed on to the reporting entity and provide a detailed accounting of how the reporting entity disposed of any funds received; and

(5) All information regarding funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108 that were not passed on to the reporting entity, but were used to benefit the reporting entity, its personnel, or its operations. The report must include any correspondence regarding accepted funds, as well as a detailed account of how the funds were used to benefit the reporting entity, its personnel, or its operations.

§56.5. *Report Submission Deadlines and Requirements*

(a) Deadlines.

(1) The quarterly report under §56.3 of this chapter (relating to Quarterly and Initial Reporting Requirements) is due within 30 days of the beginning of each new reporting quarter for all reporting events that occurred in the prior reporting quarter.

(2) The reporting quarters are as follows:

(A) Quarter one: September through November;

(B) Quarter two: December through February;

(C) Quarter three: March through May; and

(D) Quarter four; June through August.

(3) The annual report under §56.4 of this chapter (relating to Annual Reports) is due at the end of each reporting year and no later than September 30.

(4) The initial report under this section is due within 90 days of the effective date of this rule.

(5) The Oversight Advisory Committee may grant an extension on a case-by-case basis if the reporting entity can establish good cause for not meeting the reporting deadlines.

(b) Electronic Submissions. A reporting entity submit all reports under this chapter electronically. Information on how to submit reports electronically can be found on the OAG's website.

§56.6. *Document Retention.*

Reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

§56.7. *Overdue reports.*

If an entity fails to comply with this chapter, in whole or in part, the OAG may send notice to the reporting entity identifying the reporting entity of its failure to comply. A reporting entity must remedy the identified reporting failure within 30 days after receipt of notice. Any reporting entity that fails to timely comply with this chapter's reporting requirements may be identified on the OAG's website as being out of compliance with both this chapter as well as Texas Government Code §41.006.

§56.8. *Compliance.*

If a reporting entity violates this chapter, without limitation:

(1) The OAG may construe the violation to constitute "official misconduct" under Local Government Code §87.011;

(2) The OAG may file a petition for quo warranto under Civil Practice and Remedies Code §66.002 for the performance of an act that by law causes the forfeiture of the County or District Attorney's office; or

(3) The OAG may initiate a civil proceeding seeking to order the County or District Attorney to comply with this chapter.

§56.9. *Oversight Advisory Committee.*

(a) The Attorney General will establish an Oversight Advisory Committee composed of three members of the Office of the Attorney General designated by the Attorney General.

(b) The Oversight Advisory Committee may issue notifications of overdue reports under §56.7 of this chapter (relating to Overdue reports).

(c) The Oversight Advisory Committee may request entire case files based on submitted reports or any other information that the Oversight Advisory Committee desires relating to criminal matters and the interests of the state on a case-by-case basis,

(d) The Oversight Advisory Committee may waive any provision of this chapter if a reporting entity demonstrates that compliance would impose an undue hardship.

§56.10. *Severability.*

(a) All provisions of this chapter are severable.

(b) If any application of any provision of this rule is held to be invalid for any reason, all valid provisions are severable from the invalid provisions and remain in effect. If any section or portion of a section is held to be invalid in one or more of its applications, in all valid applications the provisions remain in effect and are severable from the invalid applications.

The agency certifies that legal counsel has reviewed the adoption and found it to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on March 13, 2025.

TRD-202500891

Exhibit
P-1

Justin Gordon
General Counsel
Office of the Attorney General
Effective date: April 2, 2025
Proposal publication date: September 13, 2024
For further information, please call: (512) 475-4291

♦     ♦     ♦

# PART 15.   TEXAS HEALTH AND HUMAN SERVICES COMMISSION

## CHAPTER 353.   MEDICAID MANAGED CARE

## SUBCHAPTER O.   DELIVERY SYSTEM AND PROVIDER PAYMENT INITIATIVES

### 1 TAC §353.1306

The executive commissioner of the Texas Health and Human Services Commission (HHSC) adopts amendments to §353.1306, concerning Comprehensive Hospital Increase Reimbursement Program for Program Periods on or after September 1, 2021.

Section 353.1306 is adopted with changes to the proposed text as published in the September 13, 2024, issue of the *Texas Register* (49 TexReg 7143). This rule will be republished.

BACKGROUND AND JUSTIFICATION

HHSC has been working since September 2022 to evaluate the future of the Medicaid hospital financing system in a post-public health emergency environment. With the combination of new Medicaid fee-for-service and managed care rules at the federal level, the unwinding of the Medicaid caseload coverage from the public health emergency, and the interplay between directed payment programs and new supplemental payment programs (e.g., the private graduate medical education (GME) and Hospital Augmented Reimbursement program (HARP)), hospital financing in Medicaid and for the uninsured has been challenging to forecast. With the support of hospitals and their representatives, Medicaid managed care organizations and their representatives, and industry subject matter experts, HHSC made final decisions regarding the program design for CHIRP that will be implemented, beginning in state fiscal year (SFY) 2026.

Comprehensive Hospital Increase Reimbursement Program

Beginning in SFY 2025, CHIRP is composed of three components: Uniform Hospital Rate Increase Payment (UHRIP), Average Commercial Incentive Award (ACIA), and Alternate Participating Hospital Reimbursement for Improving Quality Award (APHRIQA). The amendment to §353.1306 updates the ACIA component calculation beginning in SFY 2026 to calculate the Average Commercial Reimbursement (ACR) gap on an aggregated, per-class basis. The amendment to §353.1306 also allocates available ACIA funds across hospital classes based on the proportion of the combined ACR gap of each hospital class within a Service Delivery Area (SDA) to the total ACR gap of all hospitals within the SDA. Lastly, the rule amendment to §353.1306 updates the maximum ACR Upper Payment Limit (UPL) percentage to 95 percent beginning in SFY 2027 and to 100 percent beginning in SFY 2028.

COMMENTS

The 31-day comment period ended October 15, 2024.

During this period, HHSC received comments regarding the proposed rule from three commenters: the Texas Association of Behavioral Health Systems, the Children's Hospital Association of Texas, and the Texas Hospital Association. A summary of comments relating to §353.1306 and HHSC's responses follow.

Comment: Multiple commenters requested that HHSC withdraw the CHIRP rule amendment due to new Federal reporting requirements and recent Centers for Medicare & Medicaid Services (CMS) guidance on the CHIRP program. Commenters believe that the CHIRP rule should be withdrawn and that HHSC should draft an alternative amendment to include greater details and clarity on CMS requirements for the program.

Response: HHSC appreciates the comment and understands the desire for greater clarity and transparency. The rule amendment, as proposed, describes the CHIRP Program as is; HHSC is continuing to work with CMS on requirements for future years. Depending on the outcomes of these discussions, additional rule amendments may be made in future years. No revision to the rule text was made in response to this comment.

Comment: Multiple commenters requested that HHSC provide greater clarity and transparency for program definitions and descriptions including class definitions and separation by managed care programs in alignment with new CMS requirements for the CHIRP program.

Response: HHSC appreciates the comment and understands the desire for greater clarity and transparency. HHSC is continuing to work with CMS on requirements for future years. Depending on the outcomes of these discussions, additional rule amendments may be made in future years. No revision to the rule text was made in response to this comment.

Comment: A commenter stated that, in light of recent CMS requirements for the CHIRP program for SFY 2025, it is important to ensure that all CHIRP payments are capped at 100 percent of the average commercial rate for all program components.

Response: HHSC appreciates this comment. In the rule text, language is included to increase the percentage of ACR UPL to 100 percent by the program period beginning on or after September 1, 2027. No revision to the rule text was made in response to this comment.

Comment: A commenter requested clarifications to the language of the ACIA allocation of available funds to take into consideration UHRIP payments because the ACIA distribution occurs after the UHRIP distribution.

Response: HHSC appreciates the comment and has updated subsection (g)(3)(A) to clarify that the allocation of available funds across hospital classes will be proportional to the combined ACR gap less UHRIP payments of each hospital class within an SDA to the total ACR gap of all hospital classes within the SDA. In addition, (g)(3)(D) is updated to clarify that the ACIA payment example is for program periods beginning on or before September 1, 2024.

Comment: A commenter requested that HHSC oppose CMS's requirement to limit the Medicare UPL gap to ACR gap limits.

Response: This comment is outside the scope of the rule amendment. No revision to the rule text was made in response to this comment.

Comment: A commenter stated that they believed that the new federal rule does not explicitly limit CHIRP payments at the aggregate ACR rate for inpatient behavioral health services in an

Exhibit
P-1

# Appendix
# Tab C.2

**Exhibit
P-4**



**JOHN CREUZOT**
CRIMINAL DISTRICT ATTORNEY
CIVIL DIVISION
DALLAS COUNTY, TEXAS

October 11, 2024

**VIA E-MAIL:  OAGRuleCommentsCh56@oag.texas.gov**
OAG's Open Records Division

**VIA MAIL**
Josh Reno
Attn: Rule Comments
Office of the Attorney General,
P.O. Box 12548
Austin, Texas 78711-2548

**Sent Certified Mail/ Return Receipt requested:**

*Re: Comments on proposed rules, Chapter 56 in Title 1 of the Texas Administrative Code.*

Dear Attorney General Paxton:

As the Dallas County Criminal District Attorney, I submit these comments and objections to the revised proposed rules, Chapter 56 in Title 1 of the Texas Administrative Code ("proposed rule"), regarding required reports to the Attorney General ("OAG") under Texas Government Code § 41.006.  The initial proposed rules were first published in the March 8, 2024 edition of the Texas Register.  The new proposed rules, which retain many facets of the March iteration, were published in the September 20, 2024 edition of the Texas Register. The proposed rules require the DA's Office produce three reports: 1) quarterly report (56.3(a)); 2) initial reports (56.3(b)); and, 3) annual reports (56.4).  The proposed rules create a bevy of legal, operational, and other issues for the Dallas County Criminal District Attorney's office ("DA's Office"), including violation of state and federal law concerning the disclosure of various confidential information.

The DA's office has serious concerns regarding the proposed rules; a summary of some of the identified issues is as follows, and set forth below:

**Concern 1:** The Texas Constitution provides for separation of powers between the executive and judicial departments. Tex. Const. art. II, § 1; *State v. Stephens*, 663 S.W.3d 45, 50 (Tex. Crim. App. 2022).  The Oversight Advisory Committee, a committee composed of OAG employees, is given authority to ask for "any case file for prosecutions relating to criminal matters" and to advise on same.  This gives rise to concerns of the OAG's insertion in cases over which it has no jurisdiction and interference with the professional responsibilities and discretion of prosecutors. Under what authority does the OAG, in the Executive department, seek to adopt the proposed rules governing the DA's Office, in the Judicial department, seeking to assess its "case file"? How do the proposed rules not violate the Texas Constitution's separation of powers?  And, how is the

**Exhibit
P-4**

intent to review a "case file" to assess prosecutorial discretion on whether or not to prosecute a case not a violation of separation of powers?

**Concern 2:** The Texas Constitution prohibits the Legislature from passing any local or special law, except as otherwise provided in the Constitution, "…authorizing…regulating the affairs of counties..." Tex. Const. art. III, § 56(2). The Texas legislature did not adopt a special or local law when it enacted Texas Government Code § 41.006, which applies to all county and district attorneys. For example, a bracketed bill that does not relate to the purpose of the bill may be considered a prohibited local bill. In that the proposed rule creates a population bracket that does not exist in 41.006, how is this not an attempt to create a de facto local law by administrative rule? And, how is it not a violation of the Texas Constitution's prohibition regarding the passing of local and special laws? And, what is the reasonable justification for applying the regulations to only some district and county attorneys over a certain size?

**Concern 3:** The OAG asserts that "[t]he proposed chapter prescribes the time, form, and content of reports the OAG requires from **certain district and county attorneys' offices**." What statutory and/or legislative authority is the OAG relying on to limit the scope of 41.006 to "certain district and county attorneys' offices" when 41.006 contains no such limitation? In that Texas Government Code § 41.006 does not have a population limitation, what is the authority for the creation of the population bracket in the proposed rules?

**Concern 4:** The authority of state agencies, such as the OAG, to promulgate rules is generally granted by the Texas Legislature through enabling statutes. Texas Government Code § 41.006 is devoid of any enabling authority for the passage of administrative rules. Under what authority are the administrative rules in Chapter 56 in Title 1 of the Texas Administrative Code sought to be passed? Even assuming that some administrative rule-making authority was somehow ceded by the Texas Legislature, how are each of the proposed rules in line with the legislative authority set out in § 41.006 of the Texas Government Code?

**Concern 5:** Assuming *arguendo* that the Texas Legislature intended to grant the OAG authority to adopt rules under Texas Government Code § 41.006, how does the breadth and scope of the rules promulgated by the OAG in Chapter 56 in Title 1 of the Texas Administrative Code does not violate the nondelegation doctrine, including the delegation of authority regarding the creation of local or special laws. TEX. CONST. ART. III, § 56(2).

**Concern 6**: Texas Government Code § 41.006 is devoid of any: 1) authority for deeming a violation of the proposed rules as "official misconduct" under Tex. Loc. Gov't Code § 87.011, which would give rise to removal under Tex. Loc. Gov't Code § 87.015; or 2) authority for petitions for *quo warranto* under Tex. Civ. Parc. & Rem. Code § 66.002. Under what authority are the official misconduct designation and *quo warranto* provisions in Chapter 56 adopted in the proposed rules? How is non-compliance with the proposed rules "official duties by an officer entrusted with the administration of justice or the execution of the law" under Texas Local Government Code § 87.011(3)?

**Concern 7**: The OAG states that the justification for the proposed rules are as follows:

**Exhibit
P-4**

Proposed new chapter 56 helps ensure that county and district attorneys are consistently complying with statutory duties, including seeking justice for citizens who have been harmed by a criminal act, appropriately administering funds, and appropriately prosecuting crimes. Whether a public official and office whose purpose is to fairly prosecute crimes and keep communities safe is enforcing criminal prosecution laws is a criminal matter and within the interest of the state.

Why is a "case file" needed to show whether county and district attorneys are complying with statutory duties and enforcing criminal prosecution laws and aren't there less burdensome ways to determine this than a "case file."? And how can the OAG assess whether the various county and district attorneys are "consistently" complying with their duties when this proposed rule does not apply to all county and district attorneys? If the OAG was truly concerned about whether county and district attorneys are "consistently" complying with their duties, the proposed rule would apply to all county and district attorneys, not just those in jurisdictions with a population of 400,000 or more.

**Concern 8**: Texas Government Code § 41.006 is limited to district and county attorneys reporting to the attorney general "information from their districts and counties that the attorney general desires relating to **criminal matters and the interests of the state**." For each category of information requested in the proposed rules, except 56.3(a)(5), how is the information required in the reports *per se* "in the interest of the state" under 41.006? For example, how is the "case file" under proposed rule 56.3(a)(4), including videos/audio recordings, regular case correspondences, etc., "in the interest of the state"? How are records concerning resignations or terminations, under 56.3(a)(12), *per se* "in the interest of the state?"

**Concern 9:** Information that is not "the interest of the state" does not fall within the purview of Texas Government Code § 41.006. What is deemed in "the interest of the state" for purposes of the Oversight Advisory Committee's authority to request an entire "case file" under section 56.3(a)(6) or correspondences under section 56.3(a)(8)? And what are the parameters for the Oversight Advisory Committee to determine that a "case file" is in the interest of the state, before requesting same? And will every document requested in the "case file" need to be "in the interest of the state" to be provided in response to an Oversight Advisory Committee request?

**Concern 10**: How is the request for the following information "relating to criminal matters" as intended by the Texas Legislature in enacting 41.006: Sections 56.3(a)(12) (records related to resignations or terminations of staff); 56.4(1) (office policies); 56.4(2) (list of laws and rules related to reports); 56.4(3) (list of expenditures made using funds from civil forfeiture); 56.4(4) (information regarding funds passed on to reporting entity); 56.4(4); 56.4(5) (information regarding funds not passed on to reporting entity).

**Concern 11:** Texas Government Code § 41.006 requires that the district attorney report to the attorney general "[a]t the times and in the form that the attorney general directs" information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state. Under what authority is the OAG seeking copies of "case files" when section 41.006 only allows for the OAG to define the time frame and the form that the report will take relating to "criminal matters and the interests of the state"?

**Concern 12:** The definitions of "case file" and "correspondence" in the proposed rules include information that is confidential per common law, the Constitution, or state/federal statutes, as set forth below:

- Sub-concern 12(a). Tex. Code Crim. Proc. art. 39.14 provides for the disclosure of records in a criminal case to the attorney for the defendant or the defendant, with certain exceptions and protections. What provision in art. 39.14 allows for the disclosure of records in a criminal case to the OAG? How does the production of the "case file" not violate the Texas Code of Criminal Procedure, article 39.14 (the Michael Morton Act)?
- Sub-concern 12(b). How does the production of the "case file" not violate work product and attorney client privilege? Tex. Gov't Code § 552.108.
- Sub-concern 12(c). Article 20.02 of the Texas Code of Criminal Procedure provides that the proceedings of a grand jury "shall be secret," and, with limited exceptions not applicable here, prohibits the disclosure of grand jury materials. Disclosure of confidential grand jury materials is punishable by contempt of court and a fine not to exceed $500.00. Tex. Code Crim. Proc. art. 20.02(b). How does the production of the "case file" not violate the secrecy/confidentiality of grand jury proceedings or anything transpiring before the grand jury? Tex. Code Crim. Proc. art. 20.02.
- Sub-concern 12(d). How does the production of the "case file" not violate the confidentiality of information obtained through interagency transfer (local, state, or federal) that is not subject to disclosure; or the confidentiality of criminal history information maintained by the Department of Public Safety or disseminated between criminal justice agencies? Are the recipients of the "case file" CJIS-certified and/or able to receive confidential or protected information and comply with CJIS rules? Tex. Gov't Code § 411.084(b); *see also* Tex. Hum. Res. Code § 40.005 (d); *Houston Chronicle Publ'g Co. v. City of Houston*, 531 S.W.2d 177, 188 (Tex. Civ. App.—Houston [14th Dist.] 1975), *writ ref'd nurse.*, 536 S.W.2d 559 (Tex. 1976) (holding "rap sheets" and NCIC and TCIC printouts are confidential).
- Sub-concern 12(e). How does the production of the "case file" not violate the confidentiality of Texas Crime Stoppers Council records? Tex. Gov't Code § 414.007. Intentional or knowing disclosure of confidential crime stoppers material is a class A misdemeanor. Tex. Gov't Code § 414.009(b).
- Sub-concern 12(f). How does the production of the "case file" not violate the confidentiality of juvenile records? Tex. Fam. Code Chapter 58, Subchapter A (see section 58.007).
- Sub-concern 12(g). How does the production of the "case file" not violate the *Informers* privilege. *See Rover v. United States,* 353 U.S. 53, 59 (1957).
- Sub-concern 12(h). How does the production of the "case file" not violate the law enforcement privilege regarding records relating to the detection, investigation, or prosecution of crime, if the release of the information would interfere with the detection, investigation, or prosecution of crime? Additionally, how does the production of the "case file" not violate the confidentiality of law enforcement records relating to a criminal investigation that does not result in a conviction or deferred adjudication or a pending

investigation? *Hobson v. Moore,* 734 S.W.2d 340 (Tex. 1987); Tex. Gov't Code § 552.108(a)(1)-(2); Tex. Civ. Prac. & Rem. Code § 30.006.

- Sub-concern 12(i). How does the production of the "case file" not violate the confidentiality of sexual assault, stalking, family violence, or child victim identity? Tex. Code Crim. Proc. arts. 58.103-107; 58.151-58.157; 58.201-208; and 58.251-256.

- Sub-concern 12(j). How does the production of the "case file" not violate the confidentiality of sexual assault crisis services records? Tex. Health & Safety Code § 44.071.

- Sub-concern 12(k). How does the production of the "case file" not violate the confidentiality of health records, including Personal Health Information ("PHI" as identified by HIPAA), such as health records concerning treatment for drug and alcohol abuse or mental illness, including under the Texas Medical Privacy Act? How will PHI of parties and innocent bystanders be protected? How will the OAG comply with Chapter 58 of the Tex. Code of Crim. Proc. regarding the Confidentiality of Identifying Information and Medical Records? 42 C.F.R. § 2.12(a)(1), 2.13; 45 C.F.R. §§ 164.512(e), 164.508; Tex. Health & Safety Code §§ 181.006, 773.091(b), (g); Tex. Occ. Code §§ 159.002, 159.004; Tex. Code Crim. Proc. arts. 58.301-303.

- Sub-concern 12(l). How does the production of the "case file" not violate the confidentiality of family violence shelter and sexual assault program information? Tex. Gov't Code § 552.138(b).

- Sub-concern 12(m). How does the production of the "case file" not violate the confidentiality of information shared by the Department of Family and Protective Services or other investigative agency? 40 Tex. Admin. Code § 700.203(a)(12)(g); *see also* Tex. Fam. Code § 261.201.

- Sub-concern 12(n). How does the production of the "case file" not violate the confidentiality of personal or private information protected by the constitution and common law right to privacy, including but not limited to victim/witness information, law enforcement officer information, lab personnel information, and Personal Identifying Information (PII, such as social security numbers, drivers license, credit card numbers…etc.), etc.? How will PII of parties and innocent bystanders be protected? Additionally, the "case file" may include employment or civil service information. What procedure has been set up for the transfer of this information that does not subject the sending or receiving agency to criminal liability and/or prosecution? Tex. Gov't Code § 552.101.

- Sub-concern 12(o). How does the production of the "case file" not violate the confidentiality of autopsy photographs and crime scene photographs? Tex. Gov't Code §§ 552.101, 552.1085; Tex. Code Crim. Proc. art. 49.25 § 11.

- Sub-concern 12(p). How does the production of the "case file" not violate the confidentiality of body-worn camera videos? Tex. Occ. Code § 1701.661.

- Sub-concern 12(q). How does the production of the "case file" not violate the confidentiality of identity information of a 911 caller furnished by computerized 911 service suppliers or business service user? Tex. Health & Safety Code § 772.118(c).

- Sub-concern 12(r). How does the production of the "case file" not violate the confidentiality of records related to child pornography, including laws concerning the storage and delivery of such information? Tex. Code Crim. Proc. art. 39.15; Tex. Penal Code § 43.24.
- Sub-concern 12(s). How does the production of the "case file" not violate the confidentiality of biometric identifiers such as retina or iris scan, fingerprints, voiceprints, or records of hand or face geometry? Tex. Gov't Code § 560.003.
- Sub-concern 12(t). How does the production of the "case file" not violate the confidentiality of school records? 20 U.S.C. § 1232g; Tex. Gov't Code § 552.114.
- Sub-concern 12(u). How does the production of the "case file" not violate the confidentiality of inmate communication with a private citizen? Tex. Gov't Code § 552.101; Open Records Decision Nos. 430 (1985), 428 (1985), 185 (1978).
- Sub-concern 12(v). How does the production of the "case file" not violate the confidentiality of DNA and Forensic Family Genealogy (FGG) information, including reports of analysis, profiles, and bench notes? Tex. Gov't Code §§ 411.153(b), 552.101.
- Sub-concern 12(w). How does the production of the "case file" not violate the confidentiality of forensic interviews of child victims? Tex. Code Crim. Proc. arts. 39.14, 39.15; Tex. Fam. Code § 264.408.
- Sub-concern 12(x). How does the production of the "case file" not violate expunction laws? Tex. Code Crim. Proc. Chapter 55.
- Sub-concern 12(y). How does the production of the "case file" not violate the confidentiality of information involving trafficking of a person or substantial physical or mental abuse. Tex. Fam. Code § 54.04012; Tex Code Crim. Proc. arts. 58.253, 58.254, 58.255, and 58.256.
- Sub-concern 12(z). How does the production of the "case file" not violate the confidentiality of records regarding alleged or suspected abuse or neglect of a child. Tex. Fam. Code § 261.201.
- Sub-concern 12(aa). How does the production of the "case file" not violate the confidentiality of records concerning elder abuse? Tex. Hum. Res. Code § 48.101(a).

**Concern 13:** Various statutes limit the disclosure of confidential information without a court order or the satisfaction of some other statutory requirement(s). For example, Tex. Code Crim. Proc. art. 20.02(e) only provides for the district court in which a case is pending to release grand jury information. Tex. Fam. Code § 261.201 sets out the procedure for the release of child abuse records (and the release of an informer's information, section 261.101). Tex. Occ. Code § 1701.661 sets out the requirements for the release of body cam video. What authority does the OAG have to order the release of confidential information, under the proposed rules, outside of the statutory authority? Also, what authority allows the OAG to demand receipt of legally protected, confidential information, including information confidential by federal law?

**Concern 14:** The Public Information Act ("PIA") provides for exceptions to disclosure of certain information. Under what legal authority is the OAG able to receive the requested "case file" without the reporting entity waiving privileges and exceptions to disclosure under the PIA?

Exhibit
P-4

Additionally, how will the OAG ensure compliance with maintaining the confidentiality of the information? Since the OAG will be in possession of the prosecuting attorney's file, how will it respond to requests under the Open Records Act, Tex. Code of Crim. Proc. art. 39.14 (the Michael Morton Act) Tex. Code of Crim. Proc. art. 2.1397(the Richard Miles Act) or subpoena(s) in individual criminal or civil cases for the case file, in whole or in part? For a pending criminal case, how will the OAG's office make sure that evidence in the "case file," which release may be harmful to the prosecution of the case, is not released. For example, information contained in a video that is reviewed or shared with a witness who is not authorized to view the video and will testify in a criminal case could result in false testimony of the witness who had access to the video or a description of what was contained in the video. Defense counsel for the defendant can also use the witness's access to the video to challenge his/her testimony in the criminal case, i.e., the witness's testimony was based on review of the video and not his/her independent recollection. How does the OAG plan to protect the "case file" so as not to harm a pending criminal prosecution?

**Concern 15:** How does compliance with the proposed rule not violate HIPAA and Texas Health and Safety Code Chapter 81? What authority does the DA's Office have to share mental health records or substance abuse/treatment records obtained for the purpose of criminal prosecution with the OAG? See, e.g., 45 CFR Parts 160, 164; Tex. Health & Safety Code § 81.103(j) (creating a Class A misdemeanor offense for the release of HIV test results with criminal negligence); Tex. Gov't Code § 552.118 (exempting prescription information from public information requirements).

**Concern 16:** Various state and federal laws have rules regarding the storage and transmission of some of the data in a case file, including but not limited to CJIS and HIPAA. How will the "case file" be stored? Is the OAG CJIS-compliant and HIPAA compliant entity? If so, how will the OAG ensure compliance with CJIS and HIPAA requirements? Are the members of the OAG's proposed Oversight Committee CJIS-certified and/or able to receive such protected and confidential information, including members of the OAC? If so, how and under what authority? Additionally, how will the OAG ensure the Oversight Committee's compliance with CJIS requirements? And, will the OAG provide certification of CJIS and HIPAA compliance before the provision of any such data?

**Concern 17:** The proposed rules are vague and over broad as set forth below:

- The reporting requirements concerning certain "decisions" fail to specify which decisions are reportable. For example, whose decision must be reported, i.e., is it the decision of the DA's Office, the grand jury, etc? Proposed Rule, 56.3(a) (10)-(11).
- The reporting requirements concerning the number of instances involving an arrest for a violent crime where no indictment was issued, or all charges were dropped, fails to specify whose decisions are reportable, i.e., is it the decision of the peace officer/police department, DA's Office, etc.? Proposed Rule, 56.3(a)(7).
- How is the district attorney to determine the number of prosecutions to report concerning cases involving discharge of a firearm and justification under Chapter 9 of the Penal Code, Subchapters C and/or D when it is unclear whether "raised a justification under Chapter

**Exhibit
P-4**

9 of the Penal Code, subchapters C and/or D" means during trial, during jury charge conference, during plea negotiations, in the courthouse hallway, etc.? Must justification be formally raised or is the mere mention if justification in a conversation with defense counsel included. Proposed Rule, 56.3(a)(3).

- The reporting requirements concerning the case file when a recommendation is made to a judicial body that a person subject to final judgment of conviction be released before the expiration of their sentence, resentenced to a lesser sentence, or granted a new trial on a confession of error fails to specify whose recommendations are reportable, i.e., is it the recommendation of the DA's Office, the defense attorney, the Innocence Project, etc? Proposed Rule, 56.3(4).

- Does the definition of "case file" include: the appellate file, including the reporter's record, the clerk's record; the post-conviction writ file, which would include additional investigation and would be subject to (in Dallas County) a discovery order or discovery agreement which restricts the dissemination of information to third-parties; any conviction integrity investigation that would include not only the information outlined, *supra*, and would be subject to (in Dallas County) a discovery order or discovery agreement which would restrict the dissemination of information to third-parties? If so, how would the OAG protect the information? Proposed Rule, 56.2(1).

- The reporting requirement for "[t]he case file for prosecutions for which the Texas Governor has announced that The Office of the Texas Governor is considering a pardon," does not define "announcement." Proposed Rule, 56.3(a)(5). On what basis is the reporting entity to determine whether to turn over the "case file" when it is unclear what constitutes an "announcement" by the Governor's Office? That is, is any of the following an announcement: a "tweet"; a verbal announcement at a small private fundraiser; a formal written request for comment issued by the Texas Board of Pardons and Paroles, etc? Additionally, who must make the "announcement?"

- The reporting requirement for the case file "for prosecutions relating to criminal matters and the interests of the state, as requested by the Attorney General through the Oversight Advisory Committee" fails to include the basis/prongs for the OAG's Oversight Committee's conclusion that the matter is of interest of the state. How will the Committee's conclusion be made? Proposed Rule, 56.3(a)(6).

- Proposed Rule 56.3(b)(1) fails to provide any process by which the reporting entity would obtain "a written exception, in whole or in part, from the OAG." Under the proposed rules, the OAG would be both the interested party seeking the information *and* the arbiter of whether the information they seek should be disclosed? How would a reporting entity obtain a written exception in whole or in part from the OAG? In that there is a conflict with the OAG, who will be the neutral arbiter for any such decision?

- Proposed Rule 56.3(a)(8) is vague and confusing? What information must be provided in response to a request from the OAG under Rule 56.3(a)(8)?

- Does the requested report include files related to open cases, closed cases, cases on appeal, cases pending a writ of habeas corpus…etc.?

- Proposed Rule 56.3(a)(1), (2), (3), (7) requires that the DA produce numerical data concerning certain cases. Will the OAG be creating a form to provide the numerical data?

- Proposed Rule 56.9(d) states that the Oversight Advisory Committee may waive any provision of this chapter if a reporting entity demonstrates that compliance would impose an undue hardship; however, there is no guidance as to what would constitute undue hardship. Would incurring costs in the six figures and above to comply with the reporting requirements constitute undue hardship. Would the diversion of two or more assistant district attorneys from prosecuting criminal cases to review and produce records constitute undue hardship?

**Concern 18:** Section 56.5(b) states that a reporting entity must submit all reports electronically. "Reports" is defined as "all information submitted to the OAG by a reporting entity under this chapter." This would include the "case file." What is the electronic mechanism for transferring the information to be produced under Chapter 56 in Title 1 of the Texas Administrative Code?

**Concern 19:** The proposed rule defines "electronic copies" as "a digital version of a record that can be stored on a computer device" and requires that the reports be submitted electronically. How does the requirement that the report be transmitted electronically not violate laws that prohibit the electronic transfer of certain information, such as child pornography? See, e.g., Tex. Code Crim. Proc. art. 39.15; Tex. Penal Code § 43.24.

**Concern 20:** Since most of the DA's Office cases have hundreds of pieces of digital media evidence that require large capacity external media storage devices, how can the "report" be submitted electronically without creating a substantial financial burden on the DA's Office, including encryption and security infrastructure, to ensure that the information remains secure? Further, how do the proposed rules ensure that every county is "reporting" in the same format, so that there is consistency in the data collected by the OAG to serve State interests?

**Concern 21:** The OAG argues that "[p]roposed new chapter 56 helps ensure that county and district attorneys are consistently complying with statutory duties, including seeking justice for citizens who have been harmed by a criminal act, appropriately administering funds, and appropriately prosecuting crimes." How do the proposed rules request for "case files" on matters that have been prosecuted to judgment or plea or no billed, which is the decision of a grand jury, assist in making sure crimes are prosecuted and victims get justice? And, if this is the main purpose, how do the proposed rules breadth and scope not exceed the needs of this purpose.

**Concern 22:** Texas Code of Criminal Procedure Art. 59.061 specifically gives the state auditor the right to audit or investigate the use of forfeiture funds, i.e., the "specific expenditure of proceeds and property received under this chapter." The Texas Legislature established this audit and investigation authority in the state auditor. How does section 41.006 grant the OAG the authority audit or investigate forfeiture funds by seeking information related to same?

**Concern 23:** In *State v. Heath*, 2024 WL 2952387 (Tex. Crim. App. 2024), the Texas Court of Criminal Appeals ("CCA") recently clarified that under Tex. Code of Crim. Proc. art 39.14 "the State" has a duty to disclose relevant information to the defense. The CCA held that the mandate in Article 39.14(a) of the Texas Code of Criminal Procedure that the "the state" produce discovery "as soon as practicable after receiving a timely request" includes discoverable items which,

unbeknownst to the prosecuting attorney, are in the possession of law enforcement agencies. If the OAG conducts additional investigation, or has another department conduct an investigation on its behalf, those actions, including work product notes, must be documented in the criminal file and tendered to the prosecuting attorney's office for disclosure to the defense pursuant to art. 39.14 and *Heath*. The disclosure must be made "as soon as practicable." As soon as practicable seems to mean after an indictment or information is filed in the case and before the trial setting. How will the OAG make sure that any new or additional information/data is tendered to the prosecuting attorney's office to comply with art. 39.14 and *Heath*, as soon as practicable. If, after completing its review and investigation of the case file, the OAG comes to a different conclusion of the guilt, innocence, or appropriate punishment of a defendant, how will that be communicated to the prosecuting attorney's office or the defendant? Will the members of the OAG's office who reviewed the "case file" be identified so that they can be disclosed in discovery as having relevant information or called to testify concerning their review of the case file, if needed?

**Concern 24**: Section 2001.024(a)(4)(A) & (D) of the Texas Administrative Code requires the notice of the proposed rules include the additional estimated cost to the local government. Notice of the proposed rules indicate that there are "minimal costs to local governments" for submitting the quarterly and annual reports and that "OAG cannot predict the cost amounts but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact." The OAG then gives estimates of the cost of a scanner and for an administrative assistant to scan and submit the information to the OAG. What due diligence did the OAG engage in to determine the cost to the local government based on how a district attorney's office actually operates, including the typical size of an average criminal case file, the number of audio/video files in a typical criminal case, the number of statutorily protected information in the average criminal case file, the databases used, the actual amount of time and resources needed to extricate the information from same (or compile the information), the necessity of attorney involvement and review, etc. What typical case size is the OAG's cost estimate based on? Is the OAG estimate based on a case with audio/video data involved? Why does the cost assessment from the OAG exclude involvement of attorneys in the reviewing and compilation of the report, including the case file? Is it the OAG assessment, as to its cost estimate, that attorneys have no ethical responsibilities and duties, including duties under the Texas Disciplinary Rules of Professional Conduct, to review the data before it is submitted to the OAG? As to the databases, is it the OAG's assessment, as to the cost estimate, that the requested case file information is readily available in one convenient source rather than in multiple databases. To comply with a request for a "case file" the DA's Office will need to pull information from the Dallas_Prosecutor Case Management System as well as secure locations that house electronic files that are too large to store in Dallas_Prosecutor. In addition, the office stores files containing illicit images on a separate secure server or on individual drives. A typical cell phone dump can have 1 TB of data with about 50,000 images and videos. It can take up to a day to download a single phone. A typical criminal case will have several cell phones. Does your cost estimates include the time to download and review everything in a cell phone dump including text messages, etc.? While records on a case may be stored electronically in a database, every record within the case must be manually reviewed to see if the case meets the threshold to be counted on the report. That means every piece of evidence on a case – documents, videos, phone records, work product notes – must be reviewed to see if any statements were made that trigger the case to be counted. If so, the evidence must be

**Exhibit
P-4**

reviewed for redaction. Redaction for documents involves 1) manually open each document, 2) save a copy of the document to the desktop, 2) run OCR on each document to ensure it can be redacted, 4) run redaction (sometimes must manually do the redaction) and 5) upload it to the case. Videos must be viewed in their entirety, and someone makes notes while viewing the video. To redact a video, an individual must download the video to a desktop or server and run redaction on the video. Redaction must comply with rules about preserving the integrity of the evidence. This is done by persons trained on redaction – the office only has one analyst and one technician who are working with the trial attorneys to prepare for trial. Does the cost estimate include the time and resources to convert the information, including audio and video, in an electronically transmittable format or the needed software or licenses to do so? Operationally, gathering and transmitting case information will require significant time and resources. It will also involve significant attorney involvement, including reviewing work product, and compliance with statutory confidentiality rules. Information contained in the Odyssey Court Case Management system is under the control of the District and County Clerks. Microsoft 365 products such as Outlook and TEAMS messaging are the property of Dallas County IT under the direction of the Dallas County Commissioners Court. Personnel records regarding terminations or resignations are maintained by the Dallas County Human Resources Department under the direction of the Dallas County Commissioners Court. Does the cost estimate include costs to Dallas County to search its databases and review the information for responsiveness? Does your cost estimate include the cost for Dallas County IT to comply with requests for email correspondence? Does it include costs for Dallas County Human Resources to comply with the request for information? In fact, as explained *infra*, the proposed rules will have a significant financial cost.

The reporting requirements under Section 56.3(b) establish a schedule for submitting the information outlined in Section 56.3(a), covering events that occurred between January 1, 2021, and the rule's effective date. Meeting this requirement is beyond the realm of physical possibility and would be extremely costly. For example, from January 1, 2021, to August 2024, at least 124,000 cases were filed with the DA's Office that fall under this rule. To comply with the initial deadline, the DA's Office will need to review every case and submit its report within 90 days. Since many of these cases involve protected information, significant attorney involvement would be required for some of the reporting tasks. This would divert prosecutors away from their core duties of prosecuting cases in order to meet the requirements of this rule. Additionally, maintaining compliance with this rule will cost Dallas County millions of dollars each year.

I appreciate the opportunity to provide these comments on the proposed rules.

Sincerely

*John Creuzot*

John Creuzot
Dallas County Criminal District Attorney

**Exhibit
P-4**

# Appendix
# Tab C.3

**Exhibit
P-5**



## JOE D. GONZALES
### BEXAR COUNTY CRIMINAL DISTRICT ATTORNEY
PAUL ELIZONDO TOWER 101 W. NUEVA
SAN ANTONIO, TEXAS, 78205 (210) 335-2311

Josh Reno
Justin Gordon
Attn: Rule Comments
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
Via email: OAGRuleCommentsCh56@oag.texas.gov

RE:    Comment on newly proposed Chapter 56 in Title 1 of the Texas Administrative Code, relating to reporting requirements for District Attorneys serving a population of 400,000 or more persons.

Mr. Reno and Mr. Gordon:

Thank you for this opportunity to submit written comments on newly proposed Chapter 56, Title 1 of the Texas Administrative Code.

As will be explained below, compliance with the newly proposed Chapter 56 will create an undue hardship on the Bexar County District Attorney's Office and no doubt several of the other impacted offices across the State.

We do not have the vast resources needed to comply with the proposed new Chapter 56. Moreover, complying with the proposed rule would significantly interfere with the ongoing operations of the Office by diverting precious time and resources away from the prosecution of crimes, ultimately compromising public safety in our community.

Exhibit
P-5

Bexar County is home to over 2 million people. Given the size of Bexar County and the volume of criminal cases filed every year, it is expected that preparing the required Initial Report under proposed section 56.3(b) – with data on case files dating back to January 1, 2021 – will require an extraordinary amount of time and resources. A typical criminal filing in Bexar County includes police reports, body-worn camera videos, dash-camera videos, audio recordings, recorded witness interviews and statements, crime lab submissions, photographs, and other evidence.

It will require an inordinate amount of time for experienced prosecutors to sift through thousands of case files and evidence going back to January 1, 2021 to extract the requested information because it is not captured by Bexar County's current case management system. Prosecutors will need to be pulled away from their primary public safety function – ensuring victims are protected and criminals appropriately punished – to complete this administrative requirement.

Another concern is that due to the unique nature of certain reporting requirements in section 56.3, the fiscal cost will be significantly more than is currently projected in the proposed rule. It is anticipated that a substantial amount of overtime will need to be paid to prosecutors to review over three years of criminal case files, a cost that ultimately will be borne by the taxpayers of Bexar County. The impact of this on the community and victims of crime in Bexar County cannot be understated.

Additionally, the language of certain provisions of Chapter 56 is vague. Without further clarification, we fear compliance will either not be possible, or will be unintentionally incomplete. I agree that transparency in prosecution is a laudable goal. However, without further clarification of certain sections of the proposed rule as outlined below, Chapter 56 could have the unintended consequence of forcing this Office to expend vast sums of taxpayer dollars to complete and submit reports that are deemed incorrect or insufficient and sent back for review.

Below please find the Bexar County District Attorney Office's comments and concerns about specific provisions of newly proposed Chapter 56.

**Section 56.3 Quarterly and Initial Reporting Requirements:**

    (a)    **Content of reports. Reporting entities must submit electronic copies of the following information to the OAG quarterly in accordance with this chapter.**

- **(3): "The number of prosecutions involving a defendant's discharge of a firearm where the defendant raised a justification under Chapter 9 of the Penal Code, Subchapters C and/or D"**

The proposed rule lacks sufficient clarity regarding what is considered a "prosecution" for purposes of this subsection. Does "prosecution" include every law enforcement submission to the Bexar County District Attorney's Office, or only those cases where a prosecutor filed a formal information or obtained an indictment? Are those cases that follow a pretrial diversion program considered "prosecutions?" Bright line definitions are needed to provide clarity and assist those required to report so compliance is accurate.

The proposed rule lacks sufficient clarity regarding what is meant by "raised a justification under Chapter 9 of the Penal Code, Subchapters C and/or D" and for reasons discussed below, imposing such an administrative burden on impacted offices would create a compliance burden that would be nearly impossible to comply with. For instance, does section 56.3(a)(3) include only cases where the issue was submitted to the judge or jury at trial after evidence was introduced? When a Chapter 9 defense is raised for the first time at trial, it would require our office to order costly transcripts to comply with this provision. Does this section include cases where the defense attorney only suggested raising the justification in plea bargain negotiations? Our office has never tracked cases based on defenses raised during prosecution, and there is no current IT system where this information can be easily filtered from data reports or spreadsheets. Additionally, our office, like most District Attorney's Offices, does not currently track cases based on the type of weapon used in a case. This Office has thousands of cases dating back to 2021 that will need to be reviewed to extract the requested information. This is due in part to the fact there are many criminal offenses that potentially involve the use of a firearm, e.g., animal cruelty, criminal mischief, misdemeanor terroristic threat. Furthermore, a defendant's claim of a Chapter 9 justification may not be immediately

Exhibit
P-5

apparent from the written report, but could be contained amongst voluminous multi-media evidentiary filings.

The proposed rule would require the Bexar County District Attorney's Office to review tens of thousands of case files, police reports, body worn camera, witness interviews, etc., where the possibility of these instances exists. Furthermore, due to the complexity of these issues, this is not an activity that can be completed by support staff. Rather, this task will need to be performed by experienced prosecutors who already have significant trial dockets and the duty of discovery compliance under Chapter 39 of the Code of Criminal Procedure. The cost of complying with this section in terms of public safety cannot be stressed enough, as it will require that prosecutors be diverted away from their primary job functions of prosecuting criminal activity, and will significantly impact public safety.

- **(4): "The case file for instances a recommendation is made to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error."**

This section directly impacts the Conviction Integrity Unit of the Bexar County District Attorney's Office. The Conviction Integrity Unit is a post-conviction unit focused on meeting the statutory and ethical obligations of the prosecutors in our office. Section 56.3(a)(4) contains ambiguous language, and the scope of the requirements is unclear. Under the previous and current language, Chapter 56.3 (a)(4) would require the complete case file and correspondence for "instances *a recommendation* is made to *a judicial body* that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error." (emphasis added). Unlike most of the other sections of Chapter 56.3, which explicitly outline the triggering event as action by the reporting entity, the Texas Governor, or the request of the Office of the Attorney General, this current wording mentions "recommendation" without specifying *who* is making the recommendation. Is this specific to recommendations made by the reporting entity, or is this any and all recommendations, including the recommendation of the attorneys for the incarcerated person? Would this include recommendations by the defense for "shock probation"? If

it does include recommendations by the defense attorney, that would mean that every post-conviction filing will trigger the reporting requirement under this section for case files involving post-conviction cases.

One thing that seems certain is that this includes final felony convictions where the reporting entity has recommended relief. This applies to many of our exonerations where we were bound by statute, case law, and ethical responsibilities to agree to relief. The legal basis for these agreements is not at issue, as the legal basis of these exonerations has been supported by the opinions and mandates of the Court of Criminal Appeals. However, the production of the case file and correspondence presents a monumental and unworkable task. This proposed chapter is retroactive to January of 2021, but the reality of that retroactivity has far-reaching implications in post-conviction work. Take, for example, an exoneration of a conviction from 1988, which our Office recently had. Based on the definition of "case file" and "correspondence" provided in section 56.2, our office will be required to locate and search retroactively for voluminous documents and records going back to 1988, and some records may no longer exist or be in our office's possession.

The cost to taxpayers to accomplish this task will be substantial. The Texas Register printed a section on the "fiscal impact on state and local governments," estimating that there may be minimal costs to local governments for gathering and submitting quarterly and annual reports to the OAG. However, absent from this or any other section featured in the Texas Register on this proposal is a consideration of the volume and reality of the backlog of cases going back to 2021. Many of our post-conviction case files are quite voluminous and contained in dozens of banker boxes. The cost to copy the case file in any given case is approximately $23.00 per file, and that cost does not include the time that will be spent by Bexar County employees to pull the files. This cost will further grow exponentially if "recommendation" includes *all* recommendations, not just those of the reporting entity.

In order to comply with section 56.3(a)(4), our office will be required to determine which employees to pull from their job duties of responding to applications for post-conviction writ so they can track down, gather and mail these requested records. These are employees that will no longer have time to call victims on cases; to substantively

respond to filings made; or to otherwise do the job they were hired to do. The solution is, potentially, the creation of a new position or positions to handle the work of Chapter 56.3(a)(4) compliance, an increased cost that will be borne by the taxpayers of Bexar County.

- **(6): "Any case file for prosecution relating to criminal matters and interests of the state, as requested by the Attorney General through the Oversight Advisory Committee, including cases where there are substantial doubts whether probable cause exists to support a prosecution."**

The rule lacks clarity on the triggering mechanism for which case files to pull. Will these be specific cases requested by the Attorney General's Oversight Advisory Committee? From whose perspective are the "substantial doubts about whether probable cause exists to support a prosecution"? Is it from the perspective of the Oversight Committee, the Reporting Entity, or defense attorneys? There is no limit to what case files may be at issue and presumably, this rule could allow the Oversight Advisory Committee to request case files for every case this office has prosecuted in a given time, or any time without limitation. Our office and any other office facing such a request would lack the resources to divert to such a request and would be unable to comply.

Additionally, the law constrains our ability to produce entire case files for cases involving family violence, crimes against children, and sexual assault. There are laws in place that prohibit our office – even under a court order from a judge – from duplicating forensic interviews of child victims. Texas Code of Criminal Procedure Art. 39.15 provides for the restricted discovery of child pornography and of the forensic interview of the child victim. This evidence must remain in the custody of the State. These items are even protected once they are admitted into evidence in a hearing and must be properly sealed by the Court so that they are not available to the public. *See* Tex. Code Crim. Proc. § 39.15(b); *In re the State of Texas*, 564 S.W.3d 58 (Tex. App. – El Paso 2018, no pet.). Additionally, CPS records remain confidential. Texas Family Code 261.201(b) provides that a court may order disclosure of a CPS report only with a motion requesting the release, a hearing, and an in-camera review of the information. There are also certain identities in those records that must be redacted, such as the person who reported the

abuse. For sexual assault cases, there are often results from SANE exams as well as intimate photographs taken for purposes of medical diagnosis.

Furthermore, the release and duplication of this evidence could violate the victim's rights under medical privacy laws and are generally excluded from open records requests. What mechanisms are in place to ensure victim confidentiality and other prohibited evidence not be released to the public or improperly duplicated?

- **(10): "All correspondence with any employee of a federal agency regarding a decision whether to indict an individual."**

The Bexar County District Attorney's Office has never tracked correspondence with federal agencies, and it would be extremely difficult to do so. San Antonio is Military City, USA. When a member of the military is accused of a crime, it is common for communication with the defendant's branch of service regarding whether a case will be prosecuted by our office or by the military. It is also common for there to be communication between our office and the U.S. Attorney's Office about charging defendants when the defendant is also facing possible federal charges. Communications with federal law enforcement agencies are also common. It is not clear how we would be able to find all such correspondence through searches of our digital systems. As the reporting requirement under this section is not limited to any type of offense, we would be required to search our entire digital system, employee work product and personal phones (not all employees have work phones), and approximately 60,000 paper case files including any felony that has been filed or resolved with our office since 2021 for the Initial Report alone. This type of search would effectively shut our office down for a significant period of time. Bexar County Information Technology only has one employee that can perform these types of digital searches.

Do the reporting requirements under any of the sections above include juvenile cases? All estimates based on time and cost associated with complying with the proposed rule do not include juvenile cases. If juvenile cases and related communications are required to be reported, the time, cost and difficulty with compliance will substantially increase.

- **§ 53.6(b) Initial Report.**

Compliance with the time frame for reporting data under section 56.3(a)(3) imposed under section 56.3(b) – requiring an Initial Report to include data on cases from January 1, 2021 to the present – will require the Bexar County District Attorney's Office to pull more than a dozen prosecutors from their daily court duties for several weeks. Compiling this data in a timely fashion (i.e., within 90 days of Rule 56.5 going into effect) will also require paying overtime. The cost of funding the overtime will be borne by Bexar County taxpayers and will need approval by the Bexar County Commissioners Court, which is not guaranteed. Unfortunately, we, like many prosecutor's offices across the State, are already understaffed and have an inadequate number of applicants to fill our more than twenty open prosecutor positions. As a result, those prosecutors left behind to manage their large dockets without proper support, will be pressed to decide which cases to put their energies into, and which ones they cannot, given the County's limited resources.

For all of the foregoing reasons, submitting quarterly reports under section 56.3(a) would also create an undue hardship on the Bexar County District Attorney's Office.

- **§ 56.8 includes an improper remedy under § 66.002 of the Civil Practice and Remedies Code for administrative compliance.**

A writ of *quo warranto* is an extraordinary remedy available to determine disputed questions about the proper person entitled to hold a public office and exercise its functions. *State ex rel. Angelini v. Hardberger*, 932 S.W.2d 489, 490 (Tex. 1996); *see* Tex. Civ. Prac. Rem. Code Ann. § 66.001. The purpose of a *quo warranto* action involving officeholders is to determine disputed questions concerning the proper person entitled to hold a public office and exercise its functions. *State ex rel. Patterson v. Garcia*, No. 04-05-00001-CV, 2005 WL 605388, at *1 (Tex. App.—San Antonio Mar. 16, 2005, no pet.) (mem. op.). Among other circumstances, grounds exist for an action in the nature of *quo warranto* under Chapter 66 if: i) a person usurps, intrudes into, or unlawfully holds or executes a franchise or an office; or ii) a public officer does an act or allows an act that by law causes a forfeiture of his office. Tex. Civ. Prac. Rem. Code Ann. § 66.001 (1)-(2).

*Quo warranto* is an improper remedy for an administrative default. Even if one were to concede for purposes of argument (which I do not) that removal from office –

which the Attorney General's Office lacks statutory authority to pursue under the removal statute – is an appropriate remedy for an administrative failure, claims that an officer abused his or her office by unlawful acts will not support a judgment in a *quo warranto* proceeding. *Quo warranto* actions should not be sought in an attempt to seek relief for claimed or purported acts of "official misconduct." *See State ex rel. Phillips v. Trent Indep. Sch. Dist.*, 141 S.W.2d 438, 441 (Tex. Civ. App. – Eastland 1940, writ ref'd). In other words, *quo warranto* is not the proper remedy to pursue for non-compliance with this proposed rule. Under Texas law, *quo warranto* is the exclusive method used to test whether an individual has the proper authority to hold an office, not to test the validity or propriety of an individual's actions once in it. *Newsom v. State*, 922 S.W.2d 274, 278-79 (Tex. App. – Austin 1996, writ denied).

- **§ 56.8 is overly broad and includes conduct that would not meet the definition of "official misconduct" in section 87.011 of the Texas Local Government Code.**

Section 56.8 provides that *any* violation of Chapter 56 by a reporting entity – whether intentional or unintentional – may be considered "official misconduct" by the Office of the Attorney General under Local Government Code § 87.011, and may result in the initiation of a *quo warranto* proceeding to remove the District Attorney from office under section 66.002 of the Texas Civil Practice & Remedies Code. Noticeably absent from the language of section 56.8 is any kind of scienter requirement. As currently written, section 56.8 could reasonably be interpreted to include good faith efforts by a reporting entity to comply with Chapter 56's reporting requirements that ultimately fall short. This would stretch the meaning of "official misconduct" beyond the definition established by the Texas Legislature in § 87.011(3), which is defined as the "*intentional*, unlawful behavior relating to official duties by an officer entrusted with the administration of justice or execution of the law." Tex. Local Gov't Code § 87.011(3) (West 2023) (emphasis added). Section 56.8 should be amended to conform with section 87.011 of the Texas Local Government Code.

## Conclusion

The proposed rule would undermine the prosecution of criminal cases by diverting staff and resources away from prosecution. It would create an extraordinary burden on

# Appendix
# Tab C.4

**Exhibit
P-6**



**Dallas County Commissioners Court Public Comment on
Proposed Chapter 56 in Title 1 of the Texas Administrative Code**

On behalf of the Dallas County Commissioners Court, I respectfully submit these public comments to the Office of the Attorney General (OAG) regarding the proposed rule on reporting requirements for District Attorneys and County Attorneys presiding in a district or county with a population of 500,000 or more persons to implement Government Code §41.006. The proposed reporting requirement includes requirements to send all case files and correspondence relating to the indictment of violent crimes in our County to the OAG and / or a newly proposed Oversight Committee with an overly vague duties / mandates.

The proposed reporting requirements will have a profound financial and operational impact to our County. It will ultimately require the Dallas County Commissioners Court to raise property taxes to comply and provide no additional transparency or increased public safety to our community as a result. The Dallas County Commissioners Court submits the attached public comments to the OAG highlighting our substantial concerns with this proposed rule.

By virtue of this submission of public comment, **we also formally request the Office of the Attorney General to hold a public hearing on the matter** so the public may be adequately informed on the consequences of the proposed rule by your office.

Sincerely,


Charles Reed
Assistant County Administrator
Dallas County

**Concern 1: Government Code §41.006 does not have a population bracket.**

Given that this proposed rule is intended to implement Government Code §41.006, under what authority does the OAG propose limiting the statute's implementation to counties with a population of 500,000 or more?

Government Code §41.006 does not contain a population bracket limiting the application of this law to counties with a population of 500,000 or more. This law cannot be implemented only for specific counties under additional political scrutiny by the OAG. Even if the requirements of the proposed rule were legal or constitutional, statute requires that the implementation of the law be applied equally to all counties.

**Concern 2: The Government Growth Impact Statement prepared by the OAG in compliance with Texas Government Code §2001.0221 is entirely misleading to the public.**

Why does your office's Government Growth Impact Statement not include the tremendous financial and operational impact that would lead to government growth at the local level of government to comply with this proposed rule?

The OAG is requesting all case files to include documents, notes, memoranda and communications including all emails, instant messages, text messages, direct messages, social media messages, handwritten notes, and typed or handwritten memoranda, whether a draft of final copy produced with or received by the reporting entity's office including work product and otherwise privileged and confidential matters. The OAG is requesting all correspondence to include email, letter, memorandum, instant message, text message, direct message, social media message, note, or otherwise, received or issued by an employee of the reporting entity. And, the OAG is requesting policies, rules, reports on expenditures, and other public information already available to the public through our website.

We assume since the OAG has little authority over criminal matters in the State of Texas, your office likely did not have the expertise necessary to consider the immense labor cost to counties to collect and format all this information into a reportable form. This lack of expertise is likely what led to the poor analysis included in the Fiscal Impact on State and Local Governments. For Dallas County, the universe of cases in question is over 100,000 cases for initial compliance.

It is anticipated the amount of data to be collected and prepared for a CJIS and HIIPA certified transfer to the OAG for the number of cases we would be required to report on initially to cost at least $8.9 million. These costs include court reporter transcripts, software changes, hard drives, server space, and other associated costs. We also expect ongoing annual costs of at least $3.5 million for personnel, certified mail, additional hard drives for each report, annual software maintenance, and court reporter transcripts.

**The estimated five-year cost of this proposed rule to Dallas County taxpayers is $22.9 million and would result in a future property tax increase of approximately 1% on our taxpayers to offset the costs.**

Additionally, the OAG is incorrectly assuming the office will not experience any additional increase to the agency to receive this information from Dallas County and others. This also leads us to believe the OAG has not seriously considered the magnitude of information being requested that the OAG will need to take custody in a manner that complies with CJIS and HIPPA standards.

In compliance with Government Code §2001.0221, please see the total Government Growth Impact Statement for Dallas County to be included in the OAG's updated statement included in the State Register. The proposed rule:

(1) will create a government program by requiring additional personnel and capital infrastructure for quarterly data reporting to the OAG.
(2) will require the creation of employee positions.
(3) will require an increase in future legislative appropriations to District Attorneys who act as, and on behalf of, the State of Texas.
(4) will not lead to an increase in fees paid to a state agency.
(5) will create a new regulation that is inconsistent with Government Code §41.006.
(6) will not repeal an existing regulation.
(7) will result in a decrease in the number of individuals subject to the rule by illegally limiting the application of Government Code §41.006 to specific counties under additional political scrutiny by the OAG; and
(8) will adversely affect the state's economy by unnecessarily burdening local property taxpayers with the cost of complying with the implementation of the proposed rule.

We expect that the OAG will update the Government Growth Impact Statement to include the anticipated growth experienced by Dallas County and the other 253 counties in the State of Texas that this proposed rule should apply to.

**Concern 3: The OAG does not have robust access controls to restrict access to sensitive files being required to report that are deemed confidential by both federal and state law.**

Does the OAG have a Strict Access Control Policy, the ability to encrypt and decrypt data, a secure storage environment, strict policies and procedures outlining the handling, storage, and sharing of sensitive files, a monitoring system or technology to detect any unauthorized attempts to access or share sensitive files, and clear reporting mechanisms for employees to report any suspicious activities or breaches of security and how will these policies be made available to local prosecutors transferring sensitive data in their custody?

Given the sensitivity of evidence in some cases falling under the reportable definition of this rule, the OAG must demonstrate that it has the stated policies and technologies to ensure the protection of data being reported. Protection of this data is paramount as it could include nudity and child pornography and/or crime scene and autopsy photos that, if leaked, could emotionally harm the involved individuals and jeopardize potential future prosecutions.

Additionally, we have several concerns about format changes to digital evidence around quality reduction of evidence, metadata alteration, frame loss and time distortion, aspect ratio changes, color space changes, audio-video synchronization issues, and reduced quality for judgement.

**Concern 4: The OAG is not sufficiently resourced to receive, store, and remain in the custody of the vast amounts of data expected to be sent to and received by OAG staff.**

What physical and digital storage resources does the OAG have in place to receive and securely store the physical or digital evidence being collected?
If being transferred in physical form, in what secure location will the OAG store the physical evidence that is protected by CJIS and HIPPA regulations?

We expect to have to transfer digital evidence, either in the form of hard drives or uploaded into a government cloud controlled by the OAG, 880 terabytes of data per quarter to the OAG to comply with all requirements of the proposed rule. This will come either in the form of 55 physical, external hard drives or upload into the cloud. All this information will be protected under CJIS regulations and some under HIPPA regulations.

Given that the OAG does not typically handle this type of information, we are not confident the OAG will have sufficient physical space or technical expertise to store. If the plan is to store the information digitally, the Government Growth Impact Statement does not accurately reflect the new, and likely substantial, cost that will be borne by the OAG to securely store the evidence. Additionally, we do not believe the OAG is sufficiently considering the time and effort it will take to properly catalogue and maintain the amount of data expected to be received.

**Questions regarding other concerns:**

How will the OAG provide indemnification to Counties if a data breach occurs while physical and digital data from respective counties is in the possession of OAG personnel and in what form will that take?

Does the OAG, or will the OAG, conduct regular vulnerability tests or penetration tests to ensure storage sites remain secure?

What recovery procedures does the OAG have in place in the event of an information technology infrastructure incident?

What incident management procedures have OAG put in place to appropriately handle a data security incident?

How will affected counties be notified in the event of a data security breach?

Which employees at OAG will have access to our high-risk assets and will they be trained and certified on CJIS and HIPPA rules and regulations?

# Appendix
# Tab C.5

**Exhibit
P-7**



## OFFICE OF THE
## HARRIS COUNTY ATTORNEY
# CHRISTIAN D. MENEFEE

October 14, 2024

Mr. Josh Reno
Office of the Texas Attorney General
Open Records Division
Attn: Rule Comments
P.O. Box 12548
Austin, Texas 78711-2548
OAGRuleCommentsCh56@oag.texas.gov

> *Re: Comments in response to proposed new 1 Tex. Admin. Code §§56.1-56.10, related to District and County Attorney (in a district or county with a population of 500,000 or more persons) reporting requirements, as published in the Texas Register on September 13, 2024 (49 TexReg Number 37 Pages 7129-7406)*

Dear Mr. Reno:

I write again in my capacity as the statutory counsel for Harris County and its elected officials regarding the Office of the Attorney General's ("OAG") proposed changes to the Texas Administrative Code at 1. Tex. Admin. Code. §§56.1-.10 (the "Rules") imposing certain reporting requirements on district and county attorneys.

I submitted a letter on April 8, 2024, expressing concerns about a prior version of these rules. I highlighted their impact on district and county attorneys with criminal jurisdiction, especially regarding their professional ethical obligations, their impact on county finances, and potential confusion regarding their application to county attorney offices (like mine) with no criminal jurisdiction. More generally, I was concerned that the Attorney General lacked the statutory and constitutional authority to promulgate these rules.

I see that the Attorney General has proposed new Rules that purport to lower the reporting obligations on district and county attorneys. However, I continue to hold the concerns I shared with you in my April 8, 2024, letter. I, therefore, restate the arguments in that letter by reference and urge the Attorney General not to proceed with the implementation of these Rules.

\*\*\*

**Exhibit
P-7**



I look forward to your response to these comments.

Sincerely,

Christian D. Menefee
Harris County Attorney



April 8, 2024

Mr. Josh Reno
Office of the Texas Attorney General
Open Records Division
Attn: Rule Comments
P.O. Box 12548
Austin, Texas 78711-2548
OAGRuleCommentsCh56@oag.texas.gov

> *Re: Comments in response to proposed new 1 Tex. Admin. Code §§56.1-56.9, related to District and County Attorney (in a district or county with a population of 250,000 or more persons) reporting requirements, as published in the Texas Register on March 8, 2024 (49 TexReg 1357-1360)*

Dear Mr. Reno:

I write in my capacity as the statutory counsel for Harris County and its elected officials regarding the Office of the Attorney General's ("OAG") proposed changes to the Texas Administrative Code at 1. Tex. Admin Code. §§56.1-.9 (the "Rules") imposing certain reporting requirements on district and county attorneys. I understand that district and county attorneys across the state have already provided substantive comments on the OAG's lack of authority to promulgate these Rules and the Rules' impact on prosecutors' ability to comply with their professional responsibilities and confidentiality obligations. I incorporate those arguments by reference to the submissions of other district and county attorneys across the state. I write to highlight the significant impact these requirements will have on Harris County (and other counties') finances, and to seek clarification that the rules do not apply to my office.

Impact on District and County Attorneys with criminal jurisdiction

I incorporate by reference the arguments made by other district and county attorneys in large jurisdictions across the state. To summarize some of these arguments:

- Texas Government Code § 41.006 does not provide the Attorney General with general rulemaking authority.

- Even if it does, it violates the Texas Constitution's nondelegation principles by failing to provide any reasonable standards and limitations. In addition, granting the OAG oversight of criminal prosecutions by district and county attorneys violates separation of powers principles by unconstitutionally interfering with the judicial branch's inherent authority.
- The Rules would require district and county attorneys with criminal jurisdiction to violate their professional ethics by disclosing privileged communications and attorney work product. The Rules would also require these attorneys to potentially violate statutes governing the confidentiality of sensitive records, including records regarding juvenile cases and Child Protective Services records.
- The Rules purport to grant the Attorney General the authority to remove a district or county attorney for non-compliance pursuant to Texas Local Government Code chapter 87 and to initiate *quo warranto* proceedings pursuant to chapter 66 of the Civil Practice and Remedies Code. Section 41.006 of the Government Code contains no such authority, and in any event, only the legislature may constitutionally amend or add new provisions to existing statutes.

Impact on County Finances

You claim in the Texas Register entry for the proposed Rule "for the first five-year period the proposed rules are in effect, enforcing or administering the rules does not have foreseeable implications relating to cost or revenues of state government." You go on to state that "minimal costs to local governments for gathering and submitting quarterly and yearly reports to OAG, however, the gathering and submitting of the required reports can likely be absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact." However, the Texas Register entry provides no support for these assertions, and the size of Harris County's prosecuting agency makes these claims preposterous.

Harris County has around 4.8 million residents, and is by far Texas' largest county. The Harris County District Attorney's Office, which prosecutes most crimes in the name of the State in Harris County, has around 800 lawyers and currently handles a caseload of over 30,000 felony court cases and thousands more misdemeanor cases.

The proposed Rules will significantly impact operations for this already burdened agency. Aside from producing the quarterly and annual reports, the Harris County District Attorney's office would need to update its data gathering mechanisms, which will come at an operational and labor cost. Moreover, the Rules will require individual prosecutors to spend hours gathering this data, at the expense of swiftly prosecuting their cases. The Rules will therefore interfere with the actual mission of the District Attorney's Office, which is to make Harris County safer by prosecuting offenders and obtaining justice for victims. For example, Rule 56.3(a)(7)-(12) requires gathering all correspondence in the office and determining whether it must be produced, necessitating potentially hundreds of additional hours from attorneys and staff. Alleviating that burden would require hiring additional prosecutors and staff, which will impact Harris County's already-strained budget.

And these impacts will be felt immediately. Proposed Rule 56.3(b) requires district and county attorneys report all "reporting event[s] [that] occurred between January 1, 2021, and the

effective date of this rule".  Forcing prosecutors to apply a lookback period of over three years will impact ongoing operations in their offices and would require at least a temporary increase in labor costs in addition to the permanent increase in staffing required to comply with Rules 56.3(a) and 56.4.

Harris County's budget office anticipates that complying with these Rules will carry an initial cost of $16 million.

<u>Clarification Regarding County Attorneys with no criminal jurisdiction</u>

Taken as a whole, the proposed rules appear to apply only to data stemming from criminal prosecutions. *See* Proposed Section 56.1 (stating that district and county attorneys "shall submit quarterly and annual reports relating to ***criminal matters*** and the interest of the state to the Office of the Attorney (OAG) in a manner prescribed by the OAG and as set forth in this chapter"); *see also* Tex. Gov't Code § 41.006.  Unlike most other county attorneys in Texas, my office has no criminal jurisdiction. *See* Tex. Gov't Code § 45.201; *see also Driscoll v. Harris Cnty. Comm'rs Court*, 688 S.W.2d 569, 572-73 (Tex.App.—Houston [14th Dist.] 1988, write refused n.r.e.).  My office represents Harris County and its officials in lawsuits, and provides legal advice to the County. To the extent Government Code Section 41.006 allows the OAG to promulgate the Rules, it clearly does not extend rulemaking authority over my office. However, the text of the Rules is at times ambiguous and could suggest that my office must comply with their requirements.

The quarterly reporting requirements (56.3) on their face apply only to criminal prosecutions. While Section 56.3(a)(12) requires county attorneys to produce "[c]orrespondence or other records memorializing assistant district attorney or assistant county attorney resignations or terminations and the reasons therefore where a complaint was made, formally or informally, by the assistant district attorney or assistant county attorney", the entire context of the rule and the fact the OAG's purported authority to prescribe the rule applies only to "criminal matters and the interest of the state," suggests that this requirement should not apply to the Harris County Attorney. However, given the lack of clarity in Section 56.3(a)(12), OAG should clarify that this rule does not apply to my office.

Given Texas Government Code Section 41.006's and Section 56.1's scope, Section 56.4's annual reporting requirements likewise appear to apply only to county attorneys with criminal jurisdiction. However, the text of Section 56.4 is not limited on its face to county attorneys with criminal jurisdiction. For example, it requires any county attorney in the state to produce, without limitation, "[a]ll policies, rules, and orders, including internal operating procedures and public policy documents, that were modified during the prior 12 months."  Because this ambiguity could cause my office unnecessary expense in order to avoid the draconian penalties associated with non-compliance, I ask that you clarify that the Rules do not apply to my office.

\*\*\*

I look forward to your response to these comments.

Sincerely,

Christian D. Menefee
Harris County Attorney

# Appendix
# Tab C.6

**Exhibit
P-8**



**DELIA GARZA**
COUNTY ATTORNEY

LUCIO DEL TORO
FIRST ASSISTANT

LESLIE DIPPEL
EXECUTIVE COUNTY ATTORNEY

314 W. 11th STREET
GRANGER BLDG., SUITE 500
AUSTIN, TEXAS 78701

P.O. BOX 1748
AUSTIN, TEXAS 78767

(512) 854-9415
FAX: (512) 854-4808

October 10, 2024

Josh Reno
Office of the Texas Attorney General
Attn: Rule Comments on Proposed Chapter 56
P.O. Box 12548
Austin, Texas 78711-2548
OAGRuleCommentsCh56@oag.texas.gov

Dear Mr. Reno,

I write to share significant concerns with and express opposition to the proposed new Chapter 56 in Title 1 of the Texas Administrative Code in the Texas Register published on September 13, 2024, at 49 Tex. Reg. 7139. This proposed Chapter relates to implementation of Texas Government Code section 41.006 and contains ten new rules, many of which exceed the scope of section 41.006. I have many substantive and practical concerns with the proposed rules, but wish to highlight the proposed rules (1) conflict with federal and state laws such as those protecting the privacy of crime victims and law enforcement officers; and, (2) subject local entities and the State to substantial costs on an unreasonably tight timeline.

The overly broad definition of "case file" to specifically include confidential and privileged information would require disclosure of information subject to numerous constitutional and statutory restrictions, including state and federal privacy laws. Disclosing information such as crime victim location and contact information; victim impact statements; juvenile records; records that have been sealed or otherwise restricted by a court; law enforcement officer personnel information; grand jury information; personal health information; and personal financial information would violate deep-rooted privacy rights of some of our most vulnerable and sensitive populations.

There is a significant legal question whether the Travis County Attorney's Office may send, and the Office of the Attorney General may receive, all the information falling within the broad definition of a "case file." Many of the above categories of information have civil and criminal penalties for improper disclosure—and for good reason. The legislature has determined that the sensitivity of these particular categories of information outweighs the public's right to access certain information.

**Exhibit
P-8**

To require disclosure of such an unprecedented broad definition of "case file" without regard to any privilege places our citizens and peace officers at a risk that is not outweighed by the Attorney General's individual stated purpose "to hold public officials accountable." With every election, our public officials are held accountable for their decisions in the eyes of the public without the added measure of disclosing the sensitive and personal information of our County's residents. Further, the disclosure of private information retroactively removes the privacy victims and witnesses depend upon when they first report a crime or cooperate with a prosecution. This betrayal of trust will discourage future crime victims from coming forward and will impair our peace officers, whose information will also be shared, from safely performing their duties.

This concern is not mitigated by the revision of the proposed rules that initially require reporting of the *number* of instances of the specified categories when the Oversight Advisory Committee composed of employees of the Attorney General may request *the entire case* file "based on submitted reports or any other information that the Oversight Advisory Committee desires. . ." Proposed Rule 56.8(3)(c).

Furthermore, the published Cost Note (49 Tex. Reg. 7140), that there is "minimal cost to local governments" is simply inaccurate. Certainly, there are significant initial and ongoing costs imposed on local governmental entities to comply with the proposed rules. The Travis County Attorney's Office, like many prosecuting agencies in large counties, utilizes software to maintain its criminal case matters. This software is not designed to generate reports sufficient to meet the proposed requirements' extremely broad definition of correspondence to include "any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee…." Accordingly, compliance will require both software modification and manual review which will also necessitate additional staff and resources.

This would also include the solicitation of vendors to either create or modify software to accomplish such a large breadth of information that is not all currently maintained in the form required by the proposed rules. The modification and review process will be time consuming, expensive, and subject to the constraints of the Travis County rules and budget schedule.

Moreover, the retrospective reporting of cases back to January 2021 will require manual review of tens of thousands of files to ensure subject matter compliance of reported "case files" and "correspondence." The cost of the manual review of the cases subject to the proposed rule's retroactive reporting requirement of proposed section 56.3(b)—both in time and financially—will be considerable. Finally, the quarterly reports will require counties to transmit significant amounts of data in the form of "case files" and other documents to the Office of the Attorney General, resulting in the need for increased data storage needs on the part of the State. For these and other reasons likely to emerge as reporting begins, the fiscal impact borne by local governments, the State, and thus taxpayers will be substantial. This cost is not limited to the purchase of scanners as the proposed rules suggest.

With these concerns in mind, the proposed rules impose a great burden that does not achieve any stated goal that is tied to the underlying statute. The proposed rule only imposes significant cost, and the risk of disclosure of the most sensitive information a prosecutor's office collects without regard to any privacy rights already enacted. I oppose the proposed rules on these and other grounds.

Sincerely,

Delia Garza
Travis County Attorney

# Appendix
# Tab C.7

**Exhibit
P-9**

Mr. Josh Reno
Attn: Rule Comments
Office of Texas Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
*Sent via electronic mail to*: OAGRuleCommentsCh56@oag.texas.gov

October 11, 2024

Re:     Written Comments on Proposed Rules Creating 1 Tex. Adm. Code §§ 56.1-56.10,
        Pertaining to Tex. Gov't Code § 41.006

Dear Mr. Reno:

Thank you for the opportunity to again submit written comments regarding proposed rules to create a new Chapter 56 in the Texas Administrative Code. These proposed rules published in the Texas Register on September 13, 2024, like their previous iteration initially published in the Texas Register on March 8, 2024, seek to implement Tex. Gov't Code § 41.006, a statute enacted in 1985. Many of the comments detailed in this letter reiterate concerns I previously submitted to your office on April 5, 2024. You did not address any of these concerns in the most recent version of Chapter 56 proposed last month.

The Travis County District Attorney's (TCDA) objections to the proposed rules continue to fall within four broad categories. The proposed rules: 1) will erode victim's trust in the criminal legal system and make our communities less safe; 2) violate existing law, creating an untenable choice for reporting entities; 3) cause an immense burden and cost to our office, diverting resources away from prosecuting crime; and 4) curtail the ability of prosecutors to seek justice in the interest of public safety.

1. **The Proposed Rules will have a Detrimental Impact on Public Safety in Texas and on the Rights of Crime Victims.**

It is imperative for public safety that crime victims feel safe reporting crime so that the offender can be arrested, prosecuted, and punished. Prosecutor offices and other law enforcement agencies strive to earn and maintain the trust of crime victims so that victims feel comfortable participating in criminal investigations and prosecutions. Foundational to the trust established between crime victims and prosecutors is the understanding that prosecutor offices will be responsible stewards of case information and honor the privacy rights afforded to crime victims under Texas law.

The proposed rules will require TCDA to disclose "case files" and "correspondence" to the Office of the Attorney General (OAG) on a quarterly basis, even if a crime victim does not consent to case information being shared with OAG. The proposed rules provide no path for a crime victim to be notified about, object to, or prevent the disclosure of case information to OAG.

By requiring prosecutor offices to share case information with OAG, the proposed rules will deteriorate the trust built between crime victims and prosecutor offices and deter victims from

reporting crime and participating in criminal prosecutions. If victims choose not to report criminal activity or cooperate in criminal prosecutions, offenders will continue to harm our community. This will undermine TCDA's efforts to promote public safety.

### a. Crime victims must be able to trust that prosecutors will be responsible stewards of case information.

Protecting victim information from disclosure to a third party serves a well-established public safety purpose. For this reason, victim and case information are protected from disclosure in numerous provisions of Texas law. *See* e.g. Tex. Gov't Code § 552.108 (establishing the "law enforcement" exception to the Texas Public Information Act); Tex. Fam. Code §82.011 (allowing a victim who applies for a protective order to request that their contact information be kept confidential). Safeguarding victim information encourages the public to report criminal activity, secures cooperation with the criminal justice process, and protects victims from further victimization and retaliation.

Information that must be disclosed to OAG under the proposed rules includes sensitive victim information – such as transcripts of a child victim's forensic interview about a sexual assault or correspondence with a family violence victim about her safety plan. OAG has no legitimate law enforcement purpose in receiving or reviewing this information. OAG is a state agency that does not have original jurisdiction to prosecute state criminal offenses. *State v Stephens*, 663 S.W.3d 45, 56 (Tex. Crim. App. 2021), *reh'g denied,* 664 S.W.3d 293 (Tex. Crim. App. 2022); Tex. Const. Art. 4, § 22. The proposed rules do not specify where this information will be kept at OAG, who will have access to this information at OAG, how OAG will use this information, or with whom OAG may share this information. *Cf.* Tex. Code Crim. Proc. Art. 39.14(e)-(f) (defining the narrow circumstances in which the defense may disclose discovery to a third party, the defendant, or a witness). Nor is it clear if OAG can protect this information from public disclosure through the open records process.

Should these rules go into effect, TCDA will no longer be able to assure victims how sensitive case information will be accessed, shared, or utilized. The natural consequence of these proposed rules is that victims will be less likely to trust us, share important case-related information with us, or participate fully with us in criminal prosecutions. Without the trust and cooperation of victims and witnesses, prosecutors cannot hold those who commit acts of violence in our community accountable. This will make our community less safe.

### b. Disclosing private and sensitive crime victim information to OAG violates the privacy rights of crime victims afforded by Texas law.

The Texas Constitution affords crime victims with the right to privacy throughout the criminal justice process. Tex. Const. Art. I, § 30(a)(1). All crime victims have additional rights enumerated in the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. § 56A. For example, the address of a victim may not be a part of the court file "except as necessary to identify the place of the offense" and the phone number of a victim may not be a part of the court file at all. Tex. Code Crim. Proc. § 56A.101. A defendant has only a limited right to discovery of a victim impact statement under Tex. Code Crim. Proc. Art. 39.14. Tex. Code Crim. Proc. Art. 56A.155.

**Exhibit**
**P-9**

Additional provisions in Texas law similarly seek to protect the privacy of crime victims and of the non-profit organizations that support them.

A victim's name, social security number, address, telephone number, and any other information contained in a victim impact statement that could identify or tend to identify the victim if disclosed are confidential and cannot be released. Tex. Gov't Code § 552.1325. The proposed rules would require that the entirety of a victim impact statement, including identifying information, be shared with OAG.

Even if a victim is using a pseudonym, the proposed rules require prosecutor offices to release correspondence and other records that include the victim's legal name and contact information to OAG. OAG has no role in the investigation or prosecution of the offense involving the victim. It is a class C misdemeanor for a public servant to knowingly disclose the name, address, or telephone number of a crime victim using a pseudonym to "a person who is not assisting in the investigation or prosecution of the offense," Tex. Code Crim. Proc. Art. 58.256.

Information about centers for victims of family violence, trafficking, or sexual assault and their clients is confidential. Tex. Gov't Code Sec. 552.138. The proposed rules mandate that correspondence between prosecutor offices and nonprofit organizations, including centers that serve victims of family violence, trafficking and sexual assault, be disclosed to OAG.

Under the Texas Constitution, it is prosecuting attorneys who are tasked with the responsibility of enforcing the rights of crime victims. Tex. Const. Art. I, § 30(d). Yet, the proposed rules obligate prosecuting attorneys to violate victims' rights to privacy by disclosing to OAG victim information that is confidential, privileged, or otherwise protected under Texas law.

### 2. The Proposed Rules Require TCDA to Violate the Law

TCDA cannot comply with the proposed rules without violating existing law. In addition to the laws described above that relate to the privacy of victims and the nonprofit organizations that serve them, the proposed rules conflict with numerous other requirements established by statute and legal precedent. The following is a sampling of authority that limits or prohibits TCDA's ability to comply with the reporting mandates proposed by Chapter 56:

### a. Grand Jury Secrecy Requirements

Under the proposed rules, information contained in case files or correspondence that relates to grand jury proceedings must be disclosed to OAG. However, Texas law does not allow grand jury information to be disclosed to OAG. Grand jury proceedings are secret, and a subpoena or summons relating to a grand jury proceeding or investigation must be kept secret. Tex. Code Crim. Proc. Art. 20A.202.

The proposed rules make no exception for the strict statutory requirement that binds TCDA to protect grand jury secrecy. Tex. Code Crim. Proc. Art. 20A.204. Violation of grand jury secrecy requirements is punishable "by a fine not to exceed $500, as for contempt of court, and by a term of confinement not to exceed six months." Tex. Code Crim. Proc. Art. 20A.203. By mandating

that grand jury information to be shared with OAG, the proposed rules not only violate grand jury secrecy protections established by Texas statute, they also conflict with decades of well-settled public policy and legal precedent that protect the integrity and reliability of the criminal justice process. *See also, Stern v. State ex rel. Ansel*, 869 S.W.2d 614, 621-22 (Tex. App.—Houston [14th Dist.] 1994, writ denied). While a "prosecutor is the servant of the grand jury," OAG has no role in grand jury proceedings. *Id*., at 622. The veil of grand jury secrecy may only be pierced when "*in the judgment of the court*, it becomes material to the administration of justice that disclosure be allowed." *Id*., (emphasis in original).

### b. Health Care Records

The proposed rules obligate TCDA to disclose mental and physical health records to OAG in violation of federal and state law. It is a violation of HIPPA for TCDA to disclose mental and physical health records to OAG. HIPPA 45 CFR Parts 160, 164. State law prohibits TCDA from disclosing mental health records obtained for the purpose of criminal prosecution to OAG, as such disclosure would not be "consistent with the authorized purposes" for which TCDA first obtained the information. Tex. Health & Safety Code § 611.004(d). Similar statutory restrictions prevent TCDA from disclosing records of emergency medical services, HIV testing results, and prescription information to OAG. Tex. Health & Safety Code § 773.091(c); Tex. Health & Safety Code § 81.103(j) (creating a Class A misdemeanor offense for the release of HIV test results with criminal negligence); Tex. Gov't Code § 552.118 (exempting prescription information from public information requirements).

### c. Juvenile Justice Confidentiality Requirements

The proposed rules would require TCDA to report information to OAG that pertains to juvenile respondents as well as adult defendants. Texas law does not allow TCDA to share information relating to juvenile respondents with OAG. Information acquired and kept in a local juvenile system "is not public information" and "may not be disclosed to persons, agencies, or organizations that are not members of the system except to the extent disclosure is authorized or mandated by this title." Tex. Fam. Code § 58.307. OAG has no role in the juvenile justice system and there is nothing in the Family Code that authorizes OAG to have access to information relating to juvenile respondents.

### d. Criminal History, Vehicle and Driver Confidentiality Requirements

TCDA case files contain criminal history record information and, in some instances, vehicle ownership information, that cannot be disclosed to OAG.

Every TCDA case file contains combined criminal histories of the accused which aid the prosecutor in making charging decisions and plea offer recommendations. It is common practice to store the criminal histories of victims and witnesses in TCDA case files to comply with a prosecutor's duty to disclose any exculpatory, impeachment or mitigating evidence to the defense. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *U.S. v. Bagley*, 473 U.S.667, 676-77

(1985); Tex. Code Crim. Proc. art. 39.14(h). Criminal history record information is confidential and may not be disseminated to OAG. Tex. Gov't. Code § 411.083.

Case files frequently contain vehicle ownership information and driving records. Personal information obtained in connection with a motor vehicle record may not be disclosed to OAG. Tex. Trans. Code § 730.004. These records often contain medical information and emergency contact information for the vehicle owner or license holder that also may not be disclosed to OAG. Tex. Trans. Code § 521.060(b).

### e. Sensitive Evidence Associated with Child Victims

Under the proposed rules, TCDA would be required to disclose to OAG case files or correspondence that relate to the prosecutions of crimes against children. A district attorney's office may not release the name, address, telephone number or other identifying information of a child victim "to any person who is not assisting in the investigation, prosecution or defense of this case." Tex. Code Crim. Proc. Art. 58.155.  To do so is a Class C misdemeanor. Tex. Code Crim. Proc. Art. 58.156(d).

In child abuse cases, TCDA routinely obtains records created from related investigations conducted by the Texas Department of Family and Protective Services (DFPS), school records pertinent to child victims, and forensic interviews of child victims and witnesses.  The proposed rules make no exceptions to protect this sensitive information from disclosure and would require TCDA to report this information to OAG in violation of existing law. Federal law prohibits the unauthorized disclosure of school records. 20 U.S.C. §1232g(b). Under Texas law, disclosing confidential information contained in DFPS records, papers, files, or communications is a Class A misdemeanor. Tex. Hum. Res. Code § 40.005(e).  Though a court may order the disclosure of confidential DFPS information, it may only do so in response to a motion requesting the release or the court's own motion, and then only after a hearing and an *in camera* review, followed by a finding that the information is "essential to the administration of justice" and "not likely to endanger the life or safety" of the child in question, the reporter, or any other person who participates in the investigation or who provides care for the child. Tex. Fam. Code § 261.201(b). OAG cannot bypass this legal process and obtain confidential information related to DFPS investigations without a court order.

Case files involving crimes where the child is a victim or witness to the offense often contain a forensic interview transcript. The proposed rules would require TCDA to disclose to OAG transcripts of forensic interviews with child victims in violation of Texas law. Forensic interviews of a child victim "must remain in the care, custody or control of the court or the state." Tex. Code. Crim. Proc. Art. 39.15(b). Prosecutor offices are prohibited by statute from disseminating a forensic interview of a child victim, and a court *shall deny* any request to copy, photograph, duplicate, or otherwise reproduce any property or material that falls under this category of evidence. Tex. Code. Crim. Proc. Art. 39.15(c).

In cases involving child victims, TCDA regularly collaborates with the local child advocacy center, a nonprofit organization that supports criminal investigations of crimes involving children

and provides needed services to child victims and their families. TCDA frequently exchanges correspondence, DFPS records, and other case-related information with the child advocacy center, and these records are contained in TCDA case files. Under the proposed rules, TCDA would have to disclose child advocacy center correspondence and records to OAG.  However, the files, reports, records, communications, and working papers developed or used by a child advocacy center are confidential. Tex. Fam. Code § 261.201(b).

### f.  Release of DNA Information

DNA information commonly collected in child abuse cases, sexual assault cases, and other cases involving violence must also be disclosed to OAG under the proposed rules. The release of information in a DNA record or information related to a DNA analysis of a sample to an unauthorized recipient constitutes official misconduct under Texas law and is punishable as a state jail felony. Tex. Gov't Code § 411.153.

### g.  Expunged Records

The proposed rules require prosecutor's offices to "implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this chapter." Additionally, the proposed rules mandate that documents be preserved "for at least two years after the date when they are due to be reported." This proposed documentation retention requirement conflicts with statutory requirements that relate to expunged records.

A prosecutor's office cannot retain or disseminate a case file, or any information contained in a case file, to OAG following a final expunction order. Upon receipt of a final expunction order, a prosecutor's office must either return all records and files subject to the order to the court or "obliterate all portions of the record or file that identify the person who is the subject of the order" and "delete from its public records all index references to the records and files that are subject to the expunction order." Tex. Code Crim. Proc. Art. 55.02 § 5(a)(1). The release, maintenance, dissemination, or use of expunged records and files for any purpose is prohibited. Tex. Code Crim. Proc. Art. 55.03(1). Failure to return or obliterate identifying portions of a record or file ordered expunged constitutes a Class B misdemeanor. Tex. Code Crim. Proc. Art. 55.04, §§ 2-3. Knowingly releasing, disseminating, or otherwise using expunged records or files is also a Class B misdemeanor. Tex. Code Crim. Proc. Art. 55.04. TCDA cannot disclose to OAG any file, correspondence, or other record that has been expunged.

### h.  Personnel Records

The proposed rules would require TCDA to disclose certain personnel records to OAG. Personnel records, or at least portions of personnel records, are not subject to public disclosure. Texas Government Code Section 552.102 exempts "information in a personnel file, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," and at least one Texas court has relied on this statute to protect against the compelled production of personnel file materials in response to a subpoena duces tecum. *See Atkins v. State*, No. 08-13-00113-CR, 2015 Tex. App. LEXIS 5620, at *8 (Tex. App.—El Paso June 3, 2015, no pet.)

(mem. op., not designated for publication) ("The personnel file, or at least portions of it, is certainly confidential."); *see also* Tex. Gov't Code § 552.326 (allowing a governmental body to raise an exception involving the "property or privacy interests of another person"); *Industrial Foundation of South v. Texas Industrial Accident Board*, 540 S.W.2d 668, 685 (Tex. 1976) (holding that a public employee "does not forfeit all right to maintain the confidentiality of his personal affairs merely because he has disclosed facts about those affairs to a unit of government."). OAG has no involvement in the employment practices of prosecutor's offices, is not entitled to receive personnel records of assistant district attorneys or assistant county attorneys and makes no representations about its ability to maintain the confidentiality of personnel records relating to these employees.

3. **The Proposed Rules Cause an Immense Burden and Cost to TCDA and Will Divert Significant Resources from Public Safety.**

OAG asserts that rule compliance will result in "minimal costs to local governments" and can be absorbed into TCDA's "ongoing operations with minimal, if any, fiscal impact." We respectfully disagree.

The proposed rules make no distinctions between cases that are pre- or post-indictment, cases that are pending or resolved, or cases for which an appeal or writ application may be active. The proposed rules similarly offer no exemptions for records that constitute work product, are drafts but not final versions, or are as trivial as a legal secretary's to-do list written on a Post-it note. Submissions to OAG under the proposed rules will likely total tens of thousands of pages. We question whether it will be possible for TCDA, or any reporting entity, to transmit this volume of documents electronically as proposed by § 56.5(b). Moreover, the labor required to review, identify, and disclose this quantity of records will have a major fiscal impact on TCDA and cause substantial disruptions to its ongoing operations.

OAG estimates that work required to comply with the proposed rules can be performed by an "an administrative assistant" compensated "at $21.29 an hour for one to ten hours of work to scan and electronically submit documents to OAG." Fulfilling the reporting requirements set out in the proposed rules will require far more personnel resources than an individual administrative assistant and a scanner.

TCDA, like most large prosecutor offices across the state, does not utilize physical case files that can be easily fed into a scanner and then submitted to OAG. To the contrary, case information is now organized in online case management systems to accommodate the receipt of digital evidence from law enforcement partners and the disclosure of discovery to the defense. And although an "administrative assistant" may be able to assist in the uploading of records to OAG, culling the appropriate cases to be reviewed and tabulated to comply with the proposed data reporting requirements, identifying the appropriate records within a particular case file that must be disclosed to OAG, and ensuring that necessary redactions and withholdings are made in order to prevent any unlawful disclosure of case information to OAG cannot be performed by a single

Exhibit
P-9

"administrative assistant" alone. On the contrary, the completion of these tasks will require significant paralegal, attorney, and IT professional resources.

The current minimum wage for Travis County employees is $21.84 an hour, which exceeds OAG's estimated hourly wage for an administrative assistant in the proposed rules. Including benefits, the average hourly rate for a TCDA paralegal is $43.44 an hour and the average hourly rate for a TCDA attorney is $71.15 an hour. The hourly rate that TCDA charges when responding to a public information request for records that requires computer programming to produce, as the proposed rules do, is $42.75 an hour.

OAG contends that only "minimal" county employee time will be spent compiling the required reporting data because "reporting entities should maintain standard law enforcement record keeping practices." However, the proposed rules create numerous new data and case information reporting requirements for prosecutor offices. Some of these proposed requirements seek information that TCDA does not possess.

For example, proposed rule §56.4(5) requires reporting entities to provide OAG with information and correspondence "regarding funds accepted by the commissioners court of their county…that were not passed on to the reporting entity, but were used to benefit the reporting entity, its personnel, or its operations." This language is exceptionally vague. The proposed rules offer no additional explanation or direction to help TCDA discern whether or how funds allocated to another county office or department may be considered to "benefit" TCDA. Furthermore, TCDA is not privy to information about the entirety of funds received by Commissioners Court. Nor does TCDA have knowledge of or access to all county correspondence relating to the acceptance of funds that, according to OAG, provide some undefined "benefit" to TCDA.

Other proposed requirements under Chapter 56 seek information that TCDA has no existing obligation to track or disclose under existing case law, statute, administrative rules, or disciplinary rules.

The proposed rules create a broad category of cases, referred to as "violent crimes", and require disclosure of certain records related to the disposition of this category of offenses. TCDA has no current obligation to report aggregate data related to this disparate category of case prosecutions, and the proposed rules provide no specificity as to the exact statutory citations or DPS offense codes that OAG seeks to encompass within this "violent crimes" definition. However, an initial review of TCDA case records indicates that TCDA received at least 26,021 cases between January 1, 2021 and September 30, 2024, resulting from arrests that we expect will fall within OAG's proposed "violent crime" definition, including at least 7,370 cases in 2023 alone. For its initial report due under the proposed rules, TCDA would need to review, *at a minimum*, each of these 26,021 cases to determine which instances must be reported to OAG under proposed rule § 56.3(a)(7).

The proposed rules also require the collection, storage, documentation, and dissemination of records that are not ordinarily retained as part of a criminal case file.

**Exhibit**
**P-9**

One of the many data points that TCDA would need to tabulate for the initial and quarterly reports due to OAG under the proposed rules is "the number of prosecutions involving a defendant's discharge of a firearm where the defendant raised a justification under Chapter 9 of the Penal Code, Subchapter C and/or D." TCDA does not currently track whether a case involves the defendant's discharge of a firearm, or whether a defendant has raised a justification under Subchapters C or D of Texas Penal Code, Chapter 9.

Reporting on this single provision of the proposed rules for the initial report due to OAG would require TCDA to review *at least* every homicide, deadly conduct, and aggravated assault with a deadly weapon case prosecuted since January 1, 2021. TCDA estimates that, between January 1, 2021 and September 30, 2024, it has received 5,338 cases where a defendant was arrested for homicide, deadly conduct, or aggravated assault with a deadly weapon. In 2023 alone, TCDA received 1,562 cases resulting from an arrest for homicide, deadly conduct, or aggravated assault with a deadly weapon. In order to determine whether the defendant raised one of the justifications named in proposed rule § 56.3(a)(3) for the initial report, TCDA would need to review the work product notes and digital media evidence in at least each of these 5,338 case files. These files can have more than 200 work product notes and more than 500 pieces of digital media evidence, including 4 or more hours of video. On average, TCDA estimates that this type of case file contains 80 GB of information.

TCDA cannot estimate the exact amount of staff time needed to comply with the totality of the reporting requirements mandated by the proposed rules, in part because it is impossible for TCDA to predict how often the Attorney General will order the disclosure of an entire case file that relates, in his opinion, to "the interests of the state" or how frequently OAG's Oversight Committee will request correspondence relating to a "violent offense" included in a previous quarterly report. However, TCDA does estimate that the proposed rules will cost TCDA over a million dollars each year and necessitate TCDA to assemble a dedicated unit of attorneys, paralegals, and support staff whose sole responsibility is to ensure TCDA's compliance with the reporting requirements established by proposed Chapter 56.

Additionally, to prepare the proposed "initial report" - which seeks case information dating back to January 1, 2021 - TCDA expects that it would need to hire a team of temporary attorneys, paralegals, and support staff. This team would require office space, equipment, and supplies. Time would need to be spent recruiting, hiring, and training these temporary employees. Regular staff already familiar with office processes would need to assist this team and be unable to complete their core responsibilities. We are concerned that the enormous resources required to prepare the initial report would effectively bring TCDA's operations to a halt.

This initial report is due within 90 days of the proposed rules' effective date. OAG cites no authority to justify the disclosure of information from years prior to the proposed rules' effective date

It cannot be overstated that compliance with the proposed rules will divert significant TCDA resources away from prosecutions, victim services, and other violence prevention initiatives.

4. **The Proposed Rules Will Curtail the Ability of Prosecutors to Seek Justice in the Interest of Public Safety**

The proposed rules will violate Separation-of-Powers doctrine and chill prosecutors from fulfilling their duty "to see that justice is done." Tex. Code Crim. Proc. § 2.01.

   a. **The proposed rules violate the separation-of-powers doctrine.**

The proposed rules seek to grant OAG oversight authority over county and district attorney's offices in violation of the separations-of-powers doctrine. According to our Texas Constitution, the "powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." Tex. Const. art. II, § 1. "This separation-of-powers doctrine prohibits one branch of government from exercising a power that inherently belongs to another." *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 600 (Tex. 2001); *See also State Bd. of Ins. V. Betts*, 308 S.W.2d 846, 851-52 (1958) ("It is only when the functioning of the judicial process in a field constitutionally committed to the control of the courts is interfered with by the executive or legislative branches that a constitutional problem arises.").

The duties of the OAG are "distinct and generally unrelated" to those of district attorneys. *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 930 (Tex. Crim. App. 1994). Yet, the proposed rules, purport to allow OAG to "ensure that county and district attorneys are consistently complying with statutory duties," such as seeking justice for crime victims, appropriately administering funds, and "appropriately prosecuting crimes." The OAG formulates these "statutory duties" independently of the legislature. *See* Tex. Const. art. V, § 21 ("[T]he respective duties of District Attorneys and County Attorneys shall . . . be regulated by the Legislature.")

In explaining the alleged purpose for the proposed rules, OAG asserts "whether a public official and office whose purpose is to fairly prosecute crimes and keep communities safe is enforcing criminal prosecution laws is a criminal matter and within the interests of the state." In doing so, OAG seems to imply that it has original jurisdiction over criminal matters in the State of Texas – it does not. *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002) ("Since 1923 the legislature has not given the attorney general any duty to prosecute criminal cases at any level of the courts of Texas."). In the proposed rules, OAG also misrepresents the primary duty of prosecuting attorneys under the Texas Constitution, which is "not to convict, but to see that justice is done." Tex. Code Crim. Proc. Art. 2.01.

Prosecutors enjoy a unique status as "independent members of the judicial branch of government." *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 7 (Tex. Crim. App. 1990). While district attorneys "must regularly answer to the will of the electorate," *Id.,* OAG has no legal authority to evaluate an elected district attorney's job performance.

   b. **The proposed rules violate the work product doctrine.**

The proposed rules would require TCDA to produce work product to OAG, dating back to January 1, 2021. This requirement violates the work product doctrine, threatens past, previous, and future criminal prosecutions, and may harm the public safety of this community.

The work product doctrine serves to "stimulate the production of information for trials, and it rewards an attorney's creative efforts by giving his work product a qualified privilege from being shared with others." *Pope v. State*, 207 S.W.3d 352, 357-58 (Tex. Crim. App. 2006). Included in this privilege is "the production of material – documents, e-mails, letters, disclosure of conversations and so forth—and statements that set out an attorney's litigation strategy or opinions concerning the results of his investigation or that of his agents." *Pope*, 207 S.W.3d at 365.

A prosecutor's work product may include her legal research, her correspondence with colleagues concerning her legal strategy, her impressions about the credibility of witnesses or the strength of evidence, or notes prepared in preparation for her presentations at trial. Prosecutors create work product for their benefit alone, so that they may successfully and ethically perform their duties as attorneys representing the State. Importantly, prosecutors generate work product with the understanding that it is privileged and will not be disclosed to the public, to defense counsel, or to any other third party. In the proposed rules, the OAG cites no legitimate public policy purpose for seeking work product information and superseding this long-recognized doctrine.

### c. The proposed rules will allow the OAG to unduly influence a prosecutor's individual discretion and pursuit of justice.

Key to an individual prosecutor's pursuit of justice is the broad grant of prosecutorial discretion. *See Tope v. State*, 429 S.W.3d 75, 80 (Tex. App.—Houston [1st Dist.] 2014, no pet.) Line prosecutors evaluate each case on an individual basis and make decisions based on factors including "the strength of the case, the case's deterrent value, and the government's enforcement priorities." Tex. Att'y Gen. Op. No GA-0765 (2010) (concluding a "district attorney's prosecutorial determination regarding the initiation of criminal proceedings is within the prosecutor's substantial discretion."). Elected prosecutors that attempt to limit the discretion of line prosecutors by directing them to refuse to prosecute a class or type of criminal offense are subject to removal under state law. Tex. Local Gov't Code § 87.011(3)(B); Tex. Local Gov't Code § 87.013(a)(2).

If implemented, the proposed rules will force individual prosecutors and other actors in the criminal legal system to carry out their duties under the gaze of OAG. This will impair the ability of line prosecutors to:

- Explore legal theories with colleagues and supervisors;

- Have confidential discussions with defense counsel about the theory of the case, circumstances of the defendant, or other sensitive information that may bring forth a just resolution;

- Staff ongoing investigations with law enforcement;

- Prepare a victim for a difficult or invasive cross examination at trial; or

- Collaborate with child advocacy centers, family violence centers, or other agencies that serve survivors of trafficking or sexual assault.

OAG does not have oversight authority over district attorneys' offices, yet the proposed rules seek to empower OAG to analyze and second-guess the case evaluation and decision-making processes of thousands of line prosecutors employed in county and district attorney offices across this state. *See* Proposed Rule § 56.3(a)(6) (requiring the disclosure of case files as requested by the Attorney General "including cases where there are substantial doubts whether probable cause exists to support a prosecution").

**Conclusion**

The proposed rules will infringe upon the rights of crime victims, increase mistrust in the criminal legal system, and make it more difficult for crimes in our community to be detected, investigated, and prosecuted. The proposed rules mandate that TCDA violate existing Texas laws and, in some instances, commit acts that constitute criminal conduct, overriding numerous legal protections intended to promote public safety, safeguard the privacy of victims and the public, and ensure fairness in the criminal justice process. Complying with the proposed rules will require significant TCDA staff time and money, diverting needed resources away from criminal prosecutions.

OAG alleges that the disclosures mandated by the proposed rules are "necessary" and "in the public's interest," yet OAG makes no claims about how the information collected – including confidential, privileged, and very sensitive case information – will be stored, protected, or shared, and estimates that no state costs or revenues will be required to execute this purpose. The proposed rules challenge the separation-of-powers doctrine, chill the pursuit of justice by individual prosecutors, and diminish the public's confidence in our criminal justice system. OAG's bare assertions of the proposed rules' public benefit do not offset these far-reaching consequences.

Respectfully submitted,

*/s/ José P. Garza*
JOSÉ P. GARZA
Travis County District Attorney
Travis County, Texas
State Bar No. 24050646
P.O. Box 1748
Austin, Texas 78767
(512) 854-9400
Fax. No. (512) 854-9789
jose.garza@traviscountytx.gov

**Exhibit**
**P-9**

# Appendix
# Tab C.8

**Exhibit
P-10**

Docusign Envelope ID: 6F2F5C09-3A86-4DFC-A0B7-00AC221B75E8



# TRAVIS COUNTY
# COMMISSIONERS COURT

ANDY BROWN
County Judge

JEFFREY W. TRAVILLION, SR
Commissioner, Pct. 1

BRIGID SHEA
Commissioner, Pct. 2

ANN HOWARD
Commissioner, Pct. 3

MARGARET J. GÓMEZ
Commissioner, Pct. 4

October 8, 2024

Josh Reno
Attn: Rule Comments, Office of the Attorney General
P.O. Box 12548
Austin, TX  78711-2548

RE: Comments on Chapter 56 in Title 1 of Texas Administrative Code

Dear Mr. Reno,

We are writing you today to share our opposition to the proposed rule as written to create a new Chapter 56 in Title 1, Texas Administrative Code. Although we have multiple concerns with the proposed rule, our primary concerns are regarding the practicality of implementation, an excessive negative fiscal impact, and privacy concerns for the victims of crimes in cases our prosecutors are working.

In the proposed rules, you have determined that for the first five-year period there will be "minimal costs to local governments for gathering and submitting quarterly and annual reports to OAG" and that the gathering and submitting of the required reports can "likely [be] absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact." We disagree with your first assertion that this rule will only impose minimal costs and foresee a rather significant fiscal impact. During the 83rd Regular Session, the legislature passed Senate Bill 1611, otherwise known as the Michael Morton Act, which changed discovery requirements in criminal prosecutions and the disclosure of certain case information. Per the legislation, any offense reports, any designated documents, papers, or written or recorded statements of the defendant or a witness are required to be viewable by the defendant upon request and shared electronically. Due to the new administrative duty created by this legislation, in 2014 the Travis County Commissioners Court allocated $246,242 in new funds to the District Attorney's office and $256,847 in the County Attorney's office for a total of eight new positions. These new positions are permanent, ongoing staff required to implement the legislation's requirements. Additional resources have been subsequently added to keep pace with increasing caseloads.

Docusign Envelope ID: 6F2F5C09-3A86-4DFC-A0B7-00AC221B75E8

Like the Michael Morton Act, the new Chapter 56 requires County and District Attorneys to compile a laundry list of materials that must be produced under the proposed rule. However, by defining "case file" to mean "all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electric, or otherwise, including drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters" the number of producible records grows tenfold. Additionally, the definition of "correspondence" in the rules is expansive and far-reaching and includes "any email, letter, memorandum, instant message, text message, or direct message received or issued by an employee of the reporting entity."

In its attempt to be thorough, the OAG has put more importance on quantity over quality. This rule will create hundreds of thousands of records that must be produced and distributed to the Office of the Attorney General quarterly. Very early estimates of the fiscal cost to Travis County will result in additional expenditures **in excess of a million dollars** to comply with the reporting required by the proposed rule. Not only will this rule require additional staffing, but Travis County will also need to develop new programming to help consolidate this information into a single digital source – at present we do not have a technological system that will seamlessly accommodate this new requirement, despite the numerous scanners available for use.

Further, we find no data to support your second assertion that the production of these reports can be integrated into current reporting requirements. No similar reporting requirements exist from any state or federal agency with the authority to require such; accordingly, no existing requirements cited in Title I, Part 3 of the Texas Administrative Code or Section 41.006, Texas Government Code, have established reporting procedures even remotely similar to what Chapter 56 will require. As such, there is no existing reporting process we have to build upon in order to produce the expansive annual or quarterly reports to the Office of the Attorney General being proposed by this rule. Rather, this will require an overhaul in the operations of both the County and District Attorney's offices, along with supporting offices such as the District and County Clerk, Information Technology, the County Auditor, and our Planning and Budget Department.

Finally, and most concerning to the Commissioners Court, is what the end use of this compiled data will be. In a March 13, 2024, press release, Attorney General Ken Paxton justified the need for the previous, but similarly proposed reporting standards because they, "will create much-needed transparency and enable the public to hold their elected officials accountable." Meaningful transparency has long been a value of the Travis County Commissioners Court; however, we fail to see that reflected in this proposed rule. How will sharing sensitive crime information such as statements and photos benefit the public? How will an Oversight Committee poring over such records provide any benefit to the victims themselves? The failure to adequately address why exactly the Office of the Attorney General is in need of these records gives the Commissioners Court doubt that victims and their information will be protected in this pursuit. We fear that this will ultimately lead to less people willing to come forward in reporting crimes and seeking the justice they deserve.

With these concerns in mind, we ask that the Office of the Attorney General take more time to consider how to provide transparency that is both reasonable and cost-effective, so that the rule

**Travis County Administration Building, 700 Lavaca Street, Second Floor, Austin, TX 78701**

**Exhibit**

**P-10**

Docusign Envelope ID: 6F2F5C09-3A86-4DFC-A0B7-00AC221B75E8

does not devolve into an exercise of excess. Moreover, we hope that any proposed rule will uphold the ideal that the information of victims and survivors should always be protected, and their safety and confidentiality will never be threatened for the sake of satisfying public curiosity.

Sincerely,

ANDY BROWN
COUNTY JUDGE

JEFFREY W. TRAVILLION, SR.
COMMISSIONER, PRECINCT 1

BRIGID SHEA
COMMISSIONER, PRECINCT 2

ANN HOWARD
COMMISSIONER, PRECINCT 3

MARGARET J. GÓMEZ
COMMISSIONER, PRECINCT 4

# Appendix
# Tab C.9

**Exhibit P-11**



# CHRISTINA SANCHEZ
EL PASO COUNTY ATTORNEY
320 S. Campbell St. Suite 200
El Paso, Texas 79901
TEL: (915) 273-3238
FAX: (915) 273-3277

October 11, 2024

Mr. Josh Reno
Office of the Texas Attorney General
Criminal Prosecution Division
Attn: Rule Comments
P.O. Box 12548
Austin, Texas 78711-2548
OAGRuleCommentsCh5@oag.texas.gov

> *Re: Comments in response to proposed new 1 Tex. Admin. Code §§ 56.1-56.10, related to District and County Attorney (in a district or county with a population of 400,000 or more persons) reporting requirements, as published in the Texas Register on September 13, 2024 (49 TexReg 7139-7143)*

Dear Mr. Reno:

On behalf of the County of El Paso and the El Paso County Attorney's Office, we write to provide comments on proposed rules with respect to certain District and County Attorney ("D/CA") office reporting requirements under proposed new Chapter 56 of the Texas Administrative Code. The County of El Paso ("County") is a political subdivision of the State of Texas with a population of 869,880. The County is governed by a County Judge and four County Commissioners exclusively responsible for the operation and affairs of County government, including approval of the County's operating budget, setting ad valorem property tax rates, and auditing and direct settlement of claims against the County. The El Paso County Attorney ("County Attorney" or "CA") represents the County, its officials, and employees in various legal matters and prosecutes a variety of cases affecting families and children such as juvenile crime, child and elder abuse, mental health, and family violence. The County Attorney also enforces state and county environmental and health laws, such as illegal dumping, clean air, and water violations.

Under the 1876 Texas Constitution, the Texas Attorney General, a member of the executive branch of government, is charged with representing the State in civil suits involving the State and holding private corporations accountable under the law.[1] ***The Attorney General has no***

---

[1] TEX. CONST. ART. IV, § 22; *State ex rel. Hill v. Pirtle*, 887 S.W.2d 921, 930 (Tex.Cr.App.1994) (plurality op.).

*criminal prosecution authority*.[2] Rather, under the laws of the State of Texas, only D/CA offices, members of the judicial branch of government, may represent the State in criminal prosecutions.[3] Therefore, in criminal matters, the authority of the Office of the Attorney General ("OAG") is limited by state law to assisting a D/CA upon request.[4] Despite this well-established constitutional framework, the Attorney General attempts to accomplish via administrative regulation what is unavailable to him under our constitution and statutes: to grant the OAG new supervisory powers over local prosecutors, particularly those prosecutors in large urban counties.

The County and County Attorney are deeply concerned with this reinvention of our State constitution and statutes under the new proposed rules. We also express concern that the new proposed rules are not authorized under state statute; violate the separation of powers provision under the Texas Constitution; interfere with the professional responsibilities and discretion of prosecutors; allow release of confidential and sensitive information to Austin without sufficient protections for individual and victim privacy; allow the Attorney General to insert himself into cases over which he has no jurisdiction; interfere with the judgment of prosecutors who are elected locally to act in conformity with community values; allow the Attorney General access to confidential information on cases he has politicized; and create a potentially significant unfunded mandate for County and County Attorney compliance.

The County and County Attorney offer the comments below, in order of the rules as published in the Texas Register, to explain in greater detail our concerns with the new proposed rules.

I.  The Texas Legislature did not delegate to the Attorney General the authority to promulgate proposed new Chapter 56 of the Texas Administrative Code under Texas Government Code § 41.006.

State agencies, such as the OAG, are generally empowered by the Texas Legislature through enabling statutes to promulgate rules.[5] Absent an enabling statute, a state agency, including the OAG, does not have the power, inherent or otherwise, to make rules.[6] However, when an enabling statute permits, an agency may adopt rules which have the force and effect of law as if they were statutes.[7] When identifying an enabling statute, the language of the statute will indicate whether the Legislature intends the agency to have permissive or mandatory rulemaking authority.[8] A permissive enabling statute generally will state that an agency ***"may***

---

[2] *Saldano v. State*, 70 S.W.3d 873, 880 (Tex. Crim. App. 2002).
[3] *Id.* at 879.
[4] TEX. GOV'T CODE § 402.028.
[5] *State v. Rhine*, 297 S.W.3d 301, 306 (Tex. Crim. App. 2009).
[6] *PUC of Texas v. City Public service Bd. of San Antonio*, 53 S.W.3d 310, 315 (Tex. 2001); *Tex. Ass'n of Psychological Associates v. Tex. State Bd. of Examiners of Psychologists,* 439 S.W.3d 597, 603 (Tex. App.—Austin 2014, no pet.) (stating that a state administrative agency has only those powers that the Legislature expressly confers upon it or that are implied to carry out the express functions or duties given or imposed by statute).
[7] *General Electric Credit Corp. v. Smail*, 584 S.W.2d 690, 694 (Tex. 1979); *Lewis v. Jacksonville Building & Loan Assoc.*, 540 S.W.2d 307, 310 (Tex. 1976).
[8] *See*

*adopt rules"* and a mandatory enabling statue generally will state that an agency *"shall adopt rules."*[9]

As an example, under section 402.0212(f) of the Tex. Government Code, the Legislature explicitly provides that the OAG *"may adopt rules"* as necessary to implement and administer outside counsel legal services provided to a state agency. Similarly, under section 402.035(f-3) of the Tex. Government Code, the Legislature explicitly provides that the OAG *"may adopt rules"* to administer the submission and collection of information related to human trafficking. Other enabling statutes impose mandatory rulemaking requirements. For example, sections 41.110 and 41.111 of the Tex. Government Code provide that the Court of Criminal Appeals *"shall adopt rules"* regarding training related to family violence and *"shall adopt rules"* regarding training related to a prosecuting attorney's duty to disclose certain evidence, respectively.

In contrast, section 41.006 of the Tex. Government Code, the statute the OAG relies upon to support his proposed D/CA reporting rules, includes neither permissive nor mandatory rulemaking authority. Rather, section 41.006 states simply and in its entirety:

> "REPORT TO ATTORNEY GENERAL. At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state."

It is well-settled that an agency rule is invalid if: (1) the agency had no statutory authority to promulgate it; (2) it was not promulgated pursuant to proper procedure; or (3) it is unconstitutional."[10] In this case, the plain language of section 41.006 is unambiguous. *The Legislature failed to grant the OAG any rulemaking power whatsoever under section 41.006 of the Tex. Government Code.* The Legislature's deliberate omission of the words "may adopt rules" or "shall adopt rules" in its statutory language conclusively evidences the Legislature's intent not to grant the OAG such authority under the statute.

    A. Even if the Texas Legislature intended to grant the Attorney General the authority to promulgate rules under Texas Government Code § 41.006, the statute is so broad and lacking in reasonable standards that it is an impermissible exercise of legislative authority.

Although legislature has authority to delegate its powers to agencies established to carry out legislative purposes, it must establish reasonable standards to guide the agencies.[11] The nondelegation doctrine is the constitutional restriction on the Texas Legislature's delegation of its powers to administrative agencies, which requires the Legislature to set "reasonable

---

[9] *See* Tex. Gov't Code § 311.016 (providing, as a rule of statutory construction, that "may" creates discretionary authority or grants permission and that "shall" imposes a duty).
[10] *See Abbott v. Doe*, 691 S.W.3d 55, 73 (Tex. App.—Austin 2024, pet. filed)
[11] *R.R. Comm'n of Tex. v. Lone Star Gas Co., a Div. of Enserch Corp.*, 844 S.W.2d 679 (Tex. 1992)

Exhibit
P-11

standards to guide the entity to which the powers are delegated."[12] A delegation of power by the Legislature without reasonable standards to govern its exercise is an abdication of the authority to set governmental policy which the state constitution assigns to the legislative department.[13]

Under section 41.006 of the Tex. Government Code, the Legislature has delegated to the Attorney General the authority to direct D/CAs to provide him with information that he "desires" and that relates to "criminal matters and the interests of the state." The Cambridge Dictionary (2024) defines "desire" as "a strong feeling of wanting something" and defines "interest" as "the feeling of wanting to give your attention to something or of wanting to be involved with and to discover more about something." As such, the Attorney General appears to interpret the statute to grant the OAG with a limitless power—based on the Attorney General's subjective "desire"—to investigate in any manner at any time any aspect of the workings of a D/CA office in the state. Even if the Texas Legislature intended to delegate to the OAG the authority to promulgate proposed new Chapter 56 of the Texas Administrative Code under Texas Government Code § 41.006, the statute is so broad and lacking in reasonable standards that it is an impermissible abdication of the Legislature's authority. Therefore, under the nondelegation doctrine, the OAG does not have the authority to promulgate the new proposed rules.

II.     Proposed new Chapter 56 of the Texas Administrative Code violates the separation of powers provision of the Texas Constitution and is therefore null and void.

"The Constitution of 1876, which our state still operates under, expressly divides the powers of government into three distinct departments—legislative, executive, and judicial—and prohibits the exercise of any power 'properly attached to either of the others,' unless that power is grounded in a constitutional provision."[14] "This separation of powers provision reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government."[15] One way the separation of powers provision may be violated is when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.[16] As such, the separation of powers provision requires that "any attempt by one department of government to interfere with the powers of another is null and void."[17]

As discussed, the Texas Constitution places the OAG in the executive branch of the government, with the duties to represent the State in civil matters and hold private corporations legally accountable.[18] The D/CA offices, on the other hand, are in the judicial branch of

---

[12] *City of San Antonio v. Salvaggio*, 419 S.W.3d 605, 612 (Tex. App. 2013) (citing *Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 467 (Tex. 1997), as supplemented on denial of reh'g (Oct. 9, 1997)).
[13] *Id.*
[14] TEX. CONST. ART. II, § 1; *State v. Stephens*, 663 S.W.3d 45, 49 (Tex. Crim. App. 2021).
[15] *Id.*
[16] *Stephens*, 663 S.W.3d at 51.
[17] *Meshell v. State*, 739 S.W.2d 246, 252 (Tex. Crim. App. 1987).
[18] *See,* TEX. CONST. ART. IV, § 22.

Exhibit
P-11

government.[19] Although the duties of the County and District Attorney are not enumerated in article V, section 21, Texas courts have long recognized that, along with various civil duties, their primary function is "to prosecute the pleas of the state in criminal cases."[20]

The OAG's proposed new Chapter 56 of the Texas Administrative Code unconstitutionally interferes with the powers of the judicial branch of government, impeding through direct oversight the discretion of local D/CAs to prosecute crimes in their respective communities. Under threat of removal from office by the OAG, proposed new § 56.1 mandates that D/CAs (in a district or county with a population of 400,000 or more) submit an initial, and quarterly and annual reports, including "case files," relating to "criminal matters, and the interests of the state."

Proposed new § 56.2(1) appears to define the term "case file" so broadly to include handwritten notes, instant messages, direct messages, social media messages not always included in a case file, as well as attorney work product and other privileged and confidential materials. Proposed new § 56.3(a)(12) also unlawfully injects the OAG into D/CA office employment matters, requiring disclosure of "[r]ecords memorializing assistant district attorney or assistant county attorney resignations or terminations where a complaint was made, formally or informally, by the assistant district attorney or assistant county attorney." D/CA employment matters are not "criminal matters." And proposed new § 56.8 specifies that if the OAG finds that a D/CA violates proposed new Chapter 56 of the Texas Administrative Code, the OAG may: (1) construe the violation to constitute "official misconduct" under Local Government Code § 87.011; (2) file a petition for quo warranto under Civil Practice and Remedies Code § 66.002; or (3) initiate a civil proceeding seeking to order the D/CA to comply.

Proposed new Chapter 56 of the Texas Administrative Code therefore violates the separation of powers provision of the Texas Constitution and is null and void.

III. The new proposed rules unlawfully interfere with the professional responsibilities and discretion of local prosecutors.

As noted above, proposed new § 56.2(1) defines the term "case file" to include all drafts and final copies produced within or received by the D/CA's office, including work product and otherwise privileged and confidential matters. As also noted above, the OAG has no criminal prosecution authority and is not an attorney in any of the criminal cases for which he is demanding disclosure of "case file" information, unless the D/CA has request OAG assistance in a particular case.

As licensed attorneys in the State of Texas and members of the Texas State Bar, D/CAs are obligated to adhere to the Texas Disciplinary Rules of Professional Conduct ("TDRPC") (January 31, 2022) as mandated by the Supreme Court of Texas. Rule 1.05 of the TDRPC underscores the imperative for attorneys to uphold the confidentiality of client information, including privileged communications, thereby fostering trust and preserving the integrity of the

---

[19] TEX. CONST. ART. V, § 21.
[20] *Meshell*, 739 S.W.2d at 254.

legal profession. Additionally, Rule 503 of the Texas Rules of Evidence reinforces the attorney-client privilege, serving to safeguard confidential communications between clients and their legal representatives, thus maintaining the integrity of the attorney-client relationship.

Furthermore, under article 39.14(a) of the Texas Code of Criminal Procedure, the work product of the prosecutor and investigators is protected from disclosure. The purpose of protecting prosecutor work product from discovery is to preserve the integrity of the prosecution's trial preparation process. This protection ensures that prosecutors can effectively and thoroughly prepare their case without fear of disclosure to the defense of their trial strategies, legal theories, mental impressions, or other materials prepared in anticipation of litigation. By safeguarding prosecutor work product, the legal system aims to maintain fairness in criminal proceedings, uphold the adversarial nature of trials, and prevent undue interference with the prosecution's ability to present its case effectively in court. Additionally, protecting prosecutor work product helps to maintain confidentiality and encourages open and candid discussions among legal teams, ultimately serving the interests of justice.

Unfortunately, the reporting requirements under proposed new Chapter 56 of the Texas Administrative Code derogate the purposes and protections of TDRPC Rule 1.05, Rule 503 of the Texas Rules of Evidence, and art. 39.14 of the Texas Code of Criminal Procedure by requiring D/CAs to disclose privileged and confidential information with the OAG, a third-party which is not a criminal defendant[21] and is almost never an attorney in criminal prosecutions. Proposed new Chapter therefore unlawfully interferes with the professional responsibilities and discretion of local prosecutors.

IV.   **Reporting requirements under the new proposed rule raise confidentiality issues related to juvenile and child protection records.**

The El Paso County Juvenile Unit is responsible for handling cases involving juveniles (individuals under the age of 18) who are accused of committing delinquent acts or offenses within the jurisdiction of El Paso County. Proposed new Chapter 56 of the Texas Administrative Code may potentially conflict with the confidentiality issues related to juvenile and child protection records due to the nature of the information required to be reported to the OAG. While the OAG may not be directly involved as an attorney in these cases, the reporting requirements could still involve sensitive information that falls under the confidentiality protections outlined in the Texas Family Code and the Code of Criminal Procedure. Such statutory protections include the following:

1. **Texas Family Code §§ 58.005 and 58.007:** These statutes protect certain information related to juvenile cases, including police reports, evidence, court documents, and juvenile medical records. If the proposed reporting requirements compel the disclosure of such information to the OAG, it may conflict with the confidentiality protections afforded by these statutes.
2. **Texas Family Code § 264.408:** This statute pertains to crossover cases involving Child Protective Services ("CPS") records. If CPS records are part of the files subject to

---

[21] *See* Tex. Code Crim. Proc. art. 39.14(h) (requiring the state to disclose exculpatory, impeachment, or mitigating evidence to a criminal defendant, not to other parties).

Exhibit
P-11

reporting to the OAG, their disclosure could potentially conflict with the confidentiality provisions of this statute.

3. **Code of Criminal Procedure Art. 39.15:** This statute protects the confidentiality of certain recordings in sex crime cases. If the proposed reporting requirements include information such as sex case videos or invasive recordings, it may conflict with the confidentiality protections provided by this statute.

In summary, while the OAG may not be directly involved as an attorney in these cases, the reporting requirements could still necessitate the disclosure of sensitive information protected by confidentiality statutes, potentially leading to conflicts with existing legal protections.

V.　Operationally, gathering and transmitting case information will require significant time and resources due to the collaborative nature of the County Attorney's Criminal and Juvenile Units and the need to search various communication channels.

The County Attorney's Criminal Unit uses various systems and methods to store and communicate case-related information. They include:

1. **Odyssey System:** Contains attorney notes, victim notes, court documents, and other electronic files.
2. **CA Portal:** Similar to the Odyssey System, it stores documents, videos, photographs, and communications, often including unredacted police reports with sensitive information.
3. **Text Messages/E-mail/Teams Messages:** Used for communication within the Criminal unit and with external parties like defense attorneys, courts, law enforcement, and inspectors.
4. **Sensitive Evidence:** Not uploaded electronically; stored in a locked cabinet, including forensic videos, CPS records, and medical documents.
5. **Special Prosecution Cases:** Require coordination with the District Attorney's office to ensure all relevant communications are included.
6. **Handwritten Notes and Trial Preparation:** Handwritten attorney notes and trial preparation materials may not be uploaded electronically but are essential for case preparation.
7. **Victim Letters or Notes:** Uploaded to the portal system unless they contain sensitive information.

The County Attorney's Juvenile Unit also uses various systems and methods to store and communicate case-related information. They include:

1. **JMIS (Juvenile Management Information System):** This system houses a comprehensive array of materials including police reports, evidence, court documents, juvenile medical records, school records, victim notes, and attorney work product notes. It is important to note that JMIS operates under the jurisdiction of the Juvenile Probation Department ("JPD"), and all its contents are subject to confidentiality regulations outlined in section 58.005 of the Texas Family Code.

2. **Email/Teams/Text Messages:** This platform stores communication records exchanged between various stakeholders, including attorneys within the unit, defense attorneys, law enforcement personnel, court staff, and probation officers.

3. **Sensitive Information:** Certain materials such as CPS records and forensic interviews are considered highly confidential. These are securely stored in a locked cabinet to which access is restricted. Such sensitive evidence is not uploaded electronically, and defense attorneys must schedule appointments to view these materials.

4. **Printed/One Drive Saved Documents:** Documents in physical form or saved on OneDrive include memos, pretrial notes, and trial boxes prepared for cases going to trial. Additionally, notes from all forensic interviews attended by the unit are documented for reference and stored accordingly.

Operationally, gathering and transmitting case information will require significant time and resources due to the collaborative nature of the units and the need to search various communication channels. Additionally, the possibility of receiving new special prosecution cases adds complexity to the process, particularly concerning potential conflicts with cases handled by the District Attorney's office.

VI.  The new proposed rule appears to grant the Attorney General access to confidential information on cases he has politicized in urban counties with a population of over 400,000.

It is notable that while section 41.006 of the Tex. Government Code makes no mention of population size in establishing the OAG's authority to collect criminal matter information from D/CAs, proposed new § 56.1 makes clear its reporting requirements carve out "District Attorneys and County Attorneys presiding in a district or county with a population of 400,000 or more persons" as the only communities subject to the proposed new rule. It is also notable that the Attorney General has engaged over several years in high-profile legal battles challenging the authority and policy priorities of Texas' urban counties with populations of 400,000 or more: Houston, Dallas, Austin, San Antonio, and El Paso.

For example, in February 2015, the Attorney General filed suit against Travis County to stop the "rogue actions of Travis County judges" who issued same-sex marriage licenses to Texas couples.[22] In September 2020, the Attorney General filed an appeal to stop the Harris County Clerk from sending mail-in ballots to potential voters.[23] In November 2020, the Attorney General sued El Paso County challenging a public health order issued to address the COVID-19 pandemic.[24] In May 2023, the Attorney General called Austin District Attorney Jose Garza

---

[22] "Attorney General Paxton Seeks Writ of Mandamus from Texas Supreme Court," Office of the Texas Attorney General (Feb. 20, 2015) (available at https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-seeks-writ-mandamus-texas-supreme-court).

[23] "AG Paxton Files Appeal to Stop Harris County Clerk from Unlawfully Sending Millions of Unsolicited Mail-In Ballot Applications," The Office of the Attorney General (Sept. 12, 2020) (available at https://www.texasattorneygeneral.gov/news/releases/ag-paxton-files-appeal-stop-harris-county-clerk-unlawfully-sending-millions-unsolicited-mail-ballot).

[24] "AG Paxton Joins Coalition of Businesses in Lawsuit Against El Paso Judge's Unlawful Order," Office of the Texas Attorney General (Oct. 30, 2020) (available at https://texasattorneygeneral.gov/news/releases/ag-paxton-joins-coalition-businesses-lawsuit-against-el-paso-judges-unlawful-order).

"a rogue District Attorney" who endangers the safety of law enforcement officers and has "extremist political views."[25] In January 2024, the Attorney General launched lawsuits against the cities of Austin, San Marcos, Killeen, Elgin, and Denton for adopting, in the words of the OAG, "amnesty and non-prosecution policies that violate Texas laws concerning marijuana possession and distribution."[26] Other high profile cases have included the OAG's challenge to Travis County's administration of poll watchers;[27] advocating for "the State's constitutional right of self-defense" in the context of "deterring an ongoing [border] invasion" (immigration); advocating for OAG authority to prosecute criminal law violations;[28] and filing suit to dissolve a non-profit organization providing services and housing to migrants and refugees in El Paso.[29]

Mirroring the OAG's list of policy priorities, proposed new Chapter 56 of the Texas Administrative Code requires D/CAs from these same urban Texas counties to report the following "case file" information and correspondence to the OAG:

1. **Voter Fraud:** The number of instances that "the reporting entity indicted an individual for a criminal violation under the Teas [sic] Election Code" (proposed new § 56.3(a)(2)); and any case file for prosecutions relating to criminal matters and the interests of the state, as requested by the Attorney General through the Oversight Advisory Committee, including cases where there are substantial doubts whether probable cause exists to support a prosecution (proposed new § 56.3(a)(6)).
2. **Immigration:** The number of instances that an arrest was made for a "violent crime"—defined under the new proposed rule to include "rioting" on the US-Mexico border—but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped (proposed new § 56.3(a)(7)).
3. **Non-Profit Organizations:** All correspondence with any non-profit organization regarding a decision whether to indict an individual (proposed new § 56.3(a)(11));
4. **Law Enforcement Accountability:** Any decision to indict a peace officer (proposed new § 56.3(a)(1)).

---

[25] "Statement From Attorney General Ken Paxton on Recent Violence at Texas State Capitol," Office of the Texas Attorney General (May 5, 2023) (available at https://www.texasattorneygeneral.gov/news/releases/statement-attorney-general-ken-paxton-recent-violence-texas-state-capitol).

[26] "Attorney General Ken Paxton Sues Five Cities Over Marijuana Policies Preventing Enforcement of Texas Drug Laws," Office of the Texas Attorney General (Jan. 31, 2024) (available at https://texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-five-cities-over-marijuana-policies-preventing-enforcement-texas).

[27] "AG Paxton: Poll Watch-ers Must Be Permitted to Observe Ballot Counting," Office of the Texas Attorney General (Nov. 8, 2020) (available at https://texasattorneygeneral.gov/news/releases/ag-paxton-poll-watchers-must-be-permitted-observe-ballot-counting).

[28] "Paxton Asks Court of Criminal Appeals to Reverse Its Decision Stripping OAG of Authority to Stop Election Fraud," Office of the Texas Attorney General (January 3, 2022) (available at https://www.texasattorneygeneral.gov/news/releases/paxton-asks-court-criminal-appeals-reverse-its-decision-stripping-oag-authority-stop-election-fraud).

[29] "Attorney General Ken Paxton Sues to End NGO's Operations In Texas After Discovering Potential Efforts to Facilitate Illegal Immigration," Office of the Texas Attorney General (Feb. 20, 2024) (available at https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-sues-end-ngos-operations-texas-after-discovering-potential-efforts).

5. **Prosecutorial Discretion:** All correspondence and other documentation describing and analyzing a reporting a D/CA's policy not to indict a category or sub-category of criminal offenses (proposed new § 56.3(a)(9)).

Therefore, certain categories of "case file" and correspondence information mandated for disclosure to the OAG under propose new Chapter 56 appear to grant the Attorney General access to confidential information on cases he has politicized in urban counties with a population of 400,000 or more.

VII.  <u>The new proposed rules are an unfunded mandate imposing significant financial and operational burdens on El Paso County.</u>

The OAG asserts—without evidence or explanation—that for the first five-year period in which the new proposed rules under new Chapter 56 of the Texas Administrative Code are in effect, there may be "minimal costs" to local governments for gathering and submitting quarterly and yearly reports to OAG, and that gathering and submitting of the required reports can likely be "absorbed" into local governments' ongoing operations with minimal, if any, fiscal impact. Additionally, the OAG claims that the new proposed rules are not expected to necessitate the creation or elimination of employee positions within government. This assumes that the enforcement and administration of the reporting requirements outlined in Chapter 56 will not impact the allocation of resources or the number of employee positions within El Paso County and the El Paso County Attorney's Office. These assumptions are incorrect.

The proposed reporting requirements raise significant concerns regarding the financial burdens they would impose. Compliance with these regulations is anticipated to entail substantial expenses across various aspects of County administration, including hiring personnel, technology upgrades, ongoing maintenance, and administrative tasks. The sheer scale of the workload, spanning from manual review of case files to transcription of trial transcripts, will require significant resource allocation and operational costs. Moreover, the potential long-term financial implications of sustained compliance for El Paso County taxpayers underscore the need for careful consideration and evaluation of the proposed regulations.

The reporting requirements outlined in proposed new §56.3 of the Texas Administrative Code raise several additional concerns and logistical challenges for compliance:

1. **Oversight Committee Review:** The process regarding the Oversight Advisory Committee's assessment of probable cause and subsequent submission of case files is unclear. How does the committee make a determination on probable cause without access to the case files? Is there additional information available to the committee beyond what is provided by the D/CA's office? Moreover, the authority of the committee to make such determinations needs clarification, particularly regarding its composition, expertise in criminal law, meeting frequency, transparency, and procedures for presenting evidence.
2. **Compliance Challenges:** Several El Paso County agencies, including IT, HR, and the Auditor, are responsible for maintaining information required for the reports. However, if these agencies fail to comply, the burden falls on the D/CA's office, potentially leading

Exhibit
P-11

to civil proceedings initiated by the OAG. Clear guidelines and support from the OAG are necessary to ensure effective coordination and compliance across these agencies.

3. **Transfer of Electronic Files:** Maintaining the integrity of digital evidence during transfer is critical. Detailed information about hashing algorithms, timing of hash generation, security measures, and protection against tampering is needed to safeguard the integrity of transferred electronic files effectively.

4. **Argument Against Converting Digital Evidence:** Converting digital evidence can compromise its integrity and quality, impacting crucial aspects such as metadata, frame accuracy, aspect ratio, color space, audio-video synchronization, and overall quality. Therefore, avoiding conversion and preserving original evidence is essential for fair and accurate legal proceedings.

5. **Preliminary Review for Compliance:** Complying with the reporting requirements entails significant manual review of case files, determination of applicable documents, redaction of sensitive information, and transcription of trial transcripts. The sheer volume of work, ranging from reviewing court reporter transcripts to categorizing cases and redacting documents, necessitates considerable time, resources, and personnel. When Bexar County District Attorney Joe Gonzalez reviewed an almost identical proposed OAG rule published in the Texas Register in March 2024,[30] he estimated that the new proposed rules would require his office alone to review 50,000 cases, some of which are in archives.[31] El Paso County is no different and expects to review at least 50,000 cases as well.

6. **Technology and Resource Requirements:** Technology enhancements, such as AI software for transcription and redaction, system upgrades for case management, and increased server storage capacity, are essential for efficient compliance. However, these enhancements entail substantial costs, including software procurement, system development, hardware upgrades, and ongoing maintenance.

7. **Ongoing Costs for Compliance:** The financial implications of ongoing compliance are significant, encompassing personnel expenses, court reporter transcripts, certified mail, travel costs, storage solutions, and maintenance of AI software. These expenses must be carefully evaluated and budgeted to ensure El Paso County is able to comply with the reporting requirements.

In conclusion, the proposed reporting requirements pose complex challenges for El Paso County and the El Paso County Attorney's Office, necessitating clear guidelines, robust support mechanisms, and adequate resources to ensure effective compliance while upholding the integrity of legal proceedings.

Sincerely,

---

[30] Proposed new 1 Tex. Admin. Code §§ 56.1-56.9, related to District and County Attorney (in a district or county with a population of 250,000 or more persons) reporting requirements, as published in the Texas Register on March 8, 2024 (49 TexReg 1357-1360).

[31] "Bexar County District Attorney Joe Gonzales on Texas Attorney General Paxton's new proposed rule," David Martin Davis, *Texas Public Radio* (Mar. 21, 2024) (available online at https://www.tpr.org/podcast/the-source/2024-03-21/bexar-county-district-attorney-joe-gonzales-on-texas-attorney-general-paxtons-new-proposed-rule).

El Paso County Attorney Public Comment
Regarding Proposed New 1 Tex. Admin. Code §§ 56.1-56.10
October 11, 2024

Christina Sanchez
El Paso County Attorney

Exhibit
P-11

# Appendix
# Tab C.10

**Exhibit
P-12**

From:        Shawn Dick
To:          OAGRuleCommentsCh56@oag.texas.gov
Subject:     Comments regarding Proposed Reporting Rule
Date:        Monday, October 14, 2024 4:53:00 PM

The District Attorney for the 26th Judicial District believes that the proposed administrative rules requiring submission of a District or County Attorney's case files and communications to the Office of the Attorney General contravene and, are not "in harmony" with, the specific statutory language contained in section 41.006 of the Texas Government Code because the proposed rules impose additional burdens, conditions, and restrictions in excess of, and inconsistent with, the relevant statutory provision, and thus the proposed rules are invalid.

The District Attorney for the 26th Judicial District believes that the means of enforcing the proposed administrative rules exceeds the statutory authority to enforce the proposed rules as these rules exceed the Attorney General's constitutional authority and are in contravention of the separation of powers provision of the Texas Constitution.

These proposed rules create an undue and heavy burden on our District Attorney's Office. Overall, the rules are unclear and do not request simple statistical numerical requirements more in line with the reporting to the Office of Court Administration. This rule instead requires providing all correspondence and case files dating back to 2021. This rule would be burdensome on its own moving forward from January 1, 2025, however, forcing District Attorneys to scour thousands or tens of thousands of files retroactively is a near impossible task to perform accurately.

District Attorney's Offices have limited resources. Instead of employing our limited resources on the successful prosecution of criminals, we will have to divert or hire significant resources to comply with these proposed rules. We are used to reports involving CJIS, asset forfeiture, arrests made by our investigators, Victim Assistance reports. These reports do not require looking

**Exhibit**
**P-12**

backwards and they do not require case files.  Additionally, they are mostly statistical reports done annually. This rule that forces us to look retroactively is the most burdensome as we did not have the benefit of clear rules and categories as these cases were being prosecuted.  At the very least a proposed rule moving forward would allow us time to keep records in a way to comply with this rule. There is no way to go back and provide accurate information without a case-by-case analysis.

Mr. Reno asserts that this new reporting requirement will benefit the public by ensuring that county and district attorneys are consistently complying with statutory duties, and appropriately prosecuting crimes.  This proposal may have the opposite affect by diverting our limited resources to reporting requirements and delay and impair our ability to investigate and prosecute cases.  Texans have always found accountability in local control and authority. This rule purports to give the executive branch authority over the judicial branch and to interfere with the orderly operation of our court system.

On the other hand, I cannot understand what the executive branch would do with the "case files" of the judicial branch.  The Office of Attorney General is the authority to decide which files contain open records.  The "law enforcement exception" along with other privacy and confidentiality laws would prevent the Office of Attorney General from using the "case files" they receive under this rule. Assuming the OAG follows the law, they are powerless to do anything with the information they receive as cases that do not end with an indictment are not public records.  If the OAG wants to use the information, they would be interfering with the duties of the District or County Attorneys lawfully authorized to prosecute these cases.

Therefore, on balance, the OAG's requirement to provide case files has limited to no benefit yet imposes a serious burden on District and County Attorneys, possibly at the cost of seeing that Justice is Done.

Moreover, below are just some of the specific issues with the proposed rule that are vague, unnecessary, or burdensome:

- Chapter 56.6 requires retention of any documents required by this report, but provides no exception for expunged matters. This could cause a conflict with the penal violations for maintaining records which have been expunged. Additionally, the OAG's office will need to be included in future expunctions for any cases related to these reports.

- 56.3(a)(1) requires reporting for indictments of peace officers. Does this also include cases in which officers are indicted for personal conduct such as stalking, family violence assaults, DWI's?

- 56.3(a)(2) I have looked through all the statutes and cannot find the "Teas" Election Code. I am not sure what is required here.

- 56.3(a)(4) The party making the recommendation here is not defined. Does this apply if the defense lawyer makes the recommendation? How about the Sheriff? The Judge? How are we to keep track of other decisions on time cuts or other requests.

- 56.3(a)(5) Does this include cases we receive notice from the parole board that they have been asked to consider a pardon or only cases where the Governor himself has gone on television to request a pardon?

- 56.3(a)(6) This is a catchall provision that will create the largest burden in our office going forward as we will have no consistency or understanding of which files this unknown oversight committee may want to look at with no limitations.

- 56.3(a)(11) Does this require turning over all communications with the Children's Advocacy Center or our local Crisis Shelter?  We have regular communication and cooperation with these groups and work together on cases.  How about our community partners providing mental health assistance?  This category is very broad and unclear.

- Section 56.5(b) requires a reporting entity to submit reports electronically and states that information on how to do so can be found on the OAG's website. If this is an electronic upload or an email address this may cause an issue for submitting case files given the size and volume of files and data in our County Digital Evidence Management System (DEMS).  We also have no understanding of what these reports will require and what technology is necessary.  Do we repeat information each quarter if those cases are still pending?  How about if cases are declined initially, but refiled upon further investigation?

- Quarterly reports under section 56.3(a)(3) requires reporting prosecutions involving a defendant's discharge of a firearm where the defendant raised justification under Chapter 9 of the penal Code, Subchapters C and/or D

(self-defense, defense of third person, protection of life or health, and defense of property). This wording is unclear. It does not define how a defendant raises this. The most obvious way is in trial and likely via a requested instruction in the jury charge. Does it include a justification defense raised or mentioned in plea negotiations? Does it also include every time a defendant claims self-defense to the officer on the scene or in an interview? If so, it may be much more difficult to know and determine this given the volume of body cam and dash cam video. More clarification is needed.

- Quarterly reports under section 56.3(a)(7) requires reporting Number of Instances an arrest was made for a violent crime* but no indictment was issued, the case was resolved by deferred prosecution, or all charges were dropped. First, I assume that all this section is only referring to "violent crime", however it could be read to include any case that was resolved by deferred prosecution or any case where all charges were dropped. Second, the term violent crime is defined but is very broad. It is worded as including a list of offenses. However, in theory, this definition could also encompass offenses not currently listed since the list is worded inclusively rather than exhaustively. This definition appears to mimic the way many appellate courts analyze such inclusive definitions and then find ways to read more than just the text written into them. Third, the stated offenses are capital murder, murder, other felony homicides, aggravated assault, sexual assault of an adult, indecency with a child, sexual assault of a child, family violence assault, aggravated robbery, robbery, burglary, theft, automobile theft, riot,

anything in CCP 17.50(3) which includes the previous as well as kidnapping, aggravated kidnapping, aggravated sexual assault, injury to a child, elderly individual, or disabled individual, continuous sexual abuse, continuous trafficking of persons, any crime involving family violence, and any attempt to commit any of these crimes.

- Another issue is exactly what does 56.3(a)(7) cover? Clearly it covers cases rejected at intake and cases pled to an information on docket prior to the issuance of an indictment. It also includes pre-indictment dismissals. However, because this list does not include a time frame, the question arises whether this covers cases where our Office's intake attorney asks the police department to do more investigation and the police delays or, for whatever reason, does not follow up with us after doing more. It is unclear how to keep track of such cases or what length of time might require reporting. Such cases are likely intended to be included as no indictment is issued but do not seem to be included to me because until the statute of limitations runs the investigation is ongoing and we have not dropped or refused charges.

- Further, does 56.3(a)(7) include transformative justice and other diversion programs? In our County, many of the diversion court cases have been indicted but not all. Most of the cases diverted won't necessarily include violent crimes but some might—theft? Attempted theft? Attempted vehicle theft? Attempted family violence (that might be pled down specifically to

divert if that is justice on certain facts, perhaps in veterans court).

- The language of the proposed regulations also seems to include grand jury no bills. This may be problematic in the sense that the law requires no bills to be handled in a confidential manner that is unlike how other case information is maintained.

- Also, the breadth of crimes covered by these regulations is considerable and burdensome. An attempt to commit a crime involving family violence, an attempted theft, an enhanced shoplifting or even an enhanced theft based on prior thefts where it turns out there is an issue with the judgment or finality of one of the prior thefts, could result in a disposition triggering this reporting requirement. It covers so many potential cases.

- Quarterly reports under sec. 56.3(10) requires reporting "all correspondence with any employee of a federal agency regarding a decision of whether to indict an individual." This sounds like conversations that could occur with any AUSA about cases in which they are interested. Every joint jurisdiction case involves a decision about Federal versus State indictment. The term correspondence is defined broadly as including not just email, letter, or memorandum, but instant message, text, message, or direct message. Because the proposal includes an initial report going back to January 1, 2021, and because text and instant messaging conversations with Federal prosecutors may not have been historically preserved, the collection of the things that meet correspondence may be difficult and time consuming.

- Quarterly reports under 56.3 (11) requires reporting, "all correspondence with any non-profit organization regarding a decision of whether to indict an individual." It is unclear whether the transformative justice personnel are a non-profit organization. Since our office does divert those cases pre-indictment, this regulation might cover that situation. If so, we would have difficulty gathering all the things covered by correspondence going back to January 1, 2021.

- Quarterly reports under 56.3 (12) requires reporting, "records memorializing assistant district attorney or assistant county attorney resignations or terminations where a complaint was made, formally or informally, by the assistant district attorney or assistant county attorney," The proposed regulation does not clearly define "complaint"? How close in time does the complaint have to be to the resignation? Does the complaint have to be the stated reason for the resignation? What is an informal complaint? How much has to be communicated, to whom, and how far up the chain of command, and in what manner to constitute an informal complaint? Is a social media post or series of posts expressing dissatisfaction prior to resigning sufficient to trigger the reporting requirement? What about expressing unhappiness with some aspect of the job to a trial court partner or staff? There also is no narrowing of the subject of the complaint. What are we to do about complaints about the judge or the county commissioners or retirement policy or lack of flexibility of county policy? What about someone who complains about the limits of their salary to coworkers or

friends and then communicates they accepted a higher salary elsewhere and resigns?  Is that a complaint triggering reporting?

- 56.4(2,4,5) are very unclear.  I truly do not know what these reporting requirements entail. What local, county, state and federal ordinances are you referring to?  Does section 4 and 5 include ARPA funds?  How about Government grants?  General fund disbursements?

   As an overview, we provide a number of reports every year and provide transparency in our office.  I understand the desire to enforce the laws and remain committed to transparency, however, we do not need to add additional burdensome regulations by a separate branch of government without requirement by the Supreme Court of Texas or the Texas Legislature.  These rules will only hurt the very citizens we serve and protect.

   Shawn Dick

   District Attorney, 26th Judicial District

   Williamson County, Texas

   Board Certified in Criminal Law by the Texas Board of Legal Specialization

# Appendix
# Tab C.11

**Exhibit
P-14**

Cause No. _____

| | | |
|---|---|---|
| DELIA GARZA, in her official capacity as Travis County Attorney; JOSÉ P. GARZA, in his official capacity as Travis County District Attorney; TRAVIS COUNTY; JAMES MONTOYA, in his official capacity as El Paso County District Attorney; CHRISTINA SANCHEZ, in her official capacity as El Paso County Attorney; and EL PASO COUNTY, *Plaintiffs.* | § § § § § § § § § § § § § § | In the District Court |
| | § § § | ____ Judicial District |
| v. | § § § | |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, and the OFFICE OF THE ATTORNEY GENERAL FOR THE STATE OF TEXAS, *Defendants.* | § § § § § § § | Travis County, Texas |

## DECLARATION OF DANNY W. SMITH, JR.

1. My name is Danny W. Smith, Jr., and I am an employee of the following governmental agency: Travis County, Texas. I am an Assistant County Attorney in the office of the duly elected Travis County Attorney, Delia Garza. I currently serve as the Assistant Director of the Family Violence Division. I am executing this declaration as part of my duties and responsibilities as an employe of this office. I have been licensed to practice law since November 2004.

2. I hold Bachelor of Arts degrees in Political Science and Spanish from Texas Tech University. I also obtained my Juris Doctor degree from Texas Tech University School of Law.

3. I have worked as a prosecutor my entire legal career. Prior to my current work as an Assistant Travis County Attorney, I served as an Assistant District Attorney for Brazos and Williamson Counties, prosecuting felony cases in state district courts. In Brazos County, I was the supervising attorney for all legal assistants and staff members. I also served as the Chief Appellate Prosecutor for a year and as the Chief Intake Prosecutor for five years. In Williamson County, I served as the Chief Trial Court Prosecutor from January 2016 to November 2022. I have also served Blinn College and Texas A&M Engineering Extension Service as an adjunct professor and instructor, respectively. teaching on criminal law, constitutional law, and other legal subjects.

4. I am an active member of the Texas District and County Attorneys Association (TDCAA) and have volunteered and was chosen to serve TDCAA as a Faculty Advisor for the Association's Prosecutor Trial Skills Course and as a Speaker at its Key Personnel and Victim Assistance Coordinators Conference. I have tried over forty cases, as a first or second chair, on felony criminal charges to conclusion before jury, and I have handled over two dozen felony criminal appeals. I am also Board Certified in Criminal Law by the Texas Board of Legal Specialization since 2017.

5. By virtue of my background, training, experience, and education, I possess the information needed to confirm the statements made in this declaration, and they are all true and correct. I am over eighteen years of age and fully component to make this declaration.

6. As a dedicated public servant and prosecutor, I value transparency and efficiency in government, equity in justice, and protecting the community. I also understand the need for prosecutorial discretion, and the importance of working closely with victims to protect their interests at every stage of the prosecutorial process. In my current role I supervise misdemeanor prosecutors in seven Travis County Courts at Law in cases involving family violence, including assault and violation of protective orders. As a result of this work and by virtue of my history with many types of cases, I am particularly troubled by the overreach apparent in the new rules adopted by the Attorney General and his office under Chapter 56 of the Texas Administrative Code ("Challenged Rules").

7. The Challenged Rules identified in Plaintiffs' petition represent the exact type of overreach that I believe prosecutors and courts have a responsibility to prevent. After scrutiny of the Rules, I began collaborating with other attorneys and staff in our office as part of a compliance team to prepare for application of the Challenged Rules and to compile information related to the potential legal consequences of the rules. After careful study, I believe no reasonable alternative existed to filing this lawsuit to prevent the immediate and irreparable harm caused by adoption of the Challenged Rules.

8. While the legal bases for injunctive relief are set out in the verified Original Petition and Application for Temporary Injunction, as well as the Plaintiffs' accompanying brief, this declaration is intended to set out the practical factual basis for the requested relief and to confirm the immediate and irreparable harm caused to our office and to Travis County, as well as harm to other prosecutors, county plaintiffs, and our communities.

9. First, in my opinion, the Challenged Rules are beyond the constitutional and statutory authority of the Attorney General, and as such, violate the separation of powers clause found in the Texas Constitution at article II, section 1. While the court will decide that legal issue, it is a matter of indisputable fact that the holder of the position of Attorney General is a member of the Executive Department of the State under article IV, section 1, while county and district attorneys are part of the Judicial Department of the State under article V, section 21. Put simply, it is the

1277130.1 385.654

citizens of Travis County who serve to judge the performance of our County and District Attorneys.

10. The only authority stated by Defendants to support the Challenged Rules is a vestigial statute, Texas Government Code section 41.006, under which there are no reported cases. As explained in this suit, section 41.006 appears to have originated with the first legislature in 1846, and was ultimately codified in Article 40 of the 1879 code along with directly related sections 29 and 30. Together, those three sections required the Attorney General to prepare a statistical report on prosecutions for the Governor, authorized the Attorney General's retrieval of only the data necessary to prepare that statistical report, and directed prosecutors to provide such data. Now, the statistical reporting function has been completely overtaken by the Office of Court Administration, part of the Judicial Branch, and former article 30 that authorized the AG to obtain statistical information from prosecutors for the limited purposes of reporting them to the Governor was repealed in 1925. There is no authority to invade the province of the Legislative Branch concerning rulemaking authority or preserving the confidentiality of numerous categories of very sensitive records made the subject of the Challenged Rules. Most importantly, even under the previous statutes and section 41.006, there is no authority to compel entire case files and protected communications.

12. Nevertheless, our office must prepare, under consequence of removal from office, for the possibility of having to turn over four years of data, correspondence, and certain case files, in twelve categories, by July 1, 2025. Many of the categories require electronic searches, the results of which implicate thousands of cases that must be reviewed in detail to establish whether they include required information and records. Moreover, the vague language of some of these 12 categories makes it impossible to know if our assumptions about their meaning would even achieve compliant reporting.

13. In working with information technology professionals employed by our office, including our Applications Manager and alongside numerous prosecutors and staff, we have estimated that completing the initial report will take hundreds of hours of staff and attorney time and will likely implicate at least one hundred thirty terabytes of data retrieval and consideration of well over ten thousand case files, just to ascertain potential responsiveness. These are hours that could and should have been spent prosecuting cases. This estimate of data volume does not include email or other related communications, archival information, tangible items, or application data anywhere other than from our TechShare platform used to facilitate information and evidence sharing in criminal matters, nor does it include information contained in other systems of record such as Odyssey and Tiburon that contain data available to our office related to clerk records and Sheriff's office records. We cannot estimate the volume of additional information implicated by communications and other sources outside TechShare.

14. Obviously, these preliminary compliance efforts take our employees away from the customary duties and core prosecutorial functions they undertake to serve genuine public

**Exhibit**

**P-14**

interests. The ongoing quarterly and annual compliance requirements will continue to compromise our resources.

15.     To reduce some of these negative and irreversible effects, our office and the Travis County District Attorney's office have sought approval of additional funding from the Travis County Commissioners Court to ensure adequate staffing to comply with the Challenged Rules while still performing our prosecutorial functions effectively. To date, in working with the Travis County Planning and Budget Office, and the District Attorney's Office, we have projected over $740,000.00 in added expense to Travis County to respond and comply with the Challenged Rules in the remainder of fiscal year 2025, and approximately $1,970,000.00 just for fiscal year 2026 to satisfy ongoing annual costs.

16.     The soon-to-be-created Oversight Advisory Committee's unlimited ability under the Challenged Rules to demand complete case files in matters outside the scope of the 12 categories already identified by Defendants raises the anticipated future costs exponentially in an unpredictable manner. In each such case, our office is left to evaluate the risk of noncompliance with privacy rights, confidentiality laws, and other statutory and regulatory provisions prohibiting release of certain case information and communications and weigh the risks associated with compliance against the threat of a removal action, quo warranto proceeding, or other Attorney General-initiated lawsuit for alleged noncompliance, based entirely upon Defendants' unilateral opinions. Section 56.8 of the Challenged Rules concerning "Compliance" makes this a very real threat. The Challenged Rules place only elected prosecutors in counties of over 400,000 in population in this position to have to weigh the possibility of being determined to have violated the Challenged Rules or violating long-standing state and federal laws and regulations that protect the privacy of crime victims, witnesses, law enforcement officials and accused defendants, as well as the integrity of criminal prosecutions. Either way, the people of Texas lose. Similarly, prosecutors who fully comply with the Challenged Rules as written subject themselves to allegations of violations of ethics rules and both civil and criminal penalties for violating state and federal laws and regulations. In short, the Challenged Rules place prosecutors in a situation where failing to comply with the Challenged Rules may be used as grounds for removal from office and complying with the Challenged Rules may be used as grounds for removal from office.

17.     Once the public is aware of the ability of Defendants to require turnover of correspondence and entire case files, including all evidence and potential evidence, in all closed and ongoing prosecutions or investigations and communications, whether privileged or not, this will unquestionably result in underreporting crime and produce an immeasurable chilling effect on criminal prosecutions. There is nothing in the Challenged Rules that permits prosecutors to first comply with existing statutory procedures, designed to prevent them from disclosing such information, and thereby avoid facing criminal and civil penalties. Such information will include victim impact statements; results of rape kits; graphic photos, including child pornography; statements of all victims and witnesses, including confidential informants; criminal history

**Exhibit**

**P-14**

information; detailed medical and mental health information and records; detailed substance abuse treatment information and records; and all correspondence of any kind related to the files.

18.    Given the obvious sensitivity of so much of this data, I am also concerned at the apparent lack of preparedness of the Office of the Attorney General to demand, receive, process, and secure the data required to be produced by prosecutors in counties of greater than 400,000 population under the Challenged Rules. Despite the looming deadline of July 1, 2025, to produce information related to over four years of data, and the language in Rule 56.5(b) that information on how to submit reports electronically can be found on the OAG's website, it cannot. I have been unable to find any guidance at all on the OAG website related to required report submission. The OAG website also has no information about the nature of any portal for such submissions or the security measures that exist related to any such portal.

19.    Nothing in the new rules requires the OAG to secure the information reported. Instead, based on the OAG press release, it appears the OAG and Attorney General's intent is to assure that the public has access to the reported information. While I strongly believe in, and am committed to, public access to public information, the rules make no provision for securing the confidential and highly sensitive nature of the information contained in our case files related to closed and pending prosecutions and investigations. The release of many of the categories of information included in our case files would implicate civil and criminal penalties. It is unclear how a reporting entity can fully comply with the rules as written and comply with other existing legal requirements that establish specific procedures to access such information.

20.    One example of the vagueness of the Challenged Rules involves charging instruments. Due to the references to "indictments" in the rule, and other factors, the District Attorney's data set is even larger than the one for the County Attorney. Our office uses "informations" as the charging instruments for misdemeanors. Whether this distinction was intended by the OAG and Attorney General Ken Paxton is entirely unknown. Our team must plan for the possibility than any guidance eventually offered from the OAG may include any charging instrument under the rules' definition of "indictment," if one is ever offered.

21.    Adding to the difficulty of the new tasks is the requirement of Rule 56.6 to "implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements of this chapter." Our office follows the appropriate retention schedules as promulgated by the Texas State Library and Archives. The seemingly innocuous requirement to "preserve documents for at least two years after they are to be reported" assumes we can know when things are to be reported. This is impossible because Rule 56.9(c) allows the Oversight Advisory Committee to request "entire case files based on the submitted reports or any other information that the Oversight Advisory Committee desires related to criminal matters or the interests of the state." This means we do not know what information will be requested, or when, or what the date would be to begin counting an additional two-year retention period from when it might be required to be reported.

1277130.1  385.654

22.    The Challenged Rules offer no recourse and no avenue for administrative appeal of any decision made by Defendants or the Oversight Advisory Committee. They only provide the oversight committee may waive any provision if a reporting entity "demonstrates" an undefined "undue hardship" without any opportunity for an independent administrative review or hearing. as is the case with other state agency rules. The only realistic option. therefore. would be to seek judicial review in each instance. Injunctive relief is necessary to prevent a continuous stream of litigation for every case file requested by Defendants that contains confidential information, the release of which is prohibited by law or would otherwise infringe upon the rights of victims. witnesses, grand jury participants, law enforcement officials, or accused defendants.

23.    Some additional examples of the protected information subject to submission to Defendants under the Challenged Rules include: criminal history records protected under court orders of nondisclosure; records subject to expungement orders: grand jury testimony and materials; school records protected by FERPA; attorney work product; unfiled case information; victim contact information, statements, and pseudonyms: health records concerning treatment for drug and alcohol abuse or mental illness: communications with non-profit organization containing sexual assault crisis service records; voluntary drug and alcohol abuse treatment records; emergency medical, HIV, or other protected health information: communications between victims and victim advocates regarding protective orders concerning family violence; jail recordings; disclosure of DFPS records relating to child victims: juvenile records: autopsy and crime scene photos; sexual assault examinations and photos: and numerous other types of intensely private, confidential, and statutorily protected information. These examples only touch on a portion of the protected interests and information that Defendants presume to collect that are protected under existing federal and state laws.

24.    The Challenged Rules represent a violation of diverse privacy interests, a current and incurable drain on county resources. a profound and intentional infringement on prosecutorial discretion, and presumption of an Executive Department oversight role over the Judicial Department where none exists.

25.    I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the15th day of May. 2025.

Danny W. Smith, Jr.

1277130.1  385.654

**Exhibit**
**P-14**

# Appendix
# Tab C.12

**Exhibit
P-15**

Cause No. _____

| | | |
|---|---|---|
| DELIA GARZA, in her official capacity as Travis County Attorney, JOSÉ P. GARZA, in his official capacity as Travis County District Attorney, TRAVIS COUNTY, JAMES MONTOYA, in his official capacity as El Paso County District Attorney; CHRISTINA SANCHEZ, in her official capacity as El Paso County Attorney; and EL PASO COUNTY, *Plaintiffs,* | § § § § § § § § § § § § § § § § § | In the District Court |
| v. | § § | _____ Judicial District |
| KEN PAXTON, in his official capacity as Attorney General for the State of Texas, and the OFFICE OF THE ATTORNEY GENERAL for the State of Texas, *Defendants.* | § § § § § § § § § § | Travis County, Texas |

## DECLARATION OF HOLLY TAYLOR

1. My name is Holly Taylor, and I am an employee of the following governmental agency: Travis County, Texas. I am executing this declaration as part of my duties and responsibilities in my capacity as a director with the Travis County District Attorney's Office (TCDAO).

1

2. I hold a Bachelor's degree from Rice University, a J.D. from the University of Texas School of Law, and a master's degree from the LBJ School of Public Affairs. I am Board Certified in Criminal Appellate Law by the Texas Board of Legal Specialization.

3. I currently serve as the Director of the Public Integrity and Complex Crimes Division of TCDAO. In this position, I oversee TCDAO's White Collar Crime Unit, Public Integrity Unit, and the Appeals and Complex Litigation Support Team. Previously, I worked for the Texas Court of Criminal Appeals (Court) as a staff attorney, the Court's Rules Attorney, and a Rules Advisory Committee member. I assisted the Court in evaluating proposed rules from all over the State and assessing their legality and impact on the Criminal Justice System.

4. I am leading a team working to comply with new administrative reporting requirements adopted by the Office of the Attorney General of Texas (OAG) in Chapter 56 of Title One of the Texas Administrative Code (hereafter 1 TAC Ch. 56, or "Challenged Rules"). Recently, I have dedicated most of my working hours to implementing methods for data and document collection and retention to comply with the Challenged Rules.

5. I possess the information needed to confirm the statements made in this declaration, and they are all true and correct. I am over eighteen years of age and competent to make this declaration.

6. The Challenged Rules impose initial, quarterly, and annual reporting requirements.[1] The initial reporting requirements retroactively require prosecutors to submit information and records dating back to January 1, 2021, but Texas prosecutors had no preexisting legal obligation to track much of the data the OAG

---

[1] The first quarterly report is due June 30, 2025, and the initial report including records back to January 1, 2021, is due the very next day (90 days from the effective date: July 1, 2025). 1 TAC §56.5.

Exhibit
P-15

now desires. Producing the required information in the required timeframe will be difficult. TCDAO has assigned several employees (attorneys, technical staff, paralegals, and administrative staff) to work on compliance. For some, this work has eclipsed their ability to do their normal jobs.

7. 1 TAC 56.5(b) provides that "A reporting entity submit all reports under this chapter electronically. Information on how to submit reports electronically can be found on the OAG's website." 1 TAC §56.5(b). No information about submitting these records has yet been found on the OAG's website nor has the TCDAO received any instruction from the OAG about how to turn over these materials.

8. There are twelve categories of data set out in 1 TAC §56.3 which must be produced. A failure to comply with any part of these rules can be considered "official misconduct" and can result in a suit seeking removal from office. *See* 1 TAC §56.8; *see also* Tex. Local Gov't Code §§87.012, 87.013. Some of the most significant and burdensome of the new rules include:

9. "The number of prosecutions involving a defendant's discharge of a firearm resulting in any prosecutorial decision based on Title 9 of the Penal Code." 1 TAC §56.3(3). Prosecutors had no preexisting legal duty to track this information, and the terminology used is ambiguous and confusing. Compliance will necessitate retroactive examination of records, a review of the facts of each case, and some amount of speculation. In sum, §56.3(3) will require hours of labor, taking TCDAO prosecutors and staff away from their normal duties.

10. "The case file for instances a recommendation made by the Reporting Entity is made to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error." 1 TAC

3

§56.3(4). Chapter 56 defines the term "case file" broadly to include "all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electronic, or otherwise, including drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters." 1 TAC §56.2(1). It defines "correspondence" equally broadly. 1 TAC §56.2(2). This rule compels the production of voluminous file materials, work product, and correspondence. TCDAO staff have spent numerous hours scanning boxes of internal documents and reviewing digital case files—taking prosecutors and staff away from their normal duties. This rule also forces prosecutors to disclose protected confidential information and privileged sensitive communications with crime victims and vulnerable witnesses, among others. *See* Tex. Const. Art. I, § 30.

11. "The number of instances that an arrest was made for a violent crime, but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped." 1 TAC §56.3(7). Chapter 56 defines the term "violent crime" to include common nonviolent crimes, such as theft and automobile theft. 1 TAC §56.2(7). Thousands of cases are likely to meet the OAG's broad and arbitrarily defined category of "violent crime" cases. Also, the Challenged Rules do not provide a definition of terms such as "charges were dropped." Because the criteria are vague and do not reflect statutes, rules, case law, or commonly used criminal law terminology, TCDAO staff will spend hours reviewing cases to determine if they are responsive.

12. "All correspondence with any employee of a federal agency" and "with any non-profit organization" regarding "a decision whether to indict an individual." 1 TAC §56.3(10), (11). Due to routine communication and collaboration with federal agencies (including criminal justice partners such as the FBI, DEA, and ATF) and

4

nonprofit organizations (including organizations such as the Center for Child Protection), this rule will require careful and time-consuming review of thousands of communications.

13. Further, the Challenged Rules grant the Committee the power to "request entire case files based on submitted reports or any other information that the Oversight Advisory Committee desires relating to criminal matters and the interests of the state on a case-by-case basis." 1 TAC §56.9; *see also* 1 TAC §56.3(6), (8). This Rule gives the OAG's Committee unfettered discretion to mandate the production of voluminous materials at any time without reasoned justification, reasonable time to comply, or advance notice. Because of the broad authority this grants the OAG and because there is no notice requirement to the reporting entity, it is not possible to estimate how many staffing hours or resources this part of the process may require of TCDAO. The rules further provide no process by which a reporting entity can appeal such a request by the OAG. Losing the TCDAO employees' hours will be damaging to TCDAO's ability to do its work prosecuting crime and working to protect our community.

14. Moreover, the Challenged Rules compel the disclosure of much information protected by confidentiality laws and privileges. Yet the Rules do not expressly assign any duty to the OAG and its agents to protect against the disclosure—or limit the dissemination of—sensitive data that is commonly found in such files, such as: victim contact information, statements, and pseudonyms; DNA testing of rape kits; graphic photos; grand jury testimony; identities of confidential informants; criminal history information; mental health and substance abuse treatment records; CPS records; and defense counsel's confidential communications with prosecutors. To the contrary, the OAG has promised to make information from reporting entities available to "assist citizens" to "hold rogue DA's accountable."

5

15. Collectively, the above factors are likely to have a chilling effect—hindering criminal prosecutions, interfering with the exercise of prosecutorial duties, and making our community less safe.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed in Travis County, State of Texas, on the 15th day of May, 2025.

Holly Taylor

# Appendix
# Tab C.13

**Exhibit
P-16**

Cause No. _____

| | | |
|---|---|---|
| DELIA GARZA, | § | In the District Court |
| in her official capacity as | § | |
| Travis County Attorney, | § | |
| JOSÉ P. GARZA, | § | |
| in his official capacity as | § | |
| Travis County District Attorney, | § | |
| TRAVIS COUNTY, | § | |
| JAMES MONTOYA, in his official | § | |
| capacity as El Paso County District | § | |
| Attorney; CHRISTINA SANCHEZ, | § | |
| in her official capacity as El Paso | § | |
| County Attorney; and | § | |
| EL PASO COUNTY, | § | |
| _Plaintiffs,_ | § | |
| v. | § | _____ Judicial District |
| | § | |
| KEN PAXTON, | § | |
| in his official capacity as | § | |
| Attorney General for the | § | |
| State of Texas, and the | § | |
| OFFICE OF THE ATTORNEY | § | |
| GENERAL for the State of Texas, | § | |
| _Defendants._ | § | Travis County, Texas |

## DECLARATION OF ALMA TREJO

1.     My name is Alma Trejo, I am an Assistant County Attorney in the office of the duly elected El Paso County Attorney, Christina Sanchez. I currently serve as the Senior Division Chief of the Criminal Unit. I am executing this declaration as part of my duties and responsibilities as an employee of this office. I have been licensed to practice law since 1991.

2.     I have extensive experience as an attorney, a prosecutor, and a judge. Prior to my current role I served as the Judge of County Criminal Court #1 for 21 years.

3.     By virtue of my background, training, experience, and education, I possess the information needed to confirm the statements made in this declaration, and they are all true and correct. I am over eighteen years of age and fully component to make this declaration.

4.     As a dedicated public servant and prosecutor, I value transparency and efficiency in government, equity in justice, and protecting the community. I also understand the need for prosecutorial discretion, and the importance of working closely with victims to protect their interests at every stage of the prosecutorial process.

1

Exhibit
P-16

5. In my current role I supervise the Juvenile and Criminal Divisions of the County Attorney's office with five prosecutors in the Juvenile Unit and three attorneys in the Criminal Division. As a result of this work and by virtue of my history with many types of cases, I am particularly troubled by the overreach apparent in the new rules adopted by the Attorney General and his office under Chapter 56 of the Texas Administrative Code ("Challenged Rules").

6. The Challenged Rules identified in Plaintiffs' petition represent the exact type of overreach that I believe prosecutors and courts have a responsibility to prevent. After scrutiny of the Rules, I began collaborating with other attorneys and staff in our office to prepare for compliance with the Challenged Rules and to compile information related to the potential legal consequences of the rules.

7. While the legal bases for injunctive relief are set out in the verified Original Petition and Application for Temporary Injunction, as well as the Plaintiffs' accompanying brief, this declaration is intended to set out the practical factual basis for the requested relief and to confirm the immediate and irreparable harm caused to our office and to El Paso County, as well as harm to other prosecutors, county plaintiffs, and our communities.

8. Based on my extensive legal experience, the Challenged Rules are beyond the constitutional and statutory authority of the Attorney General, and in so doing, violate the separation of powers clause found in the Texas Constitution at article II, section 1.

9. A plain language reading of the Texas Constitution identifies the Texas Attorney General as a member of the Executive Department of the State under article IV, section 1, while county and district attorneys are part of the Judicial Department of the State under article V, section 21.

10. The Texas Constitution places the power to judge the performance of El Paso County and District Attorneys in the hands of the voters of El Paso County.

11. Upon information and belief, the Attorney General has no authority to issue the Challenged Rule; the Challenged Rule is an attempt to invade the province of the Legislative Branch concerning rulemaking authority or preserving the confidentiality of numerous categories of very sensitive records made the subject of the Challenged Rules. There is no authority to invade the province of the Legislative Branch concerning rulemaking authority or preserving the confidentiality of numerous categories of very sensitive records made the subject of the Challenged Rules.

12. Nevertheless, our office must prepare, under threat of removal from office, for the possibility of having to turn over four years of data, correspondence, and certain case files, in twelve categories, by July 1, 2025. The County Attorney's office does not handle most criminal cases in El Paso County, that would be the El Paso District Attorney's office. However, even then, many of the categories require electronic searches, the results of which implicate approximately 1500 cases that must be reviewed in detail to establish whether they include required information and records. Moreover, the vague language of some of these 12 categories

2

**Exhibit
P-16**

makes it impossible to know if our assumptions about their meaning would even achieve compliant reporting.

13.     Our office has already been injured by the Challenged Rules as it has had to dedicate considerable staff resources to read, review, and decipher the vague language of the Challenged Rules to be prepared if the Challenged Rules are allowed to go into effect. Even though there was a comment period where hundreds of comments were made to the Challenged Rules seeking clarity of its scope and application, it is still unclear exactly what type of information needs to be included in the numerous reports.

14.     Based on my extensive experience and familiarity with the justice system, I estimate it will be extremely burdensome and time-intensive to comply with the Challenged Rules. This time and resources could and should have been spent prosecuting cases.

15.     Further, any attempt to prepare for and comply with the Challenged Rules take our employees away from the customary duties and core prosecutorial functions they undertake to serve genuine public interests. This harm will be ongoing, as the ongoing quarterly and annual compliance requirements will continue to compromise our resources.

16.     The Challenged Rules mandate the creation of an Oversight Advisory Committee, whose members are selected by the Attorney General. This Committee has the unlimited ability to demand complete case files for whatever reason the Committee provides. The unlimited scope of information the Challenged Rules covers creates an unpredictable cost to Plaintiffs that can increase exponentially at any given time. This unpredictability creates a requirement for our office to have staff and resources available at any given time to evaluate the risk of noncompliance with the Challenged Rules while at the same time potentially failing to meet the requirements of numerous privacy rights, confidentiality laws, and other statutory and regulatory provisions prohibiting release of certain case information and communications.

17.     Under Section 56.8 of the Challenged Rules, Defendants have the extraordinary power to unilaterally decide if any prosecutor is in violation of the Challenged rules and possess the unilateral power of initiating a removal action, quo warrant proceeding, or other lawsuit to force Plaintiffs to produce the requested information regardless of any other legal restriction that may counsel against disclosure.

18.     The Challenged Rules target only elected prosecutors in counties of over 400,000 in population. The Challenged Rules place an extraordinary burden on the prosecutors of these counties to continuously weigh the possibility of being determined to have violated the Challenged Rules or violating long-standing state and federal laws and regulations that protect the privacy of crime victims, witnesses, law enforcement officials and accused defendants, as well as the integrity of criminal prosecutions.

19.     A non-exhaustive list of Texas statutes and rules that the Challenge Rules conflict with are:

**Exhibit**

**P-16**

- Texas Public Information Act;
- Texas Code of Criminal Procedure;
- Texas Medical Records Privacy Act;
- Texas Penal Code;
- Texas Family Code; and Texas Rules of Evidence.

20. The Challenged Rules thus place prosecutors who fully comply with them to subject themselves to allegations of violations of ethics rules and both civil and criminal penalties for violating state and federal laws and regulations. In short, the Challenged Rules place prosecutors in a paradox, where failing to comply with the Challenged Rules may be used as grounds for removal from office and complying with the Challenged Rules may be used grounds for removal from office.

21. There is nothing in the Challenged Rules that permits prosecutors to first comply with existing statutory procedures, designed to prevent them from disclosing such information, and thereby avoid facing criminal and civil penalties. A non-exhaustive list of this information includes:

- Victim impact statements;
- Results of rape kits;
- Graphic photos, including child pornography, and autopsy photographs;
- Statements of all victims and witnesses, including confidential informants;
- Criminal history information;
- Detailed medical and mental health information and records;
- Detailed substance abuse treatment information and records; and
- All correspondence of any kind related to case files, including privileged attorney work-product.

22. Upon information and belief, once the public is aware of the ability of Defendants to require turnover of correspondence and entire case files, including all evidence and potential evidence, in all closed and ongoing prosecutions or investigations and communications whether privileged or not, this will unquestionably result in underreporting of crime and produce an immeasurable chilling effect on criminal prosecutions.

23. The Challenged Rules offer no recourse and no avenue for administrative appeal of any decision made by Defendants or the Oversight Advisory Committee. They only provide the oversight committee may waive any provision if a reporting entity "demonstrates" an undefined "undue hardship" without any opportunity for an independent administrative review or hearing, as is the case with other state agency rules. The only realistic option, therefore, would be to seek judicial review in each instance. Injunctive relief is necessary to prevent a continuous stream of litigation for every case file requested by Defendants that contains confidential information, the

4

**Exhibit**

**P-16**

release of which is prohibited by law or would otherwise infringe upon the rights of victims, witnesses, grand jury participants, law enforcement officials, or accused defendants.

24. A non-exhaustive list of examples of protected information subject to submission to Defendants under the Challenged Rules include:

- Criminal history records protected under court orders of nondisclosure;
- Grand jury testimony and materials;
- Attorney work product;
- Unfiled case information;
- Health records concerning treatment for drug and alcohol abuse or mental illness;
- Communications with non-profit organization containing sexual assault crisis service records;
- Voluntary drug and alcohol abuse treatment records.

25. The Challenged Rules represent a violation of diverse privacy interests, a current and incurable drain on county resources, a profound and intentional infringement on prosecutorial discretion, and presumption of an Executive Department oversight role over the Judicial Department where none exists.

26. I declare under the penalty of perjury that the foregoing is true and correct.

Executed in El Paso County, State of Texas, on the 15th day of May 2025.

_____
Alma Trejo, Asst. County Attorney

5

# Appendix
# Tab C.14

**Exhibit
P-17**

Cause No. _____

| | | |
|---|---|---|
| DELIA GARZA, | § | In the District Court |
| in her official capacity as | § | |
| Travis County Attorney, | § | |
| JOSÉ P. GARZA, | § | |
| in his official capacity as | § | |
| Travis County District Attorney, | § | |
| TRAVIS COUNTY, | § | |
| JAMES MONTOYA, in his official | § | |
| capacity as El Paso County District | § | |
| Attorney; CHRISTINA SANCHEZ, | § | |
| in her official capacity as El Paso | § | |
| County Attorney; and | § | |
| EL PASO COUNTY, | § | |
|     *Plaintiffs,* | § | |
| v. | § | ____ Judicial District |
| | § | |
| KEN PAXTON, | § | |
| in his official capacity as | § | |
| Attorney General for the | § | |
| State of Texas, and the | § | |
| OFFICE OF THE ATTORNEY | § | |
| GENERAL for the State of Texas, | § | |
|     *Defendants*. | § | Travis County, Texas |

## DECLARATION OF AMY LECHUGA

1.      My name is Amy Lechuga, and I am the Chief of Staff to Mr. James Montoya, the elected District Attorney of the 34th Judicial District, which includes El Paso County, Texas.

2.      I graduated with a Bachelor of Arts in Organizational Communication/Public Relations with a minor in Criminal Justice from the University of Texas at El Paso. I also obtained a Masters of Public Administration from the University of Texas at El Paso.

3.      I have extensive experience in public administration. Prior to my current role as Chief of Staff, I worked as the County Court Administrator for the County of El Paso for more than 8 years; a Court Coordinator for various County and District Courts in El Paso for over 7 years; and as an Executive Assistant for the County Judge's Office.

1

**Exhibit
P-17**

4.      As the Administrator for the County Courts, which includes 8 criminal courts, 3 civil courts, 2 family courts and 2 probate courts, I was responsible for a monthly and annual Court Performance Review that consisted of filings and dispositions, time to disposition, and clearance rates. I was responsible for ensuring that monthly State reporting that is submitted to the Office of Court Administration by the County Clerk and District Court was correct. I provided weekly inmate reports to the criminal courts to facilitate bond hearings and decrease the number of unnecessary jail days. I prepared statistics upon request from the courts for cases without a future hearing and scrubbed cases to ensure accuracy. I also responded to public records requests made to the County Administration related to county court statistics. I also have extensive experience working with the County Administration's Information and Technology department to ensure judicial metrics statistics were accurate.

5.      By virtue of my background, training, experience, and education, I possess the information needed to confirm the statements made in this declaration, and they are all true and correct. I am over eighteen years of age and fully component to make this declaration.

6.      As a dedicated public servant, I value transparency and efficiency in government, equity in justice, and protecting the community. I also understand the sensitive nature of the information that the El Paso District Attorney's office and different state courts hold and the importance to protect that information and follow relevant state and federal laws concerning their storage and transmission.

7.      My responsibilities as the Chief of Staff include project management, statistical data collection, policy development, staff supervision, budget and financial management, and acting as the chief liaison with other county departments.

8.     As a result of educational and work experience, I am concerned with the apparent overreach in the new rules adopted by the Attorney General and his office under Chapter 56 of the Texas Administrative Code ("Challenged Rules").

9.     This declaration is intended to set out the practical factual basis for the requested relief and to confirm the immediate and irreparable harm caused to our office and to El Paso County.

10.     Based on my understanding of the Challenged Rules, complying with them will create a large burden on myself, other staff members of the El Paso District Attorney's Office, and the County of El Paso. Further, any attempt to prepare and comply with the Challenged Rules take our employees away from their customary duties and core prosecutorial functions they undertake to serve genuine public interests. This harm will be ongoing, as the ongoing quarterly and annual compliance requirements will continue to compromise our resources.

11.     Based on my combined work and educational experience, I estimate that accurately completing the initial report will take over 12,000 hours of staff and attorney time. Further, these requirements will likely create the need for additional funds to hire new staff and implement new information and technology systems to categorize, store, and transmit the required information.

12.     At this time, I have determined that the following steps will be necessary, at least, to attempt to comply with the initial report set out by the Challenged Rules:

- Me and other staff from the El Paso District Attorney's Office would need to work with County Operations Department, which is responsible for the administration of the County's criminal justice case management software, Enterprise Justice – Tyler Technologies, to identify (a) what data elements are available for extraction, and (b) the location of these data elements within the Enterprise Justice database;

- Me and other staff from the El Paso District Attorney's Office would need to establish and identify how our current classifications of how we handle and dispose of cases presented to our Office for prosecution comport with the requirements of the Challenged Rules;

- I will have to work with the County's Information and Technology Department to create new computer code to extract data from relevant databases as well as extract potentially responsive correspondence and case annotations;

- I will need to work with our Quality Assurance Team to test the extracted data to ensure accuracy and completeness and identify anything that doesn't meet those requirements. Even then, I would have to work again with the code developer to test this new process until the Quality Assurance Team is satisfied with the accuracy of the data, before including it in any report required under the Challenged Rules. In my experience, this is an ongoing process that may take up to a year until the Quality Assurance Team approves of the accuracy of the data output.

13. One example from my previous work experience that I think is relevant to determine the length of time it will take us to comply with the Challenged Rules was when the County of El Paso was developing a Judicial Management Report in 2016. It was a project designed to gauge the efficiency and effectiveness of the county and district criminal courts operational process. I believe similar steps would be needed to comply with any report required under the Challenged Rules – it took us approximately two years before we were able to submit a finished product.

14. Based on the steps that I have determined are needed to comply with the Challenged Rules, I have determined we would likely need to hire, at minimum, one software developer, two secretaries, one attorney, and one functional data analyst permanently on staff to accurately report the initial and ongoing requirements required by the Challenged Rules.

4

15. I am also concerned that the Challenged Rules conflict with other state and federal laws that the District Attorney's Office must comply with.

16. The Challenged Rules represent a current and incurable burden on county resources.

28. I declare under the penalty of perjury that the foregoing is true and correct.

Executed in El Paso County, State of Texas, on the 15th day of May, 2025.

AMY LECHUGA
DECLARANT

5

# Appendix
# Tab C.15

**Exhibit
P-18**

| | | |
|---|---|---|
| JOHN CREUZOT, in his official capacity as Dallas County Criminal District Attorney; DALLAS COUNTY; JOE GONZALES, in his official capacity as Bexar County Criminal District Attorney; BEXAR COUNTY; SEAN TEARE, in his official capacity as Harris County District Attorney; and HARRIS COUNTY,<br><br>     *Plaintiffs*,<br><br>v.<br><br>THE OFFICE OF THE ATTORNEY GENERAL OF TEXAS, and WARREN KENNETH PAXTON JR., in his official capacity as Attorney General,<br><br>     *Defendant.* | § § § § § § § § § § § § § § § § § § § | IN THE DISTRICT COURT OF TRAVIS COUNTY, TEXAS 353rd JUDICIAL DISTRICT |

## UNSWORN DECLARATION OF MARSHA EDWARDS

I, Marsha Edwards, being at least eighteen years of age, state as follows:

1. I am Director of Special Programs for the Dallas County Criminal District Attorney's Office ("the Office"), a position I have held since 2019.

2. I have read and am familiar with 1 Tex. Admin. Code §§ 56.1-56.10, adopted by the Office of the Attorney General (OAG) (the "Final Rule"). The Final Report requires reporting entities, including the Office, to produce an initial report, quarterly reports, and annual reports to the OAG.

3. I have been tasked with overseeing the collection of data and production of initial, quarterly, and annual reports pursuant to the Final Rule, should the Court not issue a temporary injunction order.

**Exhibit
P-18**

4.      Compliance with the Final Rule, including production of the initial report due on July 1, 2025, would create a tremendous burden on the Office and would significantly and adversely affect the ongoing operations of the Office.  The Office processes thousands of criminal cases each year; for example, in 2024, the Office received more than 30,000 felony cases and more than 32,000 misdemeanor cases from Law Enforcement. During 2024, the office disposed of more than 26,000 felony cases and 29,000 misdemeanor cases.  In addition, the office processed approximately 4,800 juvenile cases. Compliance with the Final Rule would require the Office to either divert staff away from their core roles and responsibilities, hire additional staff, or contract staff to fulfil the reporting obligations.

5.      The Final Rule's "Quarterly and Initial Reporting Requirements" require the Office to produce all "correspondence" in connection with five separate categories:

- "All correspondence requested by OAG's Oversight Committee for a matter listed in response to paragraph (7)."  1 Tex. Admin. Code § 56.3(a)(8).[1]

- "All correspondence and other documentation describing and analyzing a reporting entity's policy not to indict a category or sub-category of criminal offenses." *Id.* § 56.3(a)(9).

- "All correspondence with any employee of a federal agency regarding a decision whether to indict an individual." *Id.* § 56.3(a)(10).

- "All correspondence with any non-profit organization regarding a decision whether to indict an individual."  *Id.* § 56.3(a)(11).

---

[1] 1 Tex. Admin. Code § 56.3(a)(7) requires the Office to provide "[t]he number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program or all charges were dropped."

- "All correspondence written at any time by an assistant district attorney . . . regarding the attorney's resignation under a formal or informal complaint process." *Id.* § 56.3(a)(12).

6. "Correspondence" is defined broadly to include "any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity." *Id.* § 56.2(2).

7. From January 1, 2021, until April 2, 2025, the period covered by the initial report, the Office employed more than 750 employees, approximately 75% of which were attorneys. Employees' emails are preserved on a Microsoft cloud storage platform and are accessible only by a few Dallas County Information Technology ("DCIT") employees. The Dallas County District Attorney's Office has no capacity to search for and review employee emails. I consulted with the Dallas County IT department, and they informed me that they do not have the software, personnel, or expertise to conduct forensic review of employee emails. The Office could not comply with the Final Rule's reporting obligations given our current technology and infrastructure.

8. If the Office were required to locate, review, and produce the correspondence requested in the initial and quarterly reports, the Office would be required to hire a third-party vendor at substantial expense to collect current and former employee emails, transfer them to a document review platform, and then run searches for responsive documents. The Office would then have to task staff with reviewing each email and other correspondence for which there was a document search term "hit." Given the amount of data at issue, the document review process will be costly and time-consuming.

9. This task would be especially difficult – and costly – because of the broad scope and vagueness of the requests. For example, to search for correspondence with non-profit

3

organizations, we would have to identify every non-profit organization with which we interact, and then identify individuals at those organizations and their email addresses so that searches could be run for "correspondence with any non-profit organization." Further searches would then have to be run and documents reviewed for responsiveness to determine if the correspondence relates to an indictment, where not all such correspondence would use the term "indictment." Similarly, for correspondence with "any employee of a federal agency," we would have to determine the email domain of every federal agency with whom we interact, then run searches in the emails of hundreds of employees for correspondence with those agencies, and then conduct further review to determine if that correspondence relates to a decision to indict. Once we identified those emails that relate to a decision to indict, we would then need to obtain and review the corresponding case file to determine if the case file contains any letters or other correspondence that requires production.[2]

10. The Final Rule also requests information as to cases where our case management system does not track the information according to the categories the Final Rule identifies. For example, the Final Rule asks the Office to provide the "number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped." 1 Tex. Admin. Code § 56.3(a)(7). The Final Rule further defines "violent crime" to include "automobile theft." *Id.* § 56.2(7). "Automobile theft" is not an offense category in Texas. For the period January 1, 2021, to April 2, 2025, our Office handled 82,317 cases that the Final Rule defines as involving

---

[2] In seeking "correspondence" involving a district or county attorney's "decision whether to indict and individual," the Final Rule assumes – incorrectly – that a district or county attorney has the power to indict an individual. In fact, an independent grand jury, not a district or county attorney, has the sole power to return an indictment against an individual.

"violent crimes," roughly 33,000 of which are misdemeanor cases that do not proceed through indictment.

11. Further, we cannot determine from our case management system the number of instances that a peace officer was indicted for the peace officer's conduct during official duties (*Id*. § 56.3(a)(1)) without individually reviewing case files because the offense categories used by our case management system often does not indicate whether the peace officer's offense occurred during official duties. There are 107 cases that would need to be reviewed individually to determine the number of instances a peace officer was indicted for the peace officer's conduct during official duties.

12. The Final Rule requires the Office to include in the initial and quarterly reports the "case file for instances a recommendation made by a Reporting Entity is made to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence, resentenced to a lesser sentence; or granted a new trial based on a confession of error." *Id*. § 56.3(a)(4). In consultation with the Office's conviction integrity unit, I have learned that there are potentially 12 cases that could be responsive to this request. The case files for these 12 cases comprise approximately 100 boxes of paper files.

13. Production of the case files responsive to this request would require a review of those approximately 100 boxes of paper files, the scanning of those paper files, and the potential redaction of privileged and confidential information within those files before they are submitted to the OAG. We do not have the staffing at our Office to undertake such a review and production without diverting staff from their core responsibilities.

14. Prior to production of any case files, we would need to conduct a careful review of responsive documents to determine whether they contain confidential information protected

5

from disclosure by various statutes. For example, grand jury material, victim and witness identity and medical records, and photos and videos depicting sexual assault of minors are protected from disclosure. This information is closely guarded by the prosecution team and is not shared outside the prosecution team except to the extent required by statute and case law.

15. Based on a preliminary review of the 12 cases whose case files are found in approximately 100 boxes of paper files, it is clear that those case files contain confidential material protected from disclosure. For example, one of the cases (charging injury to a child) contains children's medical records, photos displaying a child's genitalia, juvenile records, bank account information, a medical card with a social security number, and a copy of a bank check with bank account information, among other records. Another case (charging aggravated robbery) contains juror information cards, a grand jury transcript, fingerprint cards, and a victim impact statement with victim information, among other records. A third case (charging possession of a controlled substance) contains mental health records, including psychological evaluations, among other records. A fourth case (charging sexual abuse of a child) contains the victim/child's name and identifying information, grand jury transcripts, and sexual assault examination records. We would need to determine whether this information could be disclosed to the OAG without redaction.

16. To comply with quarterly reports, the Office would need to incur additional costs in setting up a program or system that would track the information, case files, and correspondence on an ongoing basis.

17. The Preamble to the Final Rule states that "[r]eporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments to the OAG in various manners and in compliance with other statutes that only generally require

disclosure of information to the OAG." 50 TexReg 2176. Our Office does not routinely submit criminal case files to the OAG. Since I arrived to the Office in 2019, I am aware of just two instances in which the Office produced a criminal case file to the OAG. In each instance the Office produced a criminal case file to the OAG after the Office was recused from the case and the trial court had appointed an assistant attorney general to serve as attorney pro tem. The Office produced the case file because an attorney in the OAG, not the Office, was prosecuting the case on behalf of the state. I am not aware of any statute requiring the Office to submit criminal case files to the OAG.

Date: May 14, 2025

Respectfully Submitted,

*Marsha Edwards*
_____
Marsha Edwards

## VERIFICATION BY UNSWORN DECLARATION

My name is Marsha Edwards, and I am an employee of the Dallas County Criminal District Attorney's Office. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the facts stated in the foregoing are true and correct.

Executed in Dallas County, State of Texas, on this 14th day of May, 2025.

*Marsha Edwards*
_____
Marsha Edwards

# Appendix
# Tab C.16

**Exhibit
P-19**

Cause No. _____



JOHN CREUZOT, in his official capacity as Dallas County Criminal District Attorney; DALLAS COUNTY; JOE GONZALES, in his official capacity as Bexar County Criminal District Attorney; BEXAR COUNTY; SEAN TEARE, in his official capacity as Harris County District Attorney; and HARRIS COUNTY,

    *Plaintiffs*,

v.

THE OFFICE OF THE ATTORNEY GENERAL OF TEXAS, and WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General,

    *Defendant.*

§ § § § § § § § § § § § § § § § § § § §

IN THE DISTRICT COURT
OF TRAVIS COUNTY, TEXAS
353rd JUDICIAL DISTRICT

## UNSWORN DECLARATION OF JAMISSA JARMON

I, Jamissa Jarmon, being at least eighteen years of age, state as follows:

1. I am the Chief Administrator for the Bexar County District Attorney's Office ("the Office"), a position I have held since 2023. I have also served as the Chief of Misdemeanor and Chief of Intake and Grand Jury at the Office.

2. I have read and am familiar with 1 Tex. Admin. Code §§ 56.1-56.10, adopted by the Office of the Attorney General (OAG) (the "Final Rule"). The Final Rule requires reporting entities, including the Office, to produce an initial report, quarterly reports, and annual reports to the OAG.

2995382.1

3.      I have been tasked with overseeing the collection of data and production of initial, quarterly, and annual reports pursuant to the Final Rule, should the Court not issue a temporary injunction order.

4.      Compliance with the Final Rule, including production of the initial report due on July 1, 2025, would create a tremendous burden on the Office and would significantly and adversely affect the ongoing operations of the Office. The Office handles thousands of criminal cases each year. In fiscal year 2023-2024, the Office received from Law Enforcement more than 27,000 felony cases, more than 33,000 misdemeanor cases, and more than 3,000 juvenile cases. Compliance with the Final Rule would require the Office to divert staff away from their core roles and responsibilities and to incur significant financial expenses.

5.      The Final Rule's "Quarterly and Initial Reporting Requirements" require the Office to produce all "correspondence" in connection with five separate categories:

- "All correspondence requested by OAG's Oversight Committee for a matter listed in response to paragraph (7)." 1 Tex. Admin. Code § 56.3(a)(8).[1]

-  "All correspondence and other documentation describing and analyzing a reporting entity's policy not to indict a category or sub-category of criminal offenses." *Id.* § 56.3(a)(9).

- "All correspondence with any employee of a federal agency regarding a decision whether to indict an individual." *Id.* § 56.3(a)(10).

-  "All correspondence with any non-profit organization regarding a decision whether to indict an individual." *Id.* § 56.3(a)(11).

---

[1] 1 Tex. Admin. Code § 56.3(a)(7) requires the Office to provide "[t]he number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program or all charges were dropped."

Exhibit
P-19

2995382.1

- "All correspondence written at any time by an assistant district attorney . . . regarding the attorney's resignation under a formal or informal complaint process." *Id.* § 56.3(a)(12).

6. "Correspondence" is defined broadly to include "any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity." *Id.* § 56.2(2). Because none of this information was previously tracked as requested by the Final Rule, currently there is no pre-existing way to identify this information to comply with these requirements.

7. From January 1, 2021, until April 2, 2025, the period covered by the initial report, the Office had approximately 905 employees, including approximately 392 attorneys. The attorneys' and professional staffs' emails are preserved on a Microsoft cloud storage platform. I have been informed by the Office's IT department that a significant amount of Office employees' emails, approximately 5 terabytes of data, are maintained in archives, in a PST format, that are not readily accessible and searchable without a manual effort. There are an additional 2.4 terabytes of data for current attorney emails that would need to be searched. I have been informed by the Bexar County IT department that it has estimated the 2.4 terabytes of data to represent over six million emails.

8. After consultation with both the Office's IT department and the Bexar County IT department, I have learned that neither IT department has the capacity, software, or personnel to review and search through such a large volume of emails.

9. If the Office were required to locate, review, and produce the correspondence requested in the initial and quarterly reports, the Office would be required to hire a third-party vendor at substantial expense to collect current and former employee emails, transfer them to a

2995382.1

document review platform, and run searches for responsive documents. The Office would then need to identify staff to review each document in which a search term was found.

10. The task of locating, reviewing, and producing responsive correspondence would be especially difficult – and costly – because of the broad scope and vagueness of the requests. For example, to search for correspondence with non-profit organizations, we would have to identify every non-profit organization with which we interact and then identify individuals at those organizations and their email addresses so that searches could be run for "correspondence with any non-profit organization." Further searches would then have to be run and documents reviewed for responsiveness to determine if the correspondence relates to an indictment, since not all such correspondence would use the term "indictment." Similarly, for correspondence with "any employee of a federal agency," we would have to determine the email domain of every federal agency with whom we interact, then run searches in the emails of hundreds of employees for correspondence with those agencies, and then conduct further review to determine if that correspondence relates to a decision to indict. Once we identified those emails that relate to a decision to indict, we would then need to obtain and review the corresponding case file to determine if the case file contains any letters or other correspondence that requires production. Since we have not previously tracked the information in these two requests, compiling lists of non-profit names, federal email addresses, and relevant terms may be difficult.

11. The Final Rule also requests information as to cases where our case management system does not track the information according to the categories the Final Rule identifies. For example, the Final Rule requests the number of instances that a peace officer was indicted for the peace officer's conduct during official duties. 1 Tex. Admin. Code § 56.3(a)(1). The Office does not track this information. To identify the correct number, the Office would need to review each

4

2995382.1

case file within the Public Integrity Division and the Civil Rights Division, which have recently been joined. The total number of cases in those two units between January 1, 2021, and April 2, 2025, is nearly 860 cases.

12. The Final Rule asks for the "number of prosecutions involving a defendant's discharge of a firearm resulting in any prosecutorial decision based on Title 9 of the Penal Code." 1 TAC § 56.3(a)(3). To identify this number, the Office would need to run disposition reports for each Title 9 offense that might involve a firearm. Once each case number is identified, each case file would need to be reviewed to determine if the case involved the discharge of a firearm. If charges were brought, the charging document would need to be reviewed. If charges were not brought, the police report would need to be reviewed. There are more than 1,024 Title 9 cases between January 1, 2021, and April 2, 2025, that would need to be reviewed individually.

13. The Final Rule asks the Office to provide the "number of instances that an arrest was made for a violent crime, but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped." 1 Tex. Admin. Code § 56.3(a)(7). The Final Rule further defines "violent crime" to include "automobile theft." *Id.* § 56.2(7). "Automobile theft" is not a specifically labeled offense in Texas. To identify the current number, the Office would need to review data in two separate locations, the mainframe case management system that housed data prior to June 1, 2024, and the new Odyssey case management system that has housed offense data since June 2, 2024. The Office would also need to review data in four systems if juvenile prosecutions were included in this request.

14. Although not as specifically requested by the Final Rule, some of the numerical data sought is reported to the Department of Public Safety and the Office of Court Administration.

Exhibit
P-19

2995382.1

15. The Final Rule requires the Office to include in the initial and quarterly reports the "case file" related to three separate categories. Case files may contain confidential information protected from disclosure by various statutes, including, for example, grand jury material, victim and witness identity, medical records, and photos depicting sexual assault of minors. This information is closely guarded by the prosecution team and is not shared outside the prosecution team except to the extent required by statute and case law. Prior to production of confidential information, we would need to determine whether such information could be disclosed to the OAG without redaction.

16. To comply with quarterly reports, the Office may need to incur additional costs in setting up a program or system that would track the information, case files, and correspondence on an ongoing basis.

17. The Preamble to the Final Rule states that "[r]eporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments to the OAG in various manners and in compliance with other statutes that only generally require disclosure of information to the OAG." 50 TexReg 2176. Our Office does not submit criminal case files to the OAG unless the Bexar County Criminal District Attorney's Office has recused itself from a case and the OAG has agreed to prosecute the case; I am not aware of any case file that was produced to the OAG without involving a recusal since I arrived at the Office in 2019. I am not aware of any statute requiring the Office to submit criminal case files to the OAG.

Date: May 14, 2025           Respectfully Submitted,

*Jamissa Jarmon*
_____
Jamissa Jarmon

6

2995382.1

Exhibit

P-19

## <u>VERIFICATION BY UNSWORN DECLARATION</u>

My name is Jamissa Jarmon, and I am an employee of the Bexar County Criminal District Attorney's Office.  I am executing this declaration as part of my assigned duties and responsibilities.  I declare under penalty of perjury that the facts stated in the foregoing are true and correct.

Executed in Bexar County, State of Texas, on this  14ᵗʰ day of May, 2025.

*Jamissa Jarmon*
_____
Jamissa Jarmon

7

2995382.1

**Exhibit**
**P-19**

# Appendix
# Tab C.17

**Exhibit
P-20**

Cause No. _____

| | | |
|---|---|---|
| JOHN CREUZOT, in his official capacity as Dallas County Criminal District Attorney; DALLAS COUNTY; JOE GONZALES, in his official capacity as Bexar County Criminal District Attorney; BEXAR COUNTY; SEAN TEARE, in his official capacity as Harris County District Attorney; and HARRIS COUNTY, | § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | OF TRAVIS COUNTY, TEXAS |
| v. | § § | 353rd JUDICIAL DISTRICT |
| THE OFFICE OF THE ATTORNEY GENERAL OF TEXAS, and WARREN KENNETH PAXTON, in his official capacity as Attorney General, | § § § § § § | |
| *Defendant.* | § | |

## UNSWORN DECLARATION OF JOSHUA REISS

1.    My name is Joshua Reiss. I am over 18 years of age, of sound mind, and capable of making this Unsworn Declaration. The facts stated in this Unsworn Declaration are within my personal knowledge and are true and correct.

2.    I am an attorney licensed in the State of Texas, and I am employed as General Counsel in the Harris County District Attorney's Office ("HCDAO"). As part of my employment duties, I assessed the burden on HCDAO to comply with Texas Administrative Code's new Chapter 56, which would for the first time require massive amounts of data to be reported to the Office of the Texas Attorney General ("OAG").

3.    HCDAO currently employs 362 attorneys and 498 non-attorneys, and its current caseload consists of approximately 54,000 felony cases and 50,000 misdemeanor cases. These caseload numbers do not include Class C misdemeanor Justice of the Peace Court ("JP") cases, which are

Page **1** of **8**

**Exhibit**
**P-20**

handled by contract prosecutors on HCDAO's behalf. Additionally, JP case files are maintained by the JP courts and Harris County Office of Court Administration ("OCA"), not HCDAO. Based on an assessment of staffing, caseload, technical infrastructure, and interpretations of Chapter 56 language and requirements, HCDAO estimates it would have to hire 10 new, fulltime employees dedicated to a specialized "OAG Reporting Unit" to comply with Chapter 56. These new employees would work in General Litigation and IT.

4. General Litigation staffing would consist of six employees: one Chief prosecutor, one Felony 2 prosecutor, three Felony 3 prosecutors, and one paralegal or administrative assistant. The Felony 2 and 3 prosecutors would be akin to PIA attorneys supervised by a Chief prosecutor, who would address compliance issues as they arise. Particular concerns that would require labor intensive review relate to "purely personal" communications, correspondence with federal agencies, firearm data, as required under § 56.3, and the initial reporting of Class C "family violence" offenses due to the latter's lack of current coding protocols. The Chief would also develop and implement ongoing training and coordinate with IT to troubleshoot and develop new reporting systems as necessary.

5. IT indicates that they will need four (4) new staff comprised of two (2) Chief Software Architects and two (2) Data Process Analysts. These professionals will be required to develop automated reporting tools to extract quarterly and annual data, tagging and metadata system development for case files and correspondence, and audit trail logging to track prosecutorial document changes. IT will also need to serve a maintenance/trouble shooting function. It is unknown at this time if additional data storage will be required.

6. The initial cost, which includes salaries and benefits for the 10 new employees, and computer system costs relating to licensing, hardware, and software, is currently estimated to be

Exhibit
P-20

in excess of $11 million over the next five years.

7.    However, this cost estimate is preliminary and can be expected to increase as currently unknown issues arise. This includes the development and implementation of new systems, such as those necessary to obtain data HCDAO currently does not have in its possession, custody, and control.

8.    Additionally, based on its current caseload, current assumptions relating to implementation of new systems, some possible modifications to its current computer system, and the hiring and training of its new OAG Reporting Unit, HCDAO currently estimates it will need at least six months, if not longer, to compile its initial report. This initial report would relate solely to HCDAO's current caseload.

9.    HCDAO is currently unable to estimate when it would be possible to compile a report for the estimated 415,000 cases dating back to January 2021. Like with HCDAO's current caseload, this past case count does not include JP cases.

***Compliance is currently impossible: HCDAO does not have possession, custody, control of some data that may be required.***

10.    As noted above, HCDAO contracts out JP prosecutions and JP case files are not currently in the possession, custody, control of HCDAO. Instead, JP cases files are maintained by the JP courts and OCA, which utilize a different file management system. While HCDAO has access to the JP courts' data, it does not have the ability to query, or make notations to, that data. As it only has access to the data, it is unclear whether HCDAO could be required to report JP data.

11.    Should HCDAO be required to report data not in its possession, custody, or control, it will be necessary for HCDAO to obtain this JP data because §56.3(7) includes "an arrest [] made for a violent crime but no indictment was issued," but the new Chapter 56 does not specifically define "arrest." This vagueness has severe consequences because, in addition to custodial arrests, the

**Exhibit
P-20**

Texas Code of Criminal Procedure contemplates arrests that are also noncustodial. *See* Tex. Code Crim. Pro. Ann. arts. 14.06(b) and (c) ("instead of taking the person before a magistrate," an officer may issue person a citation to appear at a later date) and 55A.051 ("This subchapter applies to a person who has been placed under a custodial or noncustodial arrest for commission of a felony or misdemeanor …"). Additionally, the definition of "violent crime" in §56.2(7) includes "family violence assault" and "theft." These offenses are commonly charged as misdemeanors, for which indictments are never issued, and they and Class C noncustodial arrests are prosecuted at the JP level.

12. Accordingly, HCDAO will first need to enter into data access agreements with the JP courts and work with the OCA to develop ETL (Extract, Transform, Load) processes for the initial report. Future quarterly reports will require ongoing IT support and maintenance from both the HCDAO and OCA. The initial undertaking will be time-consuming and, as with every new project, will result in unknown issues that will increase HCDAO's initial cost estimate.

13. Similarly, body and dash camera videos are not currently in the possession, custody, control of HCDAO. Instead, body and dash camera videos are maintained by local police departments. HCDAO has access to these videos via portals in its current system, but it does not download all these videos into its case files. While the term "videos" is not specifically listed anywhere in Chapter 56, it is unclear whether the definition of "case file" under § 56.2(1) may include body and dash camera videos. If it does, to account for integrating the necessary systems to download these videos and the increased storage requirements necessary to maintain them, HCDAO's financial burden will significantly increase to an unknown level above the current initial cost estimate. Additionally, this would extend the current estimated timeframe for compliance.

14. Another example of data not currently in in the possession, custody, control of HCDAO

Exhibit
P-20

relates to prior decisions involving federal agencies and non-profits. Under § 56.3(a)(10-11), HCDAO must report "all correspondence with any employee of a federal agency regarding a decision whether to indict an individual" and "all correspondence with any non-profit agency regarding a decision whether to indict an individual." The vagueness of "a federal agency" and "any non-profit agency" will lead to guesswork. HCDAO will make a best effort and identify likely agencies (*e.g.*, Federal Bureau of Investigation, Department of Justice, Children's Assessment Center, Mothers Against Drunk Driving) for internal system searches, but that that may well miss relevant data. Accordingly, to determine if data might be relevant, *i.e.*, identify whether federal agencies or non-profits were involved in a particular decision, attorneys will need to interview the former District Attorney and her Bureau Chiefs regarding any possible correspondence. The degree to which those respective parties and applicable federal agencies will recall or be willing to cooperate are unknown variables. Additionally, as to the federal agencies specifically, these interviews, the collection of data, and future, ongoing compliance will likely result in jeopardizing critical investigations and relationships. It is likely federal agencies will disapprove of their work product and confidential information (*e.g.* relating to confidential informants and interagency task forces, for which specific details and suspect information are on a need-to-know basis) being released to persons at OAG who not involved in applicable criminal investigations.

**Compliance is currently impossible: for the data it has, HCDAO cannot automate the collection of information, meaning attorney review will be required.**

15.     HCDAO's current computer system cannot automatically tag all appliable data, requiring attorneys to conduct laborious review of all applicable cases files. For example, while the current computer system could be reprogrammed to tag appliable firearm data, as required under § 56.3, current cases are not identified in this manner. Attorney review will be necessary to drill down into the pleadings, case notes, and/or work product to determine whether an individual case applies.

Exhibit
P-20

This will be a time consuming and complex task. Prospectively, compliance will require coding updates to our computer system and will require new and ongoing training of prosecutors to electronically tag (either in case notes or the case jacket) their applicable cases. However, because this is subject to human error, it will need to be supplemented by the same process as the retrospective review.

16. Another example of data necessitating attorney review relates to Class C assaults. As previously noted, HCDAO does not currently have access to all relevant data, which is maintained by the JP Courts and OCA. However, once new agreements and systems are implemented to permit HCDAO to obtain and tag all likely applicable data, attorneys must then review and identify every Class C Assault arrest to determine if the fact pattern fits the definition requirements of "family violence" under Family Code Chapter 71. *See* Godwin v. State, 91 S.W.3d 912, 919 (Tex. App. - Fort Worth 2002) ("There is no language in either article 42.013 or section 22.01(b)(2) that would exclude the use of extrinsic evidence to prove that a previous assault was against a family member when the trial court failed to make an affirmative finding in the case"). This will require additional training and time, and it will of course be subject to human error.

17. Another example of information necessitating attorney review relates to the exclusions in §56.2(1) and (2) of "correspondence that is purely personal in nature and has no connection with the transaction of official business." This review cannot be accomplished by IT software development and/or any existing AI technology. The review will necessitate attorney review of multiple categories of information to identity and exclude "purely personal" information, which may include emails with the confidential personal and family information of public employees protected under Texas Government Code §§ 552.117 or 552.1175 or HCDAO employees who have elected to have this information redacted under Texas Government Code § 552.024. This too

Exhibit
P-20

will require additional training and time, and it will of course be subject to human error.

18. Additionally, HCDAO's system does not currently tag the type of post-conviction information specified in § 56(a)(4). Although future compliance could be facilitated by modifying the system to allow relevant cases to be tagged by prosecutors, those modifications are not currently in place. This means any initial report would require attorneys to audit and identify all pertinent cases. The audit, which would involve capital murders, including death penalty cases, would be data intense and laborious.

19. Finally, regarding § 56(a)(12), which relates to an "attorney's resignation under a formal or informal complaint process," HCDAO does not currently track such information. For the initial report, Human Resources will need to perform an initial audit of all attorney resignations and terminations dating back to 2021—there is no current estimate of applicable resignations, and no timeframe until the initial audit is complete, if then. Upon initial identification by Human Resources, attorneys will need to assess whether the fact pattern at issue is implicated. For future quarterly reports, Human Resources will need to proactively identify appropriate cases.

20. In sum, OAG's expectations regarding time to comply, and its conclusion that associated costs will be "minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact" are not grounded in reality. Neither is OAG's impact statement that Chapter 56 "will not require the creation … of employee positions." Chapter 56's new reporting requirements do not correlate to HCAO's current administrative functions or record keeping standards and practices. These new reports would cost at least $11 million for the first five years and require HCAO to obtain and maintain massive amounts of data it currently does not have in its possession, custody, and control. Additionally, because agreements must first be executed to obtain this data, in addition to modifying existing computer systems, and the hiring and training

Exhibit
P-20

of the 10 employees dedicated to the new OAG Reporting Unit to review and compile the necessary information, it is impossible for HCDAO to timely comply as currently required under Chapter 56.

Dated this 15 day of May 2025.

Respectfully submitted,

Joshua Reiss

**VERIFICATION BY UNSWORN DECLARATION**

My name is Joshua Adam Reiss, and I am an employee of the following governmental entity: Harris County District Attorney's Office. I am executing this declaration as part of my assigned duties and responsibilities. I declare under penalty of perjury that the facts stated in the foregoing are true and correct.

Executed in Harris County, State of Texas, on May 15, 2025.

Joshua Reiss

Exhibit
P-20

# Appendix
# Tab C.18

**Exhibit
P-21**

CAUSE NO. D-1-GN-25-003581

| | | |
|---|---|---|
| BRIAN M. MIDDLETON, *in his official capacity as District Attorney of Fort Bend County, Texas (268th Judicial District)* and SHAWN W. DICK, *in his official capacity as District Attorney of Williamson County, Texas (26th Judicial District),* | § § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* | § § | |
| v. | § § § | 98th JUDICIAL DISTRICT |
| WARREN KENNETH PAXTON, JR., *in his official capacity as Texas Attorney General,* and THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF TEXAS, | § § § § § § § § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## DECLARATION OF BRIAN M. MIDDLETON

I, Brian M. Middleton, declare as follows:

1.      I am the elected District Attorney for the 268th Judicial District of Texas (Fort Bend County Attorney) and have served as the District Attorney for the past 6.5 years.

2.      I am over eighteen years of age and competent to make this declaration. I have personal knowledge of all matters set forth herein or have provided such information necessary to confirm the statements in this

Exhibit
P-21

declaration, and all such statements are true and correct. If called as a witness, I could and would competently testify thereto under oath.

3. Prior to being elected as the District Attorney I served as an assistant prosecuting attorney in the Fort Bend County Attorney's Office. I also served as an assistant attorney general in the Habeas Corpus Division of the Office of the Texas Attorney General in the habeas corpus division and as a briefing attorney for Judge Morris Overstreet at the Texas Court of Criminal of Appeals.

4. My training, education, experience as a prosecutor in the State of Texas and current position of District Attorney make me familiar with the constitutional duties and core functions of Texas prosecuting attorneys. I am also familiar with the collection, retention and storage of data, documents and media obtained in prosecuting attorney offices across the state and am intimately familiar with those matters in the Office of the District Attorney for the 268th Judicial District of Texas. ("Office").

5. I have read and am familiar with the "District and County Attorney Reporting Requirements" Chapter 56 (§§ 56.1–56.10) of Title 1 of the Texas Administrative Code ("TAC"), the "District and County Attorney Reporting Requirements," adopted by the Office of the Attorney General of Texas ("Attorney General") in March. 50 TEX. REG. 2173–2182 (Mar. 28, 2025) (the "Adopted Rule" or "Rule"). As extensively detailed in the Original Verified

Petition and Application for Temporary Injunction and Permanent Injunction—which my Co-Plaintiff verified at the time of filing and for which I also file a verification solely for the sake of completeness—this declaration provides further detail as to the irreparable harm the Adopted Rule foists upon the Office in submitting "an initial, and quarterly and annual reports." 1 TAC § 56.1.

6. The Office handles thousands of cases—the majority of which would have some relevance under the Adopted Rule. From January 2021 to April 2, 2025, the period covered by the initial report, the Office received over 55,000 case submissions in adult cases alone. Felony cases, which are almost always the subject to grand jury proceedings prior to indictment accounted for over 23,000 of that number. Due to the antiquated case management system for juvenile cases, thousands of cases were hand counted. From the beginning of Fiscal Year 2021 (September 1, 2020) and April 30, 2025, there were 5,197 juvenile cases.

7. At present, the Office has 174 employees, including 89 assistant prosecuting attorneys—all of whom may have relevant materials—due to the broad categories of "correspondence" for which the Adopted Rule requires reporting. The Adopted Rule compels reporting of "correspondence," which includes "any email, letter, memorandum, instant message, text message, or

Exhibit
P-21

direct message, received or issued by an employee of the reporting entity," 1 TAC § 56.2(2), for five categories:

(a) correspondence describing or containing an analysis of a district or county attorney's "policy not to indict a category or sub-category of criminal offenses," 1 TAC § 56.3(a)(9);

(b) "correspondence with any employee of a federal agency regarding a decision whether to indict an individual," 1 TAC § 56.3(a)(10);

(c) "correspondence with any non-profit organization regarding a decision whether to indict an individual," 1 TAC § 56.3(a)(11);

(d) correspondence by an assistant prosecutor regarding "that attorney's resignation under a formal or informal complaint process," 1 TAC § 56.3(a)(12); and

(e) correspondence requested by the Oversight Advisory Committee, 1 TAC § 56.3(a)(8), regarding "instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program or all charges were dropped," 1 TAC § 56.3(a)(7).

8. Individual county computers and the entire network are routinely recorded with back up tapes also recorded. The Office's (and the County's) employees are routinely advised that the destruction of public records (including emails) may constitute a criminal offense. Departing employes, in

particular, are advised as to the broad definitions employed in Texas record retention statutes and County record retention policies (including use of County-owned cellular phones). Nevertheless, 52 assistant prosecuting attorneys and 40 staff members have left the Office since January 1, 2021. Fort Bend County IT—or more likely a third-party vendor—would have to collect current and former employee emails (and other forms of communications), transfer them to a document review platform, and run searches for responsive documents.

8. Locating, reviewing, and producing responsive correspondence is also difficult because of the broad scope implicated. The Office routinely interacts with at 15 non-profit organizations, including the Fort Bend Women's Center, Child Advocates of Fort Bend, George Foundation, Wessendorff Foundation, Katy Christian Ministries, East Fort Bend Needs, Helping Hands, Fort Bend Senior Meals on Wheels, Access Health, Fort Bend Hope, United Way, Catholic Charities, United Against Human Trafficking, Hope for Three, and the Fort Bend Literacy Council. To search for responsive correspondence with non-profit organizations, the Office would have to have to identify every potential individual at those 15 organizations with which an employee of the Office interacts or has interacted. Fort Bend County IT—or more likely a third-party vendor—would then have to collect the materials and put them into a reviewable format. These would, in turn, have to be reviewed further to ensure

relevance to an actual or contemplated indictment. It is difficult to envision how such could be completed without manual review.

9. Similarly, for correspondence with "any employee of a federal agency," the Office would also have to determine individual employees of the at least nine federal agencies with whom the Office regularly interacts: ATF, DEA, DOJ, FBI, ICE, IRS, U.S. Marshal Service, U.S. Postal Inspection, and U.S. Secret Service. Collecting the emails of hundreds of employees for correspondence with hundreds more of those agencies is only the first step and not one that can be done in a complete fashion because there may well be another federal agency (or another non-profit) not included in what has already been a thorough attempt to compile such lists. After collection, conducting further review to determine if the correspondence is a "reporting event" under the Rule is an even less straightforward step that will require significant individualized review.

10. The inclusion of "automobile theft," "burglary," and "riot" as "violent crime," 1 TAC § 56.2(7), complicates review and requires the creation of new means of compiling and retaining records. Using the definition of "violent crime" in the Adopted Rule, there were 5,234 cases of "violent crime" in Fiscal Year 2024 (September 1, 2023 to October 1, 2024). Because "automobile theft" is not a specifically labeled offense in Texas, it is hard to guarantee accuracy in even this first step. While the line between a riot,

particularly one involving only property damage or disruption, and a lawful First Amendment-protected protest is not always clear, the inclusion of riot and burglary expand "violent crime" well beyond what prosecutors commonly think of as a "violent crime." The case files for those 5,234 cases (and all others from the time period of January 1, 2021 until April 2, 2025; March 1, 2025 until May 31, 2025; and thereafter quarterly) would have to be reviewed individually to determine if such would fit into the category where "no indictment was issued, the case was resolved by deferred prosecution or a similar program or all charges were dropped." 1 TAC § 56.3(a)(7).

11.     The Office's case management software, Odyssey, does not have the capability of searching our case files for arrest. Arrest/booking information is stored at the Fort Bend County Jail of which my Office only has limited access. Fort Bend County's IT Department, whose executive director reports to the County's Commissioners and not to me, would have to develop search criteria for the information sought by the Rule. It would then fall to my Office individually reviewed—a time-consuming exercise even if all materials could be accurately collected.

12.     The Preamble to the Final Rule states that "[r]eporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments to the OAG in various manners and in compliance with other statutes that only generally require disclosure of

information to the OAG." 50 TEX. REG. 2176. The Office does not routinely submit criminal case files or correspondence. Since I became the District Attorney for the 268th Judicial District of Texas on January 1, 2019, the Office has not produced in any instance a criminal case file to the Attorney General. Without the Adopted Rule, the Office would only produce a criminal case file to the Office of the Attorney General in the event the Fort Bend DAO has recused itself from a case and the Office of the Attorney General has agreed to the prosecute the matter. Case files contain confidential information or otherwise protected information, release of which is prohibited by law or would otherwise infringe upon the rights of victim witnesses, grand jury participants, law enforcement officials, or accused defendants.

13.     The Office will need at a minimum 2 full-time employees ("FTE") at a cost of at least$155,000 per year, inclusive of benefits and training. While the Office has apprised of needing at least one new person, the Office will need at least another assistant prosecuting attorney to avoid significant reductions in prosecutions. Additionally the Fort Bend County IT Department will require at a minimum 2 FTE (data analyst and programmer) at a cost of at least $225,000 annually. With respect to IT, however, it is more likely that such will have to be contracted out at a substantial cost of $120/hour. There most likely will be a cost for additional software yet to be determined.

14. The Adopted Rule offers no recourse and no avenue for administrative appeal of any decision made by the Defendants or the Oversight Advisory Committee. Instead, § 56.8 purports to give Attorney General authority to initiate a removal action or a proceeding in quo warranto to produce the requested information regardless of any other legal restriction that may counsel against disclosure.

15. Thus, my Office must prepare, under consequence of removal from office, for the possibility of having to turn over four years of data, correspondence, and certain case files, in twelve categories, by July 1, 2025. Many of the categories require electronic searches, the results of which implicate thousands of cases that must be reviewed in detail to establish whether they include required information and records. It is difficult to know if the assumptions we would have to make about any undefined term's meaning would be viewed as compliant reporting.

16. Injunctive relief is justified here because compliance with the Adopted Rule has created and will continue to impose a tremendous burden on the Office and has significantly and adversely affected the ongoing operations of the Office and if left intact will continue to seriously undermine our constitutional core duties as prosecutors and incur significant unrecoverable financial expense.

Exhibit
P-21

I declare under the penalty of perjury that all the foregoing is true and correct.

Executed in Fort Bend County, Texas, this the 13th day of June, 2025.

_____
Brian M. Middleton
Fort Bend County District Attorney

# Appendix
# Tab C.19

**Exhibit
P-23**

| | | |
|---|---|---|
| BRIAN M. MIDDLETON, *in his official capacity as District Attorney of Fort Bend County, Texas (268th Judicial District);* and SHAWN W. DICK, *in his official capacity as District Attorney of Williamson County, Texas (26th Judicial District),* entire | § § § § § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* v. | § § § § § | 98th JUDICIAL DISTRICT |
| WARREN KENNETH PAXTON, JR., *in his official capacity as Texas Attorney General,* and THE OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF TEXAS, | § § § § § § § § § § § | |
| *Defendants.* | § | TRAVIS COUNTY, TEXAS |

## DECLARATION OF SHAWN DICK

I, Shawn W. Dick, being at least eighteen years of age, state as follows:

1. I am the elected District Attorney for the 26th Judicial District of Texas ("District Attorney") and have served as the District Attorney for the past 8.5 years. Prior to being elected as the District Attorney I served as an assistant prosecutor in the Harris County District Attorney Office for over 4 years and an assistant felony prosecutor in the District Attorney's office in Williamson County for 4 years.

2. Based on my training, education, experience as a prosecutor in the State of Texas and current position of District Attorney, I am familiar with the statutory and

1

constitutional duties and core functions of Texas prosecutors. I am familiar with the collection, retention and storage of data, documents and media obtained in district attorney offices across the state and am intimately familiar with those matters in the office of the District Attorney for the 26th Judicial District of Texas. ("Office").

3. While the legal basis for injunctive relief are set out in the verified Original Petition and Application for Temporary Injunction, as well as Plaintiffs' Supplement and Further Argument in Support of Plaintiffs' Application for a Temporary Injunction brief, this declaration is intended to set out the factual basis for the requested relief and to demonstrate the immediate and irreparable harm caused to our office, as well as harm to other prosecutors, county plaintiffs, and our communities. The harm will be ongoing until such time as a Court stops this unconstitutional action of the Office of Attorney General ("OAG").

4. I have read and am familiar with 1 Tex. Admin. Code §§ 56.1-56.10, adopted by the OAG (the "Adopted Rule"). The Adopted Rule requires reporting entities to produce initial, quarterly, and annual reports to the OAG. As District Attorney, in an effort to comply with the new Adopted Rule, I have been overseeing the collection of data and case files for production of initial, quarterly, and annual reports dictated by the Adopted Rule. In that effort, I have had the help of an outside consultant, several of my assistant district attorneys and staff, as well as employees of the County IT department. The Adopted Rule requires the reports to be submitted to OAG within the next three (3) weeks. The most burdensome report (initial report) is due July 1, 2025, and spans four years of arrests and prosecutions (initial report which covers January

**Exhibit
P-23**

1, 2021-April 2, 2025). The first quarterly report is due June 30, 2025 (covering March 1, 2025-May 31,2025).

5. Compliance with the Adopted Rule has created and will continue to impose a tremendous burden on the Office and has significantly and adversely affected the ongoing operations of the Office and, if left intact, will continue to seriously undermine our constitutional core duties as prosecutors and incur significant financial expense.

6. The Office handles thousands of criminal cases each year. From January 2021 to April 2, 2025, the Office received over 15,000 charges in our Intake Division.

7. The Adopted Rule's reporting requirements dictates the Office to produce "case files" in connection with three separate categories. 1 Tex. Admin. Code § 56.3(a)(4), (5) & (6). The Preamble to the Adopted Rule states that "[r]eporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments to the OAG in various manners and in compliance with other statutes that only generally require disclosure of information to the OAG." 50 TexReg 2176. Our Office does not submit entire criminal case files to the OAG unless the Office has recused itself from a case and the OAG has agreed to prosecute the case. To my knowledge, I am not aware of any case file that was produced to the OAG without involving a recusal since I was elected and began serving as District Attorney in 2017.

8. The Adopted Rule places an extraordinary burden on the prosecutors of these counties to continuously weigh the dangers of being accused of violating the Adopted Rule or violating long-standing state and federal laws and regulations

3

**Exhibit**
**P-23**

that protect the privacy of crime victims, witnesses, law enforcement officials and accused defendants, as well as the integrity of criminal prosecutions. Many of these types of information are protected under existing federal and state laws and it is unclear, at best, the legal and ethical consequences of any such disclosure to the OAG.

9. An example of the burdensome nature of the Adopted Rule's reporting requirements dictates the Office to produce all "correspondence" in connection with five separate categories:

- "All correspondence requested by OAG's Oversight Committee for a matter listed in response to paragraph (7)." 1 Tex. Admin. Code § 56.3(a)(8) ("[t]he number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program or all charges were dropped.")

- "All correspondence and other documentation describing and analyzing a reporting entity's policy not to indict a category or sub-category of criminal offenses." *Id.* § 56.3(a)(9).

- "All correspondence with any employee of a federal agency regarding a decision whether to indict an individual." *Id.* § 56.3(a)(10).

- "All correspondence with any non-profit organization regarding a decision whether to indict an individual." *Id.* § 56.3(a)(11).

- All correspondence written at any time by an assistant district attorney . . . regarding the attorney's resignation under a formal or informal complaint process." *Id.* § 56.3(a)(12).

4

10. "Correspondence" is defined broadly to include "any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity." *Id.* § 56.2(2). Office policy requires that any "Correspondence and communications relating to a case shall be attached as a Document and/or included as a Note" in the Office's Case Management Software, Odyssey. These notes and documents are not searchable and would require going into each case file in Odyssey individually in order to read the notes or documents to determine if they would require disclosure under the Rule. Since January 2021, there over 13,000 Digital Case Files (control numbers) in Odyssey and there is no possibility of accurately completing any such review of notes and documents in Odyssey. With regard to "instant message, text message, or direct message," Office policy further provides that "Digital communications (such as texting) with defense attorneys, law enforcement, or others shall not be used for substantive communications concerning a case." If there were occasional incidents where the policy was not complied with by staff there is no way to search, gather or produce such information. Because none of this correspondence was previously tracked by the Office, currently there is no pre-existing way to identify this information to comply with the rule. Given the breath of this definition, we began our efforts with compliance by working with Williamson County's IT to identify emails of current and former employees. From January 1, 2021, until April 2, 2025, the period covered by the initial report, the Office had approximately 80 employees, including approximately 52 attorneys. The results obtained so far have not been productive.

5

Since we have not previously tracked or flagged the information sought in these two requests, compiling lists of nonprofit names, federal email addresses, and relevant terms will be impossible to complete in an accurate fashion.

13.    The Adopted Rule requires the Office to provide the "number of instances that an arrest was made for a violent crime, but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped." 1 Tex. Admin. Code § 56.3(a)(7). The Adopted Rule further defines "violent crime" to include "automobile theft." *Id.* § 56.2(7). "Automobile theft" is not a specifically labeled offense in Texas. Here again, this is not information my office tracks. Additionally, our case management software, Odyssey, apparently does not have the capability of searching our case files for arrest. Arrest/booking information is stored at the Williamson County Jail of which my Office has only limited access. Therefore, to make an effort to comply, we once again engaged Williamson County's IT Department which works with my Office but not FOR my Office (the County IT Department is under the direction of other independently elected officials), to develop search criteria for the information sought by this rule. The data we have received to date indicates over 5,000 arrests using the definition of "violent crime' in the Adopted Rule for the relevant time period. These cases will have to be individually reviewed to determine if the disposition fell into one of the categories sought ("no indictment, deferred prosecution, or all charges dropped"). The amount of time to perform this task is hard to estimate but no less than 500 hours. (assuming staff was available to review 100 cases a day for 50 days)

14.    Further, and most importantly, the time required to adequately collect the data, ascertain the information, and produce the information sought by Adopted Rule take my

6

employees away from the customary duties and core prosecutorial functions they are hired to perform. My constitutional duty is to see that justice is done; to do that we must have sufficient time to investigate, prepare and try cases on a regular basis. The Adopted Rule, unless declared invalid will cost the tax payers of Williamson County an exorbitant sum of money over the next several years. The Williamson County planning and budget office, as well as the County Manager, have estimated that the District Attorney's Office will need, at a minimum, five (5) full time employees ("FTEs") at a cost of $652,949 per year including salary, FICA, retirement, benefits and associated cost. The Williamson County Attorney's Office, which prosecutes misdemeanors in Williamson County, has already received a position for one attorney FTE at a cost of $122,968 (inclusive of all benefits) per year and will incur future expenses of $481,977 per year, which includes four (4) additional FTEs, in order to comply with the Adopted Rule. Additionally the Williamson County IT Department will require at a minimum one (1) FTE at a cost of $111,072 (inclusive of all benefits) per year because of the demands of compliance. There most likely will be cost for additional software yet to be determined. This cost will be ongoing year after year and will naturally escalate with inflation. To date my Office has budgeted $20,000 for an outside consultant to draft responses for the initial and quarterly responses due June 30 and July 1, 2025. In assisting the consultant in the process of searching, retrieving, reviewing and producing the initial and quarterly report my staff has already spent over 200 hours. I have devoted over eighty (80) hours personally on the project to date and expect to devote much more time in the coming weeks. This harm will be ongoing, as the future quarterly and annual compliance requirements will continue to undermine our resources.

7

15. The Adopted Rule mandates the creation of an Oversight Advisory Committee, whose members are selected by the Attorney General. This Committee has the unlimited ability to demand complete case files for whatever reason the Committee provides. The unlimited scope of information the Adopted Rule covers creates an unpredictable cost to Plaintiffs that can increase exponentially at any given time. This unpredictability creates a requirement for our office to have staff and resources available at any given time to evaluate the risk of noncompliance with the Adopted Rule while at the same time potentially failing to meet the requirements of numerous privacy rights, confidentiality laws, and other statutory and regulatory provisions prohibiting release of certain case information and communications as previously reference.

16. Under Section 56.8 of the Adopted Rule, the OAG has the extraordinary power to unilaterally decide if any prosecutor is in violation of the Adopted Rule and possesses the unilateral power of initiating a removal action, quo warranto proceeding, or other lawsuit to force me or another prosecutor to produce the requested information regardless of any other legal restriction that may counsel against disclosure.

17. My Office must prepare, under consequence of removal from office, for the possibility of having to turn over four years of data, correspondence, and certain case files, in twelve categories, by July 1, 2025. Many of the categories require electronic searches, the results of which implicate thousands of cases that must be reviewed in detail to establish whether they include required information and records. Moreover, the vague language of

8

some of these 12 categories makes it impossible to know if our assumptions about their meaning would even achieve compliant reporting.

18. The Adopted Rule offers no recourse and no avenue for administrative appeal of decision made by Defendants or the Oversight Advisory Committee. Injunctive relief is justified here because compliance with the Adopted Rule has created and will continue to impose a tremendous burden on the Office and has significantly and adversely affected the ongoing operations of the Office and if left intact will continue to seriously undermine our constitutional core duties as prosecutors and incur significant unrecoverable financial expenses.

_____
Shawn W. Dick
Williamson County District Attorney

## VERIFICATION BY UNSWORN DECLARATION

My name is Shawn W. Dick, and I am the District Attorney for the 26th Judicial District of Texas (Williamson County). I declare under penalty of perjury that the facts stated in the foregoing are true and correct.

Executed in Williamson County, State of Texas, on this 13th day of June, 2025.

9

**Exhibit**
**P-23**

# Appendix
# Tab D

# Texas Historical Statutes Project

1879
CODE OF CRIMINAL PROCEDURE
OF THE
STATE OF TEXAS

EXHIBIT
5



TEXAS STATE
LAW LIBRARY

This project was made possible by the
**Texas State Law Library**
and a grant from the
**Litigation Section of the State Bar of Texas**

# THE

# CODE OF CRIMINAL PROCEDURE

OF THE

# STATE OF TEXAS

PASSED BY THE

## SIXTEENTH LEGISLATURE,

FFBRUARY 21, 1879,

TOOK EFFECT JULY 24, 1879.



AUSTIN:
STATE PRINTING-OFFICE.
1887.

Section 2. BE IT FURTHER ENACTED, That the following articles shall hereafter constitute the CODE OF CRIMINAL PROCEDURE of the State of Texas, to wit:

# THE CODE

OF

# CRIMINAL PROCEDURE.

## TITLE I.

### Introductory.

## CHAPTER ONE.

### CONTAINING GENERAL PROVISIONS.

Article

Objects of this Code...................... 1
The same........................................ 2
Trial by due course of law secured.......... 3
Rights of accused persons.. ................ 4
Protection against searches and seizures..... 5
Prisoners entitled to bail, except in certain cases....................................... 6
Writ of habeas corpus shall never be suspended........................................ 7
Excessive bail, fines, etc., forbidden—open courts........................................ 8
No person shall be twice put in jeopardy for same offense................................ 9
Trial by jury shall remain inviolate.......... 10
Liberty of speech and of the press........... 11
Person shall not be disqualified as a witness for religious opinion, or want of religious belief........................................ 12
Outlawry and transportation prohibited.... 13

Article

Conviction shall not work corruption of blood, etc.................................... 14
No conviction for treason, except, etc........ 15
Privilege of senators and representatives.... 16
Privilege of voters........................... 17
Change of venue.............................. 18
Conservators of the peace, style of process, etc.......................................... 19
In what cases accused may be tried, etc., after conviction................................... 20
Same subject.................................. 21
No conviction of felony except by verdict of jury......................................... 22
Defendant may waive any right, except, etc. 23
Trials shall be public......................... 24
Defendant shall be confronted by witnesses, except....................................... 25
Construction of this Code. .................. 26
When rules of common law shall govern...... 27

ARTICLE 1. It is hereby declared that this Code is intended to embrace rules applicable to the prevention and prosecution of offenses against the laws of this state, and to make the rules of proceeding in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them. It seeks—

1. To adopt measures for preventing the commission of crime.
2. To exclude the offender from all hope of escape.
3. To insure a trial with as little delay as shall be consistent with the ends of justice.
4. To bring to the investigation of each offense, on the trial, all the evidence tending to produce conviction or acquittal.
5. To insure a fair and impartial trial; and,
6. The certain execution of the sentence of the law when declared.

Objects of this Code.
(Act Feb. 15, 1858.)
(Act Aug. 26, 1856.)
C.C.P. 1.

5

The same.
C.C.P. 2.
ART. 2. In order to collect together, for the convenience of officers and all others charged with the enforcement of the laws, the material provisions of the constitution of this state respecting the prosecution of offenses, the following provisions of said instrument are here inserted:

Trial by due course of law secured.
C.C.P. 3.
ART. 3. No citizen of this state shall be deprived of life, liberty, property or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land. (Bill of Rights, sec. 19.)

Rights of accused persons.
C.C.P. 4.
ART. 4. In all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary; in cases of impeachment and in cases arising in the army and navy, or in the militia, when in actual service in time of war or public danger. (Bill of Rights, sec. 10.)

Protection against searches and seizures.
C.C.P. 5.
ART. 5. The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation. (Bill of Rights, sec. 9.)

Prisoners entitled to bail, except in certain cases.
C.C.P. 6.
ART. 6. All prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law. (Bill of Rights, sec. 11.)

Writ of *habeas corpus* shall never be suspended.
C.C.P. 7.
ART. 7. The writ of *habeas corpus* is a writ of right, and shall never be suspended. (Bill of Rights, sec. 12.)

Excessive bail, fines, etc., forbid.
Open courts.
C.C.P. 8.
ART. 8. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law. (Bill of Rights, sec. 13.)

No person shall be twice put in jeopardy for same offense, etc.
C.C.P. 9.
ART. 9. No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction. (Bill of Rights, sec. 14.)

Trial by jury shall remain inviolate.
C.C.P. 9.
ART. 10. The right of trial by jury shall remain inviolate. (Bill of Rights, sec. 15.)

Liberty of speech and of the press.
C.C.P. 10.
ART. 11. Every person shall be at liberty to speak, write or publish his opinion on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases. (Bill of Rights, sec. 8.)

Person shall not be disqualified as a witness for religious opinion, or want of religious belief.
ART. 12. No person shall be disqualified to give evidence in any of the courts of this state on account of his religious opinions, or for the want of any religious belief; but all oaths or affirmations shall be administered in the mode most binding upon the conscience, and shall be taken subject to the pains and penalties of perjury. (Bill of Rights, sec. 5.)

ART. 13. No citizen shall be outlawed; nor shall any person be transported out of the state for any offense committed within the same. (Bill of Rights, sec. 20.)

<div style="float:right">Outlawry and transportation prohibited.</div>

ART. 14. No conviction shall work corruption of blood or forfeiture of estate. (Bill of Rights, sec. 21.)

<div style="float:right">Conviction shall not work corruption of blood, etc.</div>

ART. 15. No person shall be convicted of treason, except on the testimony of two witnesses to the same overt act, or on confession in open court. (Bill of Rights, sec. 22.)

<div style="float:right">No conviction for treason, except, etc.</div>

ART. 16. Senators and representatives shall, except in cases of treason, felony or breach of the peace, be privileged from arrest during the session of the legislature, and in going to and returning from the same, allowing one day for every twenty miles such member may reside from the place at which the legislature is convened. (State Constitution, art. 3, sec. 14.)

<div style="float:right">Privileges of senators and representatives. C.C.P. 12.</div>

ART. 17. Voters shall, in all cases except treason, felony or breach of the peace, be privileged from arrest during their attendance at elections, and in going to and returning therefrom. (State Constitution, art. 6, sec. 5.)

<div style="float:right">Privilege of voters. C.C.P. 11.</div>

ART. 18. The power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law. (State Constitution, art. 3, sec. 45.)

<div style="float:right">Change of venue.</div>

ART. 19. All judges of the supreme court, court of appeals and district courts shall, by virtue of their offices, be conservators of the peace throughout the state. The style of all writs and process shall be "The State of Texas." All prosecutions shall be carried on in the name and by the authority of "The State of Texas," and conclude, "against the peace and dignity of the state." (State Constitution, art. 5, sec. 12.)

<div style="float:right">Conservators of the peace</div>

<div style="float:right">Style of process, etc.</div>

ART. 20. By the provisions of the constitution, no person shall be exempt from a second trial for the same offense, who has been convicted upon an illegal indictment or information, and the judgment thereupon arrested; nor where a new trial has been granted to the defendant, nor where a jury has been discharged without rendering a verdict, nor for any cause other than that of a legal conviction.

<div style="float:right">In what cases accused may be tried, etc., after conviction. C.C.P. 19.</div>

ART. 21. By the provisions of the constitution, an acquittal of the defendant exempts him from a second trial or a second prosecution for the same offense, however irregular the proceedings may have been; but if the defendant shall have been acquitted upon trial in a court having no jurisdiction of the offense, he may, nevertheless, be prosecuted again in a court having jurisdiction.

<div style="float:right">Same subject. C.C.P. 20.</div>

ART. 22. No person can be convicted of a felony except upon the verdict of a jury duly rendered and recorded.

<div style="float:right">No conviction of felony except by verdict of jury. C.C.P. 22.</div>

ART. 23. The defendant to a criminal prosecution for any offense may waive any right secured to him by law, except the right of trial by jury in a felony case.

<div style="float:right">Defendant may waive any right, except, etc. C.C.P. 26.</div>

ART. 24. The proceedings and trials in all courts shall be public.

<div style="float:right">Trials shall be public. C.C.P. 23.</div>

ART. 25. The defendant upon a trial shall be confronted with the witnesses, except in certain cases provided for in this Code, where depositions have been taken.

<div style="float:right">Defendant shall be confronted by witnesses, except. C.C.P. 24.</div>

ART. 26. The provisions of this Code shall be liberally construed, so as to attain the objects intended by the legislature, the prevention, suppression and punishment of crime.

<div style="float:right">Construction of this Code. C.C.P. 25.</div>

ART. 27. Whenever it is found that this Code fails to provide a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern.

<div style="float:right">When rules of common law shall govern. (Act Feb. 15, 1858.) C.C.P. 27.</div>

# CHAPTER TWO.

## THE GENERAL DUTIES OF OFFICERS CHARGED WITH THE ENFORCEMENT OF THE CRIMINAL LAWS.

Article

### 1. The Attorney-General.
Attorney-general shall represent the state... 28
Shall report to governor annually.......... 29
May require certain officers to report to him. 30

### 2. District and County Attorneys.
Duties of district attorneys.................. 31
Same subject. ............................... 32
Duties of county attorneys........ ... ...... 33
Duty to present officer for neglect of duty, etc......................................... 34
Shall hear complaints, and what the same shall contain. .. .......... ........... ...... 35
Special duty to file complaints for violations of "local option law".................35—Note
Duty when complaint has been made......... 36
May administer oaths...................... 37
Shall not dismiss case, unless, etc .......... 38
Attorney pro tem. may be appointed......... 39
Shall report to attorney-general when required............... ..... ................ 40
Shall not be of counsel adverse to the state.. 41

### 3. Magistrates.
Who are magistrates.... ............... ...... 42
Duty of magistrates....................... 43

Article

### 4. Peace Officers.
Who are peace officers...................... 44
Certain military officers and privates are peace officers..................... .......44—Note
Duties and powers of peace officers......... 45
May summon aid when resisted............. 46
Person refusing to obey liable to prosecution 47
Officer neglecting to execute process may be fined for contempt................... ......... 48

### 5. Sheriffs.
Shall be a conservator of the peace, and arrest offenders, etc...................... ... 49
Keeper of jail................................ 50
Shall place in jail every person committed by lawful authority........................... 51
Sheriff shall notify district or county attorney of prisoners, etc......................... 52
May appoint a jailer, who shall be responsible 53
May rent room and employ guard, when..... 54
Deputy may perform duties of sheriff........ 55

### 6. Clerks of the District and County Courts.
Shall file all papers, issue process, etc........ 56
Power of deputy clerks.... ............... 57
Shall report to attorney-general when required..... . ..................... .......... 58

### I. THE ATTORNEY-GENERAL.

Attorney-general shall represent the state, etc.
C.C.P. 28.

ARTICLE 28. It is the duty of the attorney-general to represent the state in all criminal cases in the court of appeals, except in cases where he may have been employed adversely to the state, previously to his election; and he shall not appear as counsel against the state in any court.

Shall report to governor annually.
P.D. 201.

ART. 29. He shall report to the governor on the first Monday of December, annually, and at such other times as the governor may require, the number of indictments which have been found by grand juries in this state for the preceding year; the number of informations filed in this state for the preceding year; the offenses charged in such indictments or information; the number of arraignments, convictions and acquittals for each offense; the number of indictments and informations which have been disposed of without the intervention of a petit jury, with the cause and manner of such disposition; and also a summary of the judgments rendered on conviction, specifying the offense, the nature and amount of penalties imposed, and the amount of fines collected.

May require certain officers to report to him.
P.D. 202.
C.C.P. 944.

ART. 30. He may require the several district and county attorneys, clerks of the district and county courts in the state, to communicate to him at such times as he may designate, and in such form as he may prescribe, all the information necessary for his compliance with the requirements of the preceding article.

### II. DISTRICT AND COUNTY ATTORNEYS.

Duties of district attorneys.
C.C.P. 30.

ART. 31. It is the duty of each district attorney to represent the state in all criminal cases in the district courts of his district, except in cases where he has been, before his election, employed adversely, and he shall not appeal as counsel against the state, in any court, and he shall not, after the expiration of his term of office, appear as counsel against the state in any case in which he may have appeared as counsel for the state.

Same subject.
C.C.P. 31.

ART. 32. When any criminal proceeding is had before an examining court in his district, or before a judge upon *habeas corpus,* and he is notified of the same, and is at the time within the county where such proceeding is had, he shall represent the state therein, unless prevented by other official duties.

ART. 33. It shall be the duty of the county attorney to attend the terms of the county and inferior courts of his county, and to represent the state in all criminal cases under examination or prosecution in said courts. He shall attend all criminal prosecutions before justices of the peace in his county, when notified of the pendency of such prosecutions, and when not prevented by other official duties. He shall conduct all prosecutions for crimes and offenses cognizable in such county and inferior courts of his county, and shall prosecute and defend all other actions in such courts in which the state or the county is interested. He shall also attend the terms of the district court in his county, and if there be a district attorney of the district including such county, and such district attorney be in attendance upon such court, the county attorney shall aid him when so requested, and when there is no such district attorney, or when he is absent, the county attorney shall represent the state in such court and perform the duties required by law of district attorneys.

<span style="float:right">Duties of coun-<br>ty attorneys.<br>(Act Aug. 21,<br>1876. p. 283.)<br>(Act Aug. 7,<br>1876, p. 85.)<br>(Const., art. 5,<br>§21.)</span>

ART. 34. It shall be the duty of the district or county attorney to present to the court having jurisdiction, any officer, by information, for the neglect or failure of any duty enjoined upon such officer, when such neglect or failure can be presented by information, whenever it shall come to the knowledge of said attorney that there has been a neglect or failure of duty upon the part of said officer; and it shall be his duty to bring to the notice of the grand jury all acts of violation of law, or neglect or failure of duty upon the part of any officer, when such violation, neglect or failure are not presented by information, and whenever the same may come to his knowledge.

<span style="float:right">Duty to present<br>officer for neg-<br>lect of duty,<br>etc.<br>(Act Aug. 7,<br>1876, p. 85.)</span>

ART. 35. Upon complaint being made before a district or county attorney that an offense has been committed in his district or county, he shall reduce the complaint to writing, and cause the same to be signed and sworn to by the complainant, and it shall be duly attested by said attorney. Said complaint shall state the name of the accused, if his name is known, and if his name is not known it shall describe him as fully as possible, and the offense with which he is charged shall be stated in plain and intelligible words, and it must appear that the offense was committed in the county where the complaint is filed, and within a time not barred by limitation.

<span style="float:right">Shall hear com-<br>plaints, and<br>what the same<br>shall contain.<br>(Act Aug. 7,<br>1876, p. 87, §13.)</span>

NOTE.—Chapter 42, acts 1879, makes it the special duty of the county attorney to file or have filed complaints against all keepers of houses where liquor is sold for violations of the " local option " law.—L.

<span style="float:right">Special duty to<br>file complain.s<br>for violations<br>of "local op-<br>tion" law.</span>

ART. 36. If the offense be a misdemeanor, the attorney shall forthwith prepare an information, and file the same, together with the complaint, in the court having jurisdiction of the offense. If the offense charged be a felony, he shall forthwith file the complaint with a magistrate of the county, and cause the necessary process to be issued for the arrest of the accused.

<span style="float:right">Duty when<br>complaint has<br>been made.<br>(Act Aug. 7,<br>1876, p. 87, §15.)</span>

ART. 37. For the purposes mentioned in the two preceding articles, district and county attorneys are authorized to administer oaths.

<span style="float:right">May adminis-<br>ter oaths.<br>(Act Aug. 7,<br>1876, p. 87, §14.)</span>

ART. 38. The district or county attorney shall not dismiss a case unless he shall file a written statement with the papers in the case, setting out his reasons for such dismissal, which reasons shall be incorporated in the judgment of dismissal, and no case shall be dismissed without the permission of the presiding judge, who shall be satisfied that the reasons so stated are good and sufficient to authorize such dismissal.

<span style="float:right">Shall not dis-<br>miss case, un-<br>less, etc.<br>(Act Aug. 7,<br>1876, p. 88, §20.)</span>

ART. 39. Whenever any district or county attorney shall fail to attend any term of the district, county or justice's court, the judge of said court, or such justice, may appoint some competent attorney to perform the duties of such district or county attorney, who shall be allowed the same compensation for his services as are allowed the district or county attor-

<span style="float:right">Attorney pro<br>tem. may be<br>appointed.<br>(Act Aug. 7,<br>1876, p. 87, §12.)</span>

ney. Said appointment shall not extend beyond the term of the court at which it is made, and shall be vacated upon the appearance of the district or county attorney.

**Shall report to attorney-general when required.**  ART. 40. District and county attorneys shall, when required by the attorney-general, report to him at such times, and in accordance with such forms as he may direct, such information as he may desire in relation to criminal matters and the interests of the state, in their districts and counties.

**Shall not be of counsel adverse to the state.**
**C.C.P. 30.**  ART. 41. District and county attorneys shall not be of counsel adversely to the state in any case, in any court, nor shall they, after they cease to be such officers, be of counsel adversely to the state in any case in which they have been of counsel for the state.

### III. MAGISTRATES.

**Who are magistrates.**
**C.C.P. 52.**  ART. 42. Either of the following officers is a " magistrate " within the meaning of this Code: the judges of the supreme court, the judges of the court of appeals, the judges of the district court, the county judge of the county, either of the county commissioners, the justices of the peace, the mayor or recorder of an incorporated city or town.

**Duty of magistrates.**
**C.C.P. 32.**  ART. 43. It is the duty of every magistrate to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders, by the use of lawful means, in order that they may be brought to punishment.

### IV. PEACE OFFICERS.

**Who are peace officers**
**C.C.P. 53.**  ART. 44. The following are " peace officers ": the sheriff and his deputies, constable, the marshal, constable or policeman of an incorporated town or city, and any private person specially appointed to execute criminal process.

**Certain military officers and privates are peace officers.**  NOTE.—Section 6, chapter 123, acts 1879, clothes the officers, non-commissioned officers and privates of a military company, organized under the act, with the powers of peace officers, and requires them to aid the civil authorities in the execution of the law. They have authority to make arrests, but are to be governed in such cases by the law regulating sheriffs in the discharge of similar duty, and are to take an oath to discharge such duty faithfully and in accordance with law.—L.

**Duties and powers of peace officers.**
**C.C.P.34**  ART. 45. It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose he shall use all lawful means. He shall, in every case where he is authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime. He shall execute all lawful process issued to him by any magistrate or court. He shall give notice to some magistrate of all offenses committed within his jurisdiction, where he has good reason to believe there has been a violation of the penal law. He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be brought to punishment.

**May summon aid when resisted.**
**C.C.P. 44.**  ART. 46. Whenever a peace officer meets with resistance in discharging any duty imposed upon him by law, he shall summon a sufficient number of citizens of his county to overcome the resistance, and all persons summoned are bound to obey, and if they refuse are guilty of the offense prescribed in article 229 of the Penal Code.

**Person refusing to obey, liable to prosecution.**
**C.C.P. 45.**  ART. 47. The peace officer who has summoned any person to assist him in performing any duty, shall report such person if he refuse to obey, to the district or county attorney of the proper district or county, in order that he may be prosecuted for the offense.

**Officer neglecting to execute process may be fined for contempt.**
**(Act Feb. 11, 1860.)**  ART. 48. If any sheriff or other officer shall willfully refuse or fail from neglect, to execute any summons, subpœna or attachment for a witness, or any other legal process, which it is made his duty by law to execute, he shall be liable to a fine for contempt not less than ten nor more than two hundred dollars, at the discretion of the court having cognizance

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Mandy Gonzales on behalf of Michael Hurta
Bar No. 24097860
gonzales@wrightclosebarger.com
Envelope ID: 102562472
Filing Code Description: Motion for Emergency Relief
Filing Description: Appellees Emergency Motion for Temporary Relief
Status as of 6/30/2025 7:18 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Laura G. Ferguson | | lferguson@milchev.com | 6/29/2025 10:16:39 PM | SENT |
| Michael J. Statin | | mstatin@milchev.com | 6/29/2025 10:16:39 PM | SENT |
| Alexandria Oberman | | aoberman@milchev.com | 6/29/2025 10:16:39 PM | SENT |
| Randy T. Leavitt | | randy@randyleavitt.com | 6/29/2025 10:16:39 PM | SENT |
| C. RobertHeath | | bheath@bickerstaff.com | 6/29/2025 10:16:39 PM | SENT |
| Bernardo Rafael Cruz | | b.cruz@epcountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Christina Sanchez | | Ch.sanchez@epcountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Justin C. Pfeiffer | | jpfeiffer@gavrilovlaw.com | 6/29/2025 10:16:39 PM | SENT |
| Bradley W.Snead | | snead@wrightclosebarger.com | 6/29/2025 10:16:39 PM | SENT |
| Michael Adams-Hurta | | hurta@wrightclosebarger.com | 6/29/2025 10:16:39 PM | SENT |
| Christopher Garza | | Christopher.Garza@harriscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Tiffany S. Bingham | | Tiffany.Bingham@harriscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Jonathan G.C. Fombonne | | Jonathan.Fombonne@harriscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Cynthia W. Veidt | | Cyntia.Vedt@traviscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Todd A. Clark | | Todd.Clark@traviscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| Leslie W. Dippel | | Leslie.Dippel@traviscountytx.gov | 6/29/2025 10:16:39 PM | SENT |
| William H. Farrell | | bill.farrell@oag.texas.gov | 6/29/2025 10:16:39 PM | SENT |